# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Chamber of Commerce, *a Minnesota nonprofit corporation*, | ) ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) |
| vs. | ) ) |
| | ) |
| John Choi, *in his official capacity as* County Attorney for Ramsey County, Minnesota; George Soule, *in his official capacity as* Chair of the Minnesota Campaign Finance and Public Disclosure Board; David Asp, *in his official capacity as* Vice Chair of the Minnesota Campaign Finance and Public Disclosure Board; Carol Flynn, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Margaret Leppik, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Stephen Swanson, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; and Faris Rashid, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |

Case No.: 23-CV-2015 (ECT/JFD)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

In *Citizens United*, the Supreme Court clearly held, "political speech does not lose First Amendment protection simply because its source is a corporation." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010). The Supreme Court has made it clear

1

that privately-held and publicly-owned corporations, limited liability companies, and non-profit corporations have the First Amendment right to free speech—which includes independent expenditures, *id.*, and contributions and expenditures in connection with ballot questions, *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 785-88 (1978).

The Minnesota Chamber of Commerce ("Chamber") challenges the constitutionality of the "foreign influenced corporation" provisions of Minnesota's new "Democracy for the People Act," which amended Minnesota Statute §211B.15 ("statute"), because it unconstitutionally infringes these well-established First Amendment rights.

The statute is based on the dubious *assumption* that for-profit corporations, limited liability companies, and non-profit corporations are *per se* "foreign influenced" by virtue of *de minimis* foreign ownership percentages—without regard to state of incorporation, location of headquarters, citizenship of controlling officers and directors, or any evidence of actual control or influence by those foreign investors. The statute strips an entity of its First Amendment right to make independent expenditures or contributions to influence the outcome of ballot questions or elections if, *inter alia*, (a) it has a single foreign investor with "direct or indirect beneficial ownership of *one percent* or more of the total equity"; (b) it has two or more foreign investors with "direct or indirect beneficial ownership of *five percent* or more of the total equity"; or (c) it is a nonprofit that uses membership dues obtained from a corporation or LLC that may fall within the definitions of (a) or (b).

The terms of this law are plainly unconstitutional. And the legislative history shows the clear intent of these restrictions is to strip corporations and LLCs of their First Amendment rights to engage in state and federal elections.

2

The statute will become effective on January 1, 2024. Penalties for violations of the statute include, *inter alia*, fines, imprisonment, and involuntary dissolution. The statute is already chilling free speech; the Chamber and its members, fearful these severe penalties will be imposed on their officers and organizations, are reasonably engaging in self-censorship of what should be their unabridged, free speech.

The Chamber respectfully requests the Court grant a preliminary injunction to enjoin Defendants, and all in concert with them, from enforcing the statute. The Chamber readily satisfies all four of the requisite *Dataphase* factors to justify this relief. *First*, the threatened deprivation of the First Amendment right to free speech posed by the statute constitutes irreparable harm *per se* to the Chamber and its members. *Second*, the Chamber is likely to succeed on the merits in showing the statute is unconstitutional based on the clearly established Supreme Court jurisprudence reflected in *Citizens United* and *Bellotti*, and preempted by federal election laws. *Third*, Defendants cannot establish any harm that would arise if injunctive relief were granted to suspend the statute's arbitrarily-drawn, categorical infringement of the free speech rights of entities whose decision-making is not in any way subject to *actual* influence or control by "foreign investors." And *fourth*, by definition, the public interest will be best served by protecting fundamental First Amendment rights to free speech against unwarranted government intrusion.

## FACTS

### I.    THE PARTIES

#### A.    The Chamber Represents Over 6,300 Businesses in Minnesota.

The Minnesota Chamber of Commerce is the largest organization representing over 6,300 businesses in Minnesota. (Declaration of Doug Loon ("Loon Decl.") ¶2.) The Chamber leads the statewide business community to advance pro-business, responsible public policy that creates jobs and grows the economy. (*Id.* ¶3.)

The Chamber represents its members' interests through lobbying efforts, support of pro-business candidates, and advocacy of issues that impact its members. (*Id.*) These efforts include financial contributions to political action committees. (*Id.*)

#### B.    Hundreds of Chamber Members Are Threatened by the Statute.

The Chamber's members include privately-held and publicly-traded companies in every industry and everywhere throughout the State. (*Id.* ¶2.) At least 100 of the Chamber's members are corporations and LLCs that the Minnesota Legislature has now inaccurately defined as "foreign influenced corporations." (*Id.* ¶11.)

#### C.    County Attorney Choi Is Tasked with Enforcing the Statute.

Defendant Choi is the County Attorney for Ramsey County, which makes him one of the officials responsible for enforcement of the statute, in Ramsey County, where the Chamber and many members reside. *See* Minn. Stat. §211B.15, subd. 3.

#### D.    The Campaign Finance and Public Disclosure Board Is Tasked with Enforcing the Statute and Promulgating Rules Based on the Statute.

The Campaign Finance and Public Disclosure Board is a state agency empowered to audit, investigate, and enforce the provisions of Chapter 10A and the statute, throughout

4

the State, including by imposing civil penalties on persons and entities who violate Chapter 211B (collectively, "CFPD Defendants"). *See* Minn. Stat. §211B.15, subds. 6, 7.

## II.   THE "FOREIGN INFLUENCED CORPORATION" PROVISIONS

### A.   The Statute Restricts Domestic Corporations, Limited Liability Companies, and Non-profit Corporations from Making Independent Expenditures and Contributions.

The statute will be effective January 1, 2024; and applies to *state and federal* candidacies and elections. *See* Minn. Stat. §211B.01, subd. 3.

The statute prohibits domestic for-profit corporations, non-profit corporations,[1] and limited liability companies from engaging in constitutionally-protected free speech to: (1) make expenditures related to candidacies; (2) make contributions or expenditures related to ballot questions; and (3) make contributions to a political committees or political funds. *See* Minn. Stat. §211B.15, subds. 3(d) & 4a (2023). Notably, the Minnesota Legislature rejected a proposal to similarly restrict labor unions, and those organizations have retained their first amendment rights. *See infra* Facts, Part III.

The statute categorically prohibits *all* "foreign influenced corporations," which are defined as any for-profit corporation, limited liability company, or non-profit corporation "for which any of the following conditions is met":

> (1)   a single **foreign investor** holds, owns, controls, or otherwise has direct or indirect beneficial ownership of *one percent* or more of the total equity, outstanding voting shares, membership units, or other applicable ownership interests of the corporation;

---

[1] Minnesota Statute section 211B.15, subdivision 1(c) (2023) defines a "corporation" to include, *inter alia*, a "nonprofit corporation that carries out activities in this state," which includes the Chamber and many of its members.

(2)     two or more **foreign investors** in aggregate hold, own, control, or otherwise have direct or indirect beneficial ownership of *five percent* or more of the total equity, outstanding voting shares, membership units, or other applicable ownership interests of the corporation; or

(3)     a **foreign investor** participates directly or indirectly in the corporation's decision-making process with respect to the corporation's political activities in the United States.

Minn. Stat. §211B.15, subds. 1(d), 4a (emphasis added).

A "foreign investor" is defined as any person or entity that holds shares and is a foreign country, a foreign political party, an entity organized under the laws of or having a principal place of business in a foreign country, a citizen of a foreign country who is not a United States citizen, or a corporation that is 50% or more owned by a foreign investor. *See* Minn. Stat. §211B.15, subd. 1(e).

Rather than imposing restrictions on the activities of "foreign investors" themselves, the statute strips companies of their First Amendment rights based solely on speculation that they might theoretically be "influenced" by "foreign investors."

### B.     The Statute Imposes Irreparable Harm on Domestic Businesses by Prohibiting and Chilling Political Speech.

The statute also imposes a certification requirement on each corporation and LLC:

that it was *not a foreign-influenced corporation as of the date the contribution or expenditure was made*. The certification must be *submitted within seven business days* after the contribution or expenditure is made and must be *signed by the corporation's chief executive officer after reasonable inquiry, under penalty of perjury*.

Minn Stat. §211B.15, subd. 4b (emphasis added). Each entity must conduct this analysis to make the required certification *every time* it spends money for political purposes.

6

The ownership of many Minnesota corporations and LLCs constantly fluctuates, and it can be very difficult (if not impossible) to assess with sufficient precision the makeup of ownership at any given time. Many companies do not know the nationality or immigration status of their shareholders, and the ownership of shares in public corporations changes hands every day. (*See* Declaration of Archie Black ("Black Decl.") ¶¶9-10). In fact, purchasers of stock are not required under federal law to disclose their nationality unless they acquire a 5% or more ownership in a company. *See* 17 CFR §240.13d-101.

Corporations and LLCs may be fined up to $40,000 and/or be dissolved for violation of the statute; and individuals who act on behalf of such corporations and LLCs (i.e., officers) may be fined not more than $20,000 or be imprisoned for not more than five years, or both, for violation of the statute. Minn. Stat. §211B.15, subds. 6, 7 (2023).

Law-abiding, risk-averse corporations and LLCs will understandably self-censor and avoid making such expenditures and contributions. (*See, e.g.*, Black Decl. ¶26.)

Thus, the practical (but intended) effect of this certification requirement and the accompanying punitive provisions for violations of the statute, is to impose undue obstacles and threats of punishment to chill and prohibit free speech by businesses *en masse*.

## III.    THE STATUTE'S ONE-SIDED LEGISLATIVE HISTORY

The legislative history of the statute demonstrates that, under the guise of preventing foreign influence in elections, the actual legislative intent behind the statute is to undermine the *Citizens United* decision and eliminate or reduce spending in elections by businesses.

### A.     The Statute Was Conceived by Interests Who Aim to Overturn the Supreme Court's Precedent, Including *Citizens United*.

The statute began in the Minnesota House of Representatives as H.F. 3, authored by legislators that included, principally, Representative Emma Greenman (D-63B) and Representative Zack Stephenson (D-35A).[2] Representatives Greenman and Stephenson confirmed the bill originated from a similar ordinance in Seattle, Washington, and the text for the bill mirrored language proposed by the Center for American Progress,[3] which is a group that expressly seeks to nullify the Supreme Court's decision in *Citizens United*.[4] During the Senate Elections Committee meeting discussing H.F. 3's companion, S.F. 3, author Senator Liz Boldon (D-25) confirmed the statute's ownership thresholds came from the Center for American Progress's 2019 "report."[5]

During an introductory committee meeting, Representative Stephenson stated the intense dislike for *Citizens United* that motivated his authorship of the bill:

> In 2010, the United States Supreme Court opened the floodgates on campaign spending in its *Citizens United* decision. The Court overturned decades of settled law, decimated our country's pretty much already weak campaign finance regime, and allowed practically unlimited spending. A

---

[2] The bill's legislative history is available through the Minnesota House of Representatives' website, at: http://www.house.leg.state.mn.us/bills/Info/HF0003.

[3] *See* Minn. H., Floor Debate, 93rd Minn. Leg., Reg. Sess. (April 13, 2023), *available at* https://www.lrl.mn.gov/media/file?mtgid=1048024. Recordings are also available on YouTube: https://www.youtube.com/channel/UCfR6kiQaeJLkxUyPaeouZTw.

[4] *See, e.g.*, *RELEASE: On the 10th Anniversary of* Citizens United…, Ctr. Am. Progress (Jan. 16, 2020), https://www.americanprogress.org/press/release-10th-anniversary-citizens-united-momentum-builds-toward-bold-pro-democracy-reforms/.

[5] *See* Minn. Sen., Elections Comm., 93rd Minn. Leg., Reg. Sess. (February 7, 2023), *available at* https://www.lrl.mn.gov/media/file?mtgid=1047232.

decade later, the results are in; they are not so good. Campaigns are absurdly expensive, and most of the spending is done by shadowy special interest groups as opposed to the candidates themselves or even political parties.[6]

Senator Boldon, when introducing the companion bill S.F. 3 to the Senate Judiciary and Public Safety Committee, similarly stated:

> Since *Citizens United* a decade ago, there's been an explosion of spending by outside groups, by independent expenditures that are not accountable to the voters or the candidates.[7]

On the Senate Floor, Senator Boldon further explained: "the stated goal of this bill is to **get political spending out of elections**, out of influencing votes of Minnesotans."[8]

In response, Senator Eric R. Pratt (R-54) expressed concern for how the proposed legislation would affect Minnesota companies such as HMN Financial, which has 4.5 million outstanding publicly traded shares, and for whom 45,000 shares comprises 1%, thus making it possible that a single "foreign investor" could feasibly acquire a 1% position on the open market and thereby convert the company into "foreign influenced" status.[9]

Representative Harry Niska (R-31A) also cited to federal law, which already prohibits foreign nationals (defined as either foreign citizens or foreign principals (i.e.,

---

[6] Minn. H. Elections, Finance, and Policy Comm., 93rd Minn. Leg., Reg. Sess. (January 18, 2023), *available at* https://www.lrl.mn.gov/media/file?mtgid=104812 (this hearing was on HF 117, which was eventually included in HF 3).

[7] Minn. Sen. Judiciary and Public Safety Comm., 93rd Minn. Leg., Reg. Sess. (March 10, 2023), *available at* https://www.lrl.mn.gov/media/file?mtgid=1047668.

[8] Minn. Sen. Floor Debate, 93rd Minn. Leg., Reg. Sess. (April 26, 2023), *available at* https://www.lrl.mn.gov/media/file?mtgid=1048121 (emphasis added).

[9] *Id.*

businesses, *see infra*)) from, *directly or indirectly*, making contributions or independent expenditures in connection with any election. *See* 52 U.S.C. §30121(a)(1); 11 C.F.R. §110.20(i). Representative Niska thus asked why the authors were trying to pass a law that conflicts with the federal standard. Representative Greenman responded that the bill supposedly "closes a loophole that *Citizens United* opened with the federal standard."[10] However, the reference to a so-called "loophole" was never actually explained or defined. Rather, it is apparent that the "loophole" these legislators allege they sought to close was instead an excuse to categorically bar corporate spending in elections.

### B. The Legislature's Actual Intent in Setting *De Minimis* Thresholds of One Percent and Five Percent Is to Eliminate Business Spending in Elections.

The House and Senate deliberations regarding thresholds "of direct or indirect beneficial ownership" that would be sufficient to establish an entity is a "foreign influenced corporation" shows that there was significant concern about the proposed low thresholds.

In the House Elections Finance and Policy Committee, Representative Stephenson cited to a "study" which he stated showed that once an owner crosses the 5% threshold, the owner can "have real influence in the operations of the company. And so that's where the number comes from."[11] However, the "study" referenced by Representative Stephenson is derived from a citation in the 2019 Center for American Progress "report" to an article

---

[10] *Supra* note 3.

[11] *Supra* note 6.

10

allegedly written by the "Business Roundtable."[12] But the author-less article merely laments the threshold for shareholders to submit *shareholder proposals* for vote by shareholders at annual meetings is too low, and that this can enable annoying gadflies. The article says nothing about the ability for small-stake shareholders to *actually* influence or control a corporation's decision-making of any sort on any subject.

Opposing legislators, such as Representative Niska, repeatedly voiced concerns about the *de minimis* thresholds:

> I could understand if we were defining foreign influence corporations to mean something that's controlled by some foreign investor or a group of foreign investors. But it seems like the definition sweeps much, much broader than that to cover virtually every publicly traded American corporation.[13]

> [C]onstituents come into my office regularly with suggestions about things to do. They certainly don't control me. The lobbyists who come into each of our offices don't, don't, don't control us. So I'm struggling to understand that the, the imputation of some sort of meaningful control to someone who just owns 1%....[14]

> I think frankly, this law is going to test that and probably lose on those grounds if it, if it is passed and, and challenged.[15]

---

[12] *See Fact Sheet: Ending Foreign-Influenced Corporate Spending in U.S. Elections, Ctr. Am. Progress* (Nov. 21, 2019, https://www.americanprogress.org/article/ending-foreign-influenced-corporate-spending-u-s-elections-2/ (citing in note 9, "N. Peter Rasmussen, 'Responsible Shareholder Engagement & Long-Term Value Creation,' Bloomberg Law, November 2, 2016, previously available at https://www.businessroundtable.org/archive/resources/responsible-shareholder-engagement-long-term-value-creation").

[13] Minn. H. Judiciary Finance and Civil Law Comm., 93rd Minn. Leg., Reg. Sess. (March 2, 2023), *available at* https://www.lrl.mn.gov/media/file?mtgid=1047524.

[14] *Id.*

[15] *Id.*

When the bill was introduced on the Senate floor, Senator Andrew Mathews (R-27) also shared his concerns that the thresholds are much too low:

> 1% is an extremely low margin where there are numerous physical examples of where 1% is not at all controlling interest in a company's direction. And yet we are going to have the 1% control, the 99% when it is completely out of the business owner's hands as to who buys the stock. He does not control or direct who clicks buy on his computer screen in a trading account. He does not control who picks up a phone and calls a broker, but he will be responsible for the actions of others at a very, very low and drastic margin. And the provisions here is not workable.[16]

It is apparent that the extremely low thresholds of ownership are not the equivalent of actual "influence" but are instead calibrated to affect as many publicly traded corporations as possible. Indeed, as the Center for American Progress forecasted based on its proposed one and five percent thresholds, "[o]f 111 corporations studied among the S&P 500 stock index, 74 percent exceeded the 1 percent threshold for a single foreign owner and 98 percent exceeded the 5 percent aggregate foreign ownership threshold."[17] Senator Mathews thus proposed an amendment to change the ownership threshold to 50% for single and aggregate foreign investors, which was defeated.[18]

At the House Floor session, Representative Niska put it succinctly: "[This bill is] pretty clearly designed to shut out all corporations, especially all publicly traded

---

[16] *Supra* note 8.

[17] *Fact Sheet*, *supra* note 12.

[18] *Id.*

corporations from participating in our election process."[19] And as another put it: "Every business that has decided to be for-profit [and] publicly traded…**is muzzled**."[20]

### C.   The Legislature's Disregard for the Impracticality of the Statute's Certification Requirement Shows the Legislature's Intent to Effectively Chill All Corporate Political Speech.

During the legislative process, serious concerns were also raised that the requirement that a corporation or LLC certify whether it is "foreign influenced" *when it chooses to make an independent expenditure* is unworkable. For example, at the House Judiciary, Finance, and Civil Law Committee, Representative Niska explained:

> a publicly traded corporation can never say for certain on any date, what 1%, who might own 1% of its shares. The SEC only requires proxy statements or disclosures to be filed when someone owns 5% of, buys 5% of the equity of a company. The certificate of compliance provision [in the statute] **makes it impossible for any publicly traded company to ever file the certificate of compliance under the statute**. And, and so it, it seems to me that this is and, and based on your comments, that **this is intended to prohibit any publicly traded company from exercising the, the First Amendment rights that** *Citizens United* **provides for them the way its drafted**.[21]

The bill author Representative Greenman responded the Legislature would just "need to change the law and *see to find out*" if these concerns were realistic.[22]

Similar concerns were raised by Senator Michael E. Kreun (R-32), who stated:

> I don't think that there is a reasonable, practical way for complying with this. And whether or not Minnesotans agree or disagree with this concept, there are constitutionality concerns here. I mean you may not like *Citizens United*,

---

[19] *Supra* note 3.

[20] *Supra* note 3.

[21] *Supra* note 13 (emphasis added).

[22] *Supra* note 13 (emphasis added).

but it is the law of the land and so it seems to me we are effectively prohibiting those corporations from engaging in this, in their constitutionally protected right **through a statutory scheme that makes it virtually impossible for them to comply with**.

I also have concerns over federal preemption here. Federal law already regulated and restricts foreign influence under federal law….[23]

During the Senate Floor session, Senator Mathews also stated he had spoken to several companies, and they would not be able to ascertain their stock ownership details until a few weeks after the date that the contribution was made.[24] As a result, there would be no way that companies could swear that on any given day that they make a contribution they are not foreign influenced.[25] Senator Matthews further stated all the companies he spoke to indicated that they cannot know this information *even within seven days*.[26]

### D. The Legislature's Targeted Restriction of Business-Oriented Viewpoints is Further Evidenced by the Exclusion of Labor Unions from "Foreign Influenced Corporations."

The exclusion of labor unions from the definition of "foreign influenced corporations" further demonstrates the way this legislation is one-sided and aimed at selectively restricting the speech and financial support of businesses:

- Representative Niska: "Labor unions are allowed to speak regardless of their foreign influence, but every corporation, publicly traded corporation, under this bill is defined by what we're told is a carefully crafted definition. I think it is carefully crafted. Its carefully crafted to try to eliminate the First Amendment rights that the U.S. Supreme

---

[23] *Supra* note 7.

[24] *Supra* note 8.

[25] *Supra* note 8.

[26] *Supra* note 8.

Court said that groups of people when they organize themselves for for-profit business have."[27]

- Representative Duane Quam (R-24A): "[A]pparently the issue is that we don't mind if it's some influence, we're just after one type of influence, and that bothers me…. Only some international influence is bad. That's what is being said here…. This bill, this provision in this bill, this is not about ending dark money or about curtailing foreign influence. That's not what this is about. If it was, then these dark money nonprofits, these unions like SEIU, IBEW, LIUNA, *international is literally in their names*, they would be included."[28]

Indeed, the fact that supporters of the statute arbitrarily failed to include other types of entities in the definition of "foreign influenced corporation," such as partnerships and limited liability partnerships, further belies the authors' professed objective.

## IV.   THE CHAMBER CHALLENGES THE STATUTE AS AN ILLEGAL EFFORT TO ABRIDGE THE FIRST AMENDMENT'S PROTECTIONS.

The statute is vastly overbroad and not narrowly tailored to any compelling government interests. The *de minimis* 1% and 5% "foreign investor" thresholds to establish "foreign influence" actually reflect a presumptive *lack* of influence, and *lack* of actual control over decision-making. These overly broad and ambiguous restrictions on domestic companies are chilling free speech because, even now, these entities are refraining from speaking out of fear of violating the statute and receiving political retribution.

The Chamber and its members are presently preparing budgets and allocating assets for 2024 that they have historically and typically used to make independent expenditures and contributions. (Loon Decl. ¶12.) However, their planning for 2024 has been stymied,

---

[27] *Supra* note 3.

[28] *Supra* note 3 (emphasis added).

and they are fearful of the threat of prosecution for engaging in these activities after January 1, 2024. (*Id.* ¶14; Declaration of Carlos Seoane Quinteiro ("Quinteiro Decl.") ¶14; Black Decl. ¶26; Declaration of Eric Nerland ("Nerland Decl.") ¶18.)

The statute contains severe penalties that would ruin businesses and careers. *See* Minn. Stat. §211B.15, subds. 6, 7. The Chamber and its members are law-abiding organizations, and they fear prosecution and penalties for violations of the statute because they lack sufficient visibility into the *de minimis* levels of their ownership interests to accurately certify they are "not a foreign-influenced corporation *as of the date the contribution or expenditure was made.*" Minn. Stat. §211B.15, subd. 4b; (Loon. Decl. ¶43; Black Decl. ¶26.) Some of these members are also aware that they meet the statutory definition and thus cannot speak. (*See* Quinteiro Decl. ¶17; Nerland Decl. ¶18.)

**A.    The Chamber Seeks Protection for Its Own Political Speech.**

The Chamber has alleged claims in Counts I-IV to protect its right to political speech in Minnesota elections. This right is threatened because the Chamber utilizes part of its membership dues to contribute towards independent expenditure political action committees. For example, in the past, the Chamber has contributed money to the Pro Jobs Majority fund ("Pro Jobs"), as permitted by Minnesota Statute §10A.12. (Loon Decl. ¶17.) The Chamber made independent expenditures of over $1.3 million to Pro Jobs in the 2022 election. (*Id.* ¶19.) In the absence of the statute, Pro Jobs would likely make similar expenditures supported by the Chamber in 2024. (*Id.* ¶¶17-18, 42-43.)

The Chamber's ability to continue its historic political spending in the future is restricted by the statute. (*Id.* ¶41.) This is because the Chamber is prohibited from using

money, such as membership dues, received from a "foreign influenced corporation" to influence the nomination or election of candidates or local candidates or to promote or defeat a ballot question. Under the statute, non-profits may receive donations, but those funds "qualify as general treasury money pursuant to section 10A.01, subdivision 17c," Minn. Stat. §211B.15, subd. 1(d), which in turn provides that general treasury money "does not include money collected to influence the nomination or election of candidates or local candidates or to promote or defeat a ballot question," Minn. Stat. §10A.01, subd. 17c (emphasis added). Although the new statute does not prohibit donations that would qualify as "general treasury money," that money cannot be used for political speech, so the result is that the Chamber is restricted from using any membership due revenue from "foreign influenced corporations" for political speech purposes.[29] (emphasis added.)

To comply with these statutes, the Chamber must either: (a) refrain from making any additional contributions to Pro Jobs because some of the dues may be paid by members who fall into the statute's definition of "foreign-influenced corporations"; *or* (b) segregate membership revenue and utilize only those dues it can certify with certainty have been made by members who do not fall into the statute's definition. The former restricts speech. And to do the latter, the Chamber would need to be able to verify which of its members are "foreign influenced," segregate those funds in a separate account, and then certify that it is

---

[29] *See* Minutes of the June 7, 2023, Campaign Finance and Public Disclosure Board Meeting, CFPD Board (June 7, 2023), *available at* https://cfb.mn.gov/citizen-resources/the-board/meetings/agendas/ (stating that the statute "does not prohibit donations by a foreign-influenced corporation to an association's general treasury money for its general purposes *that are not election related*." (emphasis added)).

not using any funds collected from a foreign influenced corporation every time that it contributes. (Loon Decl. ¶24.) The Chamber has no way of determining with verifiable accuracy which of its members do or do not qualify as "foreign influenced." (*Id.* ¶¶27-30.) As discussed below, the member companies themselves cannot even determine whether and to what extent their shareholders are foreign. (*Id.* ¶30; Black Decl. ¶9.)

Consequently, the Chamber is barred from making any contributions—and must forego its free political speech—because the Chamber does not have current and accurate visibility into the ownership of its members.

### B.    The Chamber Seeks to Protect Its Members' Rights to Political Speech.

In addition to challenging the statute to protect its own rights, in Counts V-VIII, the Chamber also seeks to protect the rights of member corporations and LLCs. (Loon Decl. ¶¶4-5.) Like the Chamber, its members seek to make independent expenditures and contributions for various reasons; but, the recently enacted statute prohibits them from doing so. (*Id.* ¶¶12-15; Black Decl. ¶13; Quinteiro Decl. ¶13; Nerland Decl. ¶12.)

At least 100 of the Chamber's members are corporations and LLCs that the Minnesota Legislature has now erroneously defined as "foreign influenced corporations"; and the Chamber has more members who do not have sufficient visibility to precisely certify they are not "foreign influenced corporations." (Loon Decl. ¶11.) These members are all prohibited from making independent expenditures on and after January 1, 2024.

The Chamber and its members who are publicly-traded companies have particular concerns about engaging in certain political speech based on the restrictions imposed by the new statute. (*Id.* ¶¶8-10; Black Decl. ¶¶4-5.) Ownership percentages are constantly

fluctuating as these companies' shares are traded on the open market; and it can be very difficult (if not impossible) to assess with precision and perfect accuracy the status of ownership at any given time. (Black Decl. ¶¶7, 9-11; Loon Decl. ¶¶28-30.)

In addition to this difficulty, an entity will need to conduct this analysis—and its officer will have to personally certify the accuracy of this analysis—*every time* it makes an independent expenditure. Minn. Stat. §211B.15, subd. 4b. The practical effect of this requirement is that all corporations and LLCs will take steps to avoid making independent expenditures and contributions, and thereby avoid exercising their free speech rights. (Quinteiro Decl. ¶17; Black Decl. ¶29; Nerland Decl. ¶21.)

For example, SPS Commerce ("SPS") is a publicly traded company that would like to make contributions in support of certain ballot questions, including the "Page Amendment." (Black Decl. ¶¶4, 13, 20.) However, SPS cannot certify it is not "foreign-influenced" due to its constantly changing stock ownership. (Black Decl. ¶¶24-25.)

Extempore is a privately-held C-corporation that has a single foreign investor from the United Kingdom who owns 1.812% of its stock. (Quinteiro Decl. ¶¶2, 8.) As a result, Extempore is a "foreign influenced corporation" that is prohibited by the statute from making independent expenditures or contributions of any kind to support any political or civic initiative, even though Extempore would like to do so. (*Id.* ¶¶13, 18.)

Lake of the Woods Cannabis Company ("LW") is a privately-held C-corporation with a Canadian investor who owns 19.5% of its stock. (Nerland Decl. ¶¶2, 7.) As a result, LW is considered a "foreign influenced corporation" under the statute and is precluded

19

from making any independent expenditures or contributions to support any political or civic initiative, even though LW would like to do so. (*Id.* ¶¶12, 22.)

These companies illustrate how this statute not only harms the Chamber and its members' right to free political speech, but also infringes on the rights of listeners to hear "what every possible speaker may have to say." *Citizens United*, 558 U.S. at 469.

## STANDARD OF REVIEW

The Supreme Court has established the status quo by its decisions in *Citizens United* and *Bellotti*. The recently-enacted "foreign influenced corporation" law set to go into effect on January 1, 2024, fundamentally threatens the status quo and the Chamber's and its members' rights to free speech under this binding Supreme Court precedent.

The purpose of a preliminary injunction is to preserve the status quo, and to prevent further harm until the issues can be determined in a full hearing. *Benson Hotel Corporation v. Woods,* 168 F.2d 694, 696 (8th Cir. 1948). In evaluating a preliminary injunction, courts in the Eighth Circuit apply the four-factor test in *Dataphase Sys., Inc. v. CL Sys., Inc.*:

> (1) the threat of irreparable harm to the movant;
>
> (2) the state of the balance between the harm and the injury that granting the injunction will inflict on other parties litigant;
>
> (3) the probability that the movant will succeed on the merits; and
>
> (4) the public interest.

640 F.2d 109, 114 (8th Cir. 1981). The Court must balance all of these *Dataphase* factors to determine whether the balance weighs in favor of granting injunctive relief. *Lankford v. Sherman,* 451 F.3d 496, 503 (8th Cir. 2006).

Typically, the "success on the merits" factor is generally given the greatest weight. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). And, "[w]hen a plaintiff has shown a likely violation of his or her *First Amendment rights*, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (emphasis added), *opinion vacated on other grounds on reh'g*, 705 F.3d 845 (8th Cir. 2012).

Furthermore, when First Amendment rights are at stake, it is *the government's burden* to demonstrate the restrictions imposed by the challenged law are constitutional. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Thus, it is Defendants' burden to show why a preliminary injunction enjoining enforcement of the statute should not be issued. *Gonzales v. O Centro Espiritia Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

## ARGUMENT

The Chamber and its members are suffering and will continue to suffer irreparable harm through restricted and chilled free speech imposed by the statute. Accordingly, the Court should enter a preliminary injunction to immediately enjoin Defendants from enforcing this unconstitutional law.

**I.     The Chamber and Its Members Are Suffering and Will Continue to Suffer Irreparable Harm Because the Statute Violates Their First Amendment Free Speech Rights.**

The "loss of First Amendment freedoms, for even minimal periods of time, **unquestionably constitutes irreparable injury**." *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1101 (8th Cir. 2013) (emphasis added) (quoting *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976) (plurality)); *accord Phelps-Roper v. Nixon*, 509 F.3d 480,

484 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008) (en banc).

Irreparable harm is shown if the plaintiff has "an intention to engage in a course of

conduct arguably affected with a constitutional interest, but proscribed by a statute, and

there exists a credible threat of prosecution thereunder," or self-censors such that "there is

a danger of chilling free speech." *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d

789, 794 (8th Cir. 2016) (citation omitted). "[A] plaintiff need not have been actually

prosecuted or threatened with prosecution. Rather, the plaintiff needs only to establish that

he would like to engage in arguably protected speech, but that he is chilled from doing so

by the existence of the statute." *281 Care Committee v. Arneson*, 638 F.3d 621, 627 (8th

Cir. 2011).

There can be no question that the statute's restrictions and requirements will

irreparably harm the Chamber and hundreds to thousands of its members. Indeed, although

the statute does not formally go into effect until January 1, 2024, the Chamber and its

members are *already* experiencing the chilling of their free speech as they plan ahead for

the effective date of the statute. The Chamber and its members intend to engage in political

speech—especially in connection with the upcoming 2024 election—but are self-censoring

due to fear of the civil and criminal repercussions for violating the statute. (Loon Decl.

¶14; Quinteiro Decl. ¶14; Black Decl. ¶26; Nerland Decl. ¶18.) They have refrained and

will each refrain from making contributions that may be used for independent expenditures

or ballot questions, due to the statute's prohibitions and, in the case of the Chamber,

22

uncertainty as to whether the source of membership dues come from an entity that falls into the statute's definition of "foreign-influenced corporations."

The Chamber operates on the federal fiscal year (October 1 to September 30); accordingly, the Chamber has been budgeting for fiscal year 2024. (Loon Decl. ¶33.) The Chamber typically budgets around $1 million per election cycle for contributions to Pro Jobs, and the Chamber uses revenue received from membership dues for that funding. (*Id.* ¶18.) In 2022, in which the most recent general election occurred, the Chamber made independent expenditures to Pro Jobs that totaled $1,347,118.00, spread across the Chamber's fiscal year. (*Id.* ¶19.) In 2020, another general election year, the Chamber made contributions to Pro Jobs that totaled $765,000, spread across the Chamber's fiscal year. (*Id.* ¶21.) Pro Jobs then uses those funds to finance independent expenditures to promote or defeat candidates. (*Id.* ¶20-21.)

This year, due to the impeding effectiveness date of the statute on January 1, 2024, and its inability to be able to comply with the requirements imposed by the statute and the prohibitions imposed by the statute by segregating its membership dues revenue, the Chamber is forced to accelerate making contributions for independent expenditures to Pro Jobs that it would ordinarily make for fiscal year 2024, by transferring funds before the end of calendar year 2023. (*Id.* ¶36.) Accordingly, the Chamber has made a contribution of $440,000 to Pro Jobs in advance of the 2024 election year and before the statute becomes effective on January 1, 2024. (*Id.* ¶37)

The Chamber is presently unable to make an advance contribution of more than $440,000, at amounts in line with its contributions in 2020 and 2022. (*Id.* ¶38.) The need

to contribute funds now (i.e., before the statute becomes effective on January 1, 2024) will deprive the Chamber of retaining that money until the second, third, and fourth quarter of its fiscal year in 2024 for alternative interim uses. (*Id.* ¶39.) As a result, the Chamber will face an increased tax consequence in 2023. (*Id.* ¶40.) In addition, given the statute's prohibitions, if enforcement of the statute is not enjoined, the Chamber will be unable to contribute additional funds to Pro Jobs in 2024, to bring its 2024 election contributions to amounts in line with its historical contributions in 2020 and 2022. (*Id.* ¶41)

The fact is that harm is already occurring, and it will increase exponentially with every passing day because January 1, 2024, is quickly approaching. Under the current Scheduling Order, merits resolution will not occur until after the statute is designated to go into effect. (*See* Dkt. No. 51.) If a preliminary injunction is not granted now, then the Chamber and its members' First Amendment rights to free speech will be irreparably harmed because they will be prevented from speaking and making necessary plans to exercise their free speech rights in an important election. By virtue of this statute, the voices of countless Minnesota businesses will be silenced throughout the nation, and countless American businesses will be silenced in Minnesota during an ongoing political season but for injunctive relief. There will be no way to undo this harm.

## II.    The Chamber is Likely to Succeed on the Merits of its Claims that the Statute Violates the First Amendment and the Supremacy Clause.

The Chamber is likely to prevail on the merits because the statute violates the First Amendment; the statute cannot survive strict scrutiny because the government has no compelling interest; and, in any event, the statute does not promote any such interest in the

24

least restrictive means. Moreover, the statute violates the Supremacy Clause and is preempted by the Federal Election Campaign Act and regulations promulgated thereunder.

### A.    The Statute Is an Unconstitutional Violation of the First Amendment That Does Not Survive Strict Scrutiny.

The statute is facially unconstitutional because it violates the First Amendment, as has been clearly established in *Citizens United* and *Bellotti*. The First Amendment "'has its fullest and most urgent application' to speech uttered during a campaign for political office," *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (citation omitted), and the realm of political speech is where the First Amendment's "protection of robust discussion is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (citation omitted); *see also Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 503 (2007) (Scalia, J.) ("It is perhaps [the judiciary's] most important task to ensure freedom of political speech.").

Accordingly, laws that restrict political speech "are subject to strict scrutiny, which ***requires the Government to prove*** that the restriction [1] furthers a ***compelling interest*** and [2] is ***narrowly tailored*** to achieve that interest." *Citizens United*, 558 U.S. at 310 (emphasis added). Defendants cannot prove the statute withstands strict scrutiny because Defendants cannot prove that the state has a compelling interest; and, even if it did, the law is not narrowly tailored to achieve any such interest.

### 1.    Defendants Cannot Establish the Statute Promotes a Compelling Governmental Interest.

The statute does not further a compelling government interest. While purporting to address foreign influence, the plain terms and the legislative history reveals the legislation

is intended to (1) promote an anti-*Citizens United* effort to limit spending by businesses in elections, and (2) target and impose those spending limits on entities viewed by supporters as favoring pro-business viewpoints. The legislative history further demonstrates that the professed intent to limit "foreign influence" in domestic elections is a pretext.

> ### a)    *Limiting spending in elections is not a compelling government interest that could justify abridgment of the First Amendment.*

Principal House author Representative Stephenson, unabashedly stated the reasons for the bill: "I think…huge corporations and the fabulously wealthy have oversized influence in our elections."[30] Senator Boldon, the sole sponsor of the bill in the Senate, likewise remarked: "the stated goal of this bill is to **get political spending out of elections**, out of influencing votes of Minnesotans."[31] However, the government does not have a compelling interest in limiting spending in elections—i.e., limiting speech in elections.

On the contrary, election spending is a form of constitutionally protected free speech under the First Amendment. *See Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (holding independent expenditures are indisputably political speech, and any restrictions on expenditures strike "at the core of our electoral process and of the First Amendment freedoms." (quoting *Buckley*, 424 U.S. at 39). The government has an interest in *protecting* and *facilitating* free speech—not restricting it.

---

[30] *Supra* note 6.

[31] *Supra* note 8 (emphasis added).

Furthermore, *Citizens United* made it clear that the American people themselves have the right to hear all points of view, and the government cannot and does not have a legitimate—let alone a compelling—interest in restricting those voices preemptively. 558 U.S. at 339. Restrictions on speech that target certain speakers "deprives the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Id.* at 340-341.

Even prior to *Citizens United*, the Supreme Court ardently protected corporations' right to speak through spending on political issues. In *Bellotti*, the Court struck down a state law that prohibited corporations from making independent expenditures on referenda issues, reasoning the statute could not be "justified by the State's asserted interest in sustaining the active role of the individual citizen in the electoral process and preventing diminution of his confidence in government." 435 U.S. at 765-766. Thus, restrictions on political speech, and by certain speakers, ***are <u>not</u> a compelling government interest***.

The Supreme Court has "consistently rejected attempts to suppress campaign speech based on other legislative objectives.'" *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 207 (2014). This Court must do the same.

> **b)**     ***The purported interest in preventing "foreign influence" is belied by the targeting of pro-business funding sources.***

The legislative history reveals the intent to silence pro-business views, rather than to reduce purported "foreign influence" in domestic elections. The representatives and senators claimed the bill was aimed at closing a "loophole" created by *Citizens United* that allows "foreign investors" to "influence" spending in domestic elections through

corporations and limited liability companies. Yet, these legislators did not base their position on any evidence of any actual foreign influence.

The actual intent of the statute was not to close "loopholes" to prevent theoretical "foreign influence"—but, instead, to eliminate the right to speech by American businesses, while preserving free speech for labor unions no matter the amount of "foreign influence" within their membership. Obviously, this is not a legitimate—let alone a compelling—governmental interest. The Supreme Court has specifically rejected this form of political maneuvering. *See Bellotti,* 435 U.S. at 785-86.

The statute's legislative history includes references to *Bluman v. FEC*, for the proposition that the state has a compelling interest in preventing foreign influence in elections.[32] However, *Bluman* held "the government may **bar** foreign citizens (at least those who are not lawful permanent residents of the United States) **from participating in the campaign process** that seeks to influence how voters will cast their ballots in the elections." *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.) (emphasis added), *aff'd*, 565 U.S. 1104 (2012). Notably, *Bluman* declined to "analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of the First Amendment analysis." *Id.* at 292 n.4.

The government undoubtedly has an interest in barring foreign citizens from participating in American politics. And, in fact, the federal government has done just that. *See infra* Part II.B. Accordingly, the federal government has already fulfilled the

---

[32] *See supra* note 13 (emphasis added).

government interest in barring foreign citizens (including foreign corporations and LLCs) from participating in politics, directly or indirectly. Therefore, it cannot be said that the Minnesota Legislature was actually furthering any such governmental interest.

### 2. Even If the Government Has a Compelling Interest, the Statute is Not Narrowly Tailored to Achieve the Professed Interest.

The statute is not narrowly tailored to achieve any compelling interest. "A narrowly tailored [law]…does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005). The statute meets none of these criteria of a narrowly tailored restriction.

#### a) *The statute is overinclusive because it restricts the free speech of American businesses that are not actually influenced by foreign nationals.*

First, the statute is clearly overinclusive and brings within its reach non-"foreign influenced" businesses. A law is overinclusive if it "necessarily circumscribes protected expression." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (quoting *Republican Party of Minnesota v. White*, 536 U.S. 765, 775 (2002)).

*De minimis* ownership of 1% or 5% by foreign investors is a basis to presume a *lack of influence*—as opposed to a presumption of actual influence. Owners of minority positions are universally viewed to have a *lack* of influence and control. *See, e.g., In re Marriage of Brinkman*, No. A20-0597, 2021 WL 668087, at *4 (Minn. Ct. App. Feb. 22,

29

2021), *review denied* (May 18, 2021) (20% lack-of-control discount applied to share value); Swope v. Siegel-Robert, Inc*.: Why Both Minority and Marketability Discounts Should Have Applied in Determining "Fair Value" in A Minority Shareholder "Freeze-Out"*, 69 UMKC L. Rev. 455, 461 (2000).[33] Accordingly, the statute overbroadly restricts entities from exercising their fundamental rights to free speech based on ownership by "foreign investors" who are incorrectly presumed to have influence.

The statute clearly could be more narrowly tailored to define these interests at higher levels, such as the federal standard does by focusing on the foreign investors themselves. *See* 11 C.F.R. §110.20(i); *see also* 52 U.S.C. §30121(a)(1).

Moreover, the statute's focus on ownership percentages, as opposed to actual influence, necessarily restricts the rights of domestic businesses that are not actually influenced by foreign owners. (*See* Black Decl. ¶8; Quinteiro Decl. ¶10; Nerland Decl. ¶9.) The interest of preventing "influence" from "foreign investors" can be more narrowly achieved if the statute focused on those entities in which the "foreign investors" have actual control of decision-making regarding the exercise of its free speech. *See infra* Part II.B.

And even in those instances in which "foreign investors" could be presumed to have actual control, the statute applies a paradigm that in-and-of-itself is overly broad. The statute could be more narrowly drawn to restrict the activities of the "foreign investors"

---

[33] *See also* Soren Lindstrom & Lindsey Reighard, *How to Effectively Deal with Minority Shareholders: Some Practice Pointers and Recent Developments*, 36 Corp. Couns. Rev. 187, 202 (2017); Michael L. Johnson, *All in the Family: Should the Attribution Concept Apply to Disallow A Minority Discount for Lack of Control?*, 16 Creighton L. Rev. 669, 693 (1983).

themselves—whose influence the state is purportedly seeking to prevent. Federal law correctly focuses the restrictions on the foreign national who may seek to engage in influence. *See infra* Part II.B. In contrast, the state statute focuses *solely on the domestic entity* who the foreign national allegedly might seek to influence. This is the classic instance of "throwing the baby out with the bath water."

> **b)    The statute is unconstitutionally underinclusive because it restricts corporate speech, but leaves speech from labor unions and other commercial entities unrestricted.**

The statute is also obviously underinclusive. A law is unconstitutionally underinclusive if it "leaves appreciable damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 172 (2015).

Here, the statute omits from its restrictive scope numerous other kinds of business organizations, such as partnerships. Moreover, the statute (intentionally) excludes labor unions that historically contain foreign membership.[34] If the state was truly interested in decreasing foreign influence in elections, it would have also restricted labor unions.

In summary, there are obvious "gaps" in the statute's scope, such as with respect to partnerships and unions. These organizations are theoretically just as susceptible to the same foreign influence as corporations and LLCs. But the statute places no restrictions whatsoever on partnerships and unions, so it is plainly underinclusive.

---

[34] When this issue was raised in both the House and the Senate there was no agreement to include labor unions by the DFL party. *See supra* Facts, Part III.D.

c)      *Pre-existing regulations advance the state's interest with less infringement of speech, in the least-restrictive means.*

Federal law already addresses the "interests" and purported "loopholes" identified by the statute's sponsors. Indeed, the federal laws fully and directly address these interests more effectively and with *less* infringement of speech. *White*, 416 F.3d at 751.

As legislators opposed to the statute pointed out in debates, federal law already fully and comprehensively prohibits foreign nationals' direct *or indirect* attempts to influence an American business. The federal regulation provides:

> A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation, labor organization, political committee, or political organization with regard to such person's Federal or non-Federal election-related activities, such as decisions concerning the making of contributions, donations, expenditures, or disbursements in connection with elections for any Federal, State, or local office or decisions concerning the administration of a political committee.

11 C.F.R. §110.20(i); *see also* 52 U.S.C. §30121(a)(1). This law prohibits foreign nationals from *directly or indirectly* making or influencing contributions or independent expenditures in connection with *any* election. *See* 11 C.F.R. §110.20(b), (c), (f), (i).

Relatedly, the *statute itself* contains similar language as part of the definition of "foreign influenced corporation," Minn. Stat. §211B.15, subd. 1(d)(3), which illustrates a less restrictive means focused on the stated conduct of concern.

In sum, federal law comprehensively addresses "foreign influence" in American elections. There is no reason for the state to impose the statute's restrictions, let alone any justification for its overbreadth and underbreadth. The statute does nothing to narrowly

address the actual conduct at issue—foreign influence—by either banning and penalizing

such conduct, which is what federal law already fully and comprehensively addresses.

**B.      The Foreign Influenced Corporation Statute is Preempted.**

Furthermore, the Chamber is likely to prevail on the merits because the statute

violates the Supremacy Clause as it is preempted by the Federal Election Campaign Act

("FECA") and the regulations promulgated by the Federal Election Commission ("FEC").

Because the Supremacy Clause provides that the "Constitution, and the Laws of the

United States which shall be made in Pursuance thereof . . . shall be the supreme Law of

the Land . . . any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding," U.S. Const. art. VI, cl. 2, "[i]t is basic to this constitutional command

that all conflicting state provisions be without effect." *Maryland v. Louisiana*, 451 U.S.

725, 746 (1981) (citing *McCulloch v. Maryland*, 4 Wheat. 316, 427 (1819)).

There are three forms of preemption: express, implied, and conflict. The statute is

preempted under each of these doctrines.

**1.      The statute's attempt to regulate spending with respect to federal
elections is expressly preempted.**

First, express preemption occurs when "Congress explicitly prohibits state

regulation." *Noe v. Henderson*, 456 F.3d 868, 870 (8th Cir. 2006) (citation omitted). FECA

includes an express-preemption clause that declares FECA, and the "*rules prescribed

under*" it, "supersede and preempt any provision of State law with respect to election to

Federal office." 52 U.S.C.§30143(a) (emphasis added). Where Congress includes an

33

express-preemption provision, the Court must simply "identify the domain expressly pre-empted." *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993) (citation omitted)).

The FEC has also promulgated regulations defining the scope of this express preemption to include "[l]imitation on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. §108.7(b)(3).

As stated, the statute extends to federal elections. *See* Minn. Stat. §211B.01, subd. 3. But under FECA and the FEC's regulations, any such regulation is expressly preempted. Therefore, the Chamber is likely to succeed on the merits of challenging the statute on Supremacy Clause grounds. *See St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 484 (8th Cir. 2006) (holding the chamber plaintiffs adequately alleged a prior challenge to Minnesota Statute Chapter 211B and its reach extending to federal elections, which the district court agreed with on remand and entered a permanent injunction).

### 2. The statute is impliedly preempted <u>and</u> conflicts with federal law that permits the speech banned by the statute.

In addition, the statute is impliedly preempted *and* conflicts with FEC regulations with respect to federal, state, and local elections because federal law would permit numerous corporations to speak where the statute would not.

Implied preemption occurs when federal law "implicitly prohibits state regulation by pervasively occupying [a] regulatory field." *Noe*, 456 F.3d at 870 (citing *Chapman*, 390 F.3d at 624-25). If federal law leaves "no room for supplementary state regulation," then a state may not supplement the federal requirements. *Weber v. Heaney*, 793 F. Supp. 1438, 1443 (D. Minn. 1992), *aff'd*, 995 F.2d 872 (8th Cir. 1993).

34

Conflict preemption arises when "compliance with both state and federal law is impossible," or where "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC America Corp.*, 490 U. S. 93, 100, 101 (1989) (internal quotation marks omitted).

As stated, FECA and FEC regulations prohibit foreign nationals from, directly or indirectly, making or influencing contributions or independent expenditures. *See* 52 U.S.C. §30121(a)(1); 11 C.F.R. §110.20(i). By their terms, both the statute and regulation apply to federal, *state, and local* elections. The FEC has applied these requirements in the context of foreign ownership of an American subsidiary:

> in order for a domestic subsidiary of a foreign national to make donations or disbursements in connection with a State or local election, the donations or disbursements may not be derived from the foreign national's funds and no foreign national may have any decision-making authority concerning the making of donations or disbursements.

FEC Advisory Opinion No. 2006-15 (May 19, 2006).[35] The Supreme Court has proclaimed that the FEC "is precisely the type of agency to which deference should presumptively be afforded." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981); *see also Teper v. Miller*, 82 F.3d 989, 997 (11th Cir. 1996) (deferring to FEC guidance).

The statute is impliedly preempted *and* conflicts with the FECA and FEC's regulations and guidance because it would prohibit speech when federal law would permit that speech. For example, a corporation with majority foreign ownership can comply with

---

[35]  *See also Foreign Nationals*, FEC, https://www.fec.gov/help-candidates-and-committees/foreign-nationals/ (last visited Sept. 24, 2023).

federal law by ensuring that the funds the corporation uses for contributions and independent expenditures were not derived from foreign funds, and no foreign nationals have decision-making authority concerning those funds. But the state statute at issue would preclude this same speech by this same entity even if the corporation complies with these safeguards simply because one foreign inventor owns more than 1% of stock (or two or more owners hold 5% or more in the aggregate). This subverts the purposes of the federal scheme determined by Congress and the FEC and conflicts with it.

For all of the above reasons, the Chamber is likely to succeed on the merits because the statute is not narrowly tailored to advance a compelling state interest; and, moreover, the statute is preempted in several respects.

## III.    The Balance of Harms Weighs in Favor of the Chamber and Its Members.

The Chamber has established irreparable harm in the event the injunction is not entered and the likelihood of success on the merits. These two factors in turn effectively resolve this third factor: specifically, the harm the Chamber and its members are suffering and will suffer through the deprivation of their free speech rights during an active election season must be deemed to far outweigh the government's interest in enforcing an unconstitutional law. *See Phelps-Roper*, 545 F.3d at 690.

## IV.    Enjoining Defendants from Enforcing This Unconstitutional Statute Favors the Public Interest in Upholding the Constitution.

Finally, enjoining enforcement of an unconstitutional law that infringes on fundamental rights to free speech is both just and in the public interest. "[T]he determination of where the public interest lies also is dependent on the determination of

the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to protect constitutional rights." *Phelps-Roper*, 545 F.3d at 690. Here, the Chamber's likelihood of success on the merits necessitates a finding that a preliminary injunction is in the public interest.

## CONCLUSION

Based on the foregoing, the Chamber respectfully requests the Court enjoin Defendants from enforcing the statute while this matter is finally adjudicated on the merits.

Dated: October 24, 2023                    **WINTHROP & WEINSTINE, P.A.**

By: *s/Thomas H. Boyd*
Thomas H. Boyd, #0200517
Tammera R. Diehm, #0327566
Kyle R. Kroll, #0398433
Jordan E. Mogensen, #0400919
Cianna G. Halloran, #0402841

225 South Sixth Street
Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400
tboyd@winthrop.com
tdiehm@winthrop.com
kkroll@winthrop.com
jmogensen@winthrop.com
challoran@winthrop.com

*Attorneys for Plaintiff*

26840774v15