UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Chamber of Commerce, *a Minnesota nonprofit corporation*,<br><br>Plaintiff,<br><br>vs.<br><br>John Choi, *in his official capacity as* County Attorney for Ramsey County, Minnesota; George Soule, *in his official capacity as* Chair of the Minnesota Campaign Finance and Public Disclosure Board; David Asp, *in his official capacity as* Vice Chair of the Minnesota Campaign Finance and Public Disclosure Board; Carol Flynn, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Margaret Leppik, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Stephen Swanson, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; and Faris Rashid, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board,<br><br>Defendants | Case No.: 0:23-cv-02015<br><br><br><br>**DECLARATION OF DOUG LOON IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Doug Loon, hereby declare:

1. I am President and CEO of Plaintiff Minnesota Chamber of Commerce ("Chamber"), a nonprofit membership organization organized under the laws of the State of Minnesota. I have held this position since 2015. Prior to assuming leadership of the Chamber, I

1

spent 20 years at the U.S. Chamber of Commerce, as Director of Congressional and Public Affairs and then as Vice President of Regional Affairs and Advocacy.

**The Chamber's Mission and Purposes**

2. The Chamber is the largest organization representing businesses in Minnesota. The Chamber is currently comprised of approximately 6,300 members, which include both privately-held and publicly-traded companies in every industry and located throughout all of Minnesota.

3. The Chamber leads the statewide business community to advance pro-business, responsible public policy aimed at creating jobs and growing the economy and provides services to its members to address their evolving business needs. As part of this mission, the Chamber pursues these policies and represents its members' interests through lobbying efforts, supporting pro-business candidates, and advocating issues that impact its members. The Chamber carries out these efforts through various means, including financial contributions political action committees.

4. The Chamber has commenced this action in accordance with and furtherance of the above-described mission and purposes, to defend the First Amendment rights of the Chamber and its members to engage in constitutionally protected activities by challenging the recently enacted Minnesota law that imposes restrictions and penalties for political speech by domestic corporations and LLCs.

5. The Chamber's actions to protect its own free speech rights and the free speech rights of its members are germane to the mission and purpose of the Chamber's organization, which seeks to advocate and promote business issues that impact its members.

6. Here, the Chamber is seeking to protect its own rights to engage in free speech through the use of its membership dues to fund independent expenditures and debate over ballot initiatives which will be prohibited by the recently enacted Minnesota legislation amending

Minnesota Statute § 211B.15 (the "statute"). The Chamber is also seeking to protect and represent the interests of its members who are corporations and limited liability companies that seek to make independent expenditures and contribute to ballot question debates directly or through political committees for various business reasons but are prohibited from doing so by the statute.

7. The statute's prohibition on protected free speech rights affects a core business function of the Chamber—to participate as an organization in society as well as to serve as an entity collectively engaged with individual members to effect positive and constructive change in society. Businesses, as contributors and developers of society, appropriately seek to use their influence and resources to improve the communities in which they operate and to which they contribute substantially as taxpayers, employers, and responsible corporate citizens.

**The Chamber's Members' Chilled Speech**

8. The Chamber's members include privately-held and publicly-traded corporations and limited liability companies that are subject to the statute.

9. For example, the Chamber's members include corporations and limited liability companies that currently have or may have in the future foreign investors that own non-controlling, de minimis interests of 1% or more in stock or foreign investors who collectively own non-controlling, de minimis interests of 5% or more in stock. While these members are not in fact actually influenced by these foreign, non-controlling investors, these members are nonetheless prohibited from engaging in political speech by the statute because of these de minimis, noncontrolling interests owned by foreign investors.

10. The Chamber's members also include corporations and limited liability companies that are publicly traded on an ongoing basis, and therefore these entities do not have precise visibility into the extent to which its shares or membership units are owed by "foreign investors"

as defined by the statute. Consequently, these entities and officers are unable to certify as required by the statute that they are not "foreign influenced" at any given point in time due to these regular fluctuations in ownership and the lack of visibility as to the nationality of each individual owner. Thus, these companies and their officers cannot certify they are not "foreign influenced" even where there is no evidence that there was any involvement or influence whatsoever by any foreign investor over any decisions regarding the entity's independent expenditures.

11. The Chamber estimates that at least 100 of the Chamber's members are corporations and LLCs that the Minnesota Legislature has now inappropriately defined as "foreign influenced corporations." This estimate is the base minimum number of such corporations and LLC members; the Chamber likely includes many more members who are adversely impacted and restricted by the statute but cannot specifically identify because of the sheer number of members and because of the Chamber's inability to certify with certainty these members are not "foreign influenced corporations," and therefore they may be prohibited by the statute from making independent expenditures on or after January 1, 2024 when the statute formally becomes effective.

12. Many of the Chamber's members are presently preparing budgets and allocating assets for the coming year 2024.

13. With the enactment of the statute, those members of the Chamber who would like to make independent expenditures to support candidacies or ballot question initiatives in the upcoming election cycle in 2024 must now be concerned about whether they are prohibited from doing so because they may be deemed "foreign influenced" under the new statute.

14. The statute interferes with the efforts and ability of these Chamber members to plan and budget for political speech activities in 2024, and they would be understandably fearful of facing the threat of criminal prosecution, civil penalties, and potential dissolution for violations of

the statute for engaging in these types of activities on or after January 1, 2024, when the statute formally becomes effective.

15. The speech these Chamber members would seek to engage in during the upcoming 2024 election cycle will be censored if Defendants are not enjoined from enforcing the statute.

**The Chamber's Membership Dues**

16. The Chamber's members each pay annual membership dues, which are due in the month when that particular company first became a member of the Chamber. Therefore, the Chamber receives membership dues on a rolling basis every month.

17. The Chamber uses its membership dues partially for the purpose of making independent expenditures towards its political action committee called Pro Jobs Majority which is an Independent Expenditure Political Committee, as permitted by Minnesota Statutes section 10A.12.

18. The Chamber typically budgets a total of around $1 million to be made per election cycle to Pro Jobs Majority.

19. In 2022, in which the most recent general election occurred, the Chamber made independent expenditures to Pro Jobs Majority that totaled $1,347,118.00, spread across the Chamber's fiscal year.

20. These funds were used for political spending including independent expenditures to promote or defeat candidates.

21. In 2020, another general election year, the Chamber made contributions to Pro Jobs Majority that totaled $765,000, spread across the Chamber's fiscal year.

22. These funds were used for political spending including independent expenditures to promote or defeat candidates.

23. The Chamber's members understand and generally support the use of their membership dues for pro-business initiatives, including the use of those dues for political expenditures through Pro Jobs Majority.

24. The Chamber understands that when the statute becomes effective on January 1, 2024, in order to engage in political speech that is not prohibited by the statute, the Chamber will have to segregate the funds it uses for these purposes so as to exclude any revenue from membership dues paid by the statutorily defined "foreign influenced" members. This will be the only way in which the Chamber would be able to make independent expenditures in compliance with the statute.

25. While the Chamber cannot be defined as a "foreign influenced corporation" because it is an association with no owners, the Chamber believes it is still prohibited from making independent expenditures using membership dues from corporations and LLCs unable to certify they are not "foreign influenced."

26. The Chamber's belief in this regard is based on the "review of changes to campaign finance and public disclosure laws" that the Campaign Finance and Public Disclosure Board ("Board") published on June 7, 2023, in which the Board stated that the statute "does not prohibit donations by a foreign-influenced corporation to an association's general treasury money for its general purposes that *are not election related*." (Emphasis added.)

27. As a result, the Chamber is currently faced with the unduly burdensome task of verifying which of its members are "foreign influenced," segregating those funds in a separate account and then certifying that it is not using any funds collected from a foreign influenced corporation every time that it spends in connection with an election. Even if this were otherwise

feasible, the Chamber does not have the staffing, resources, or capacity to accomplish such an ongoing segregation of funds that would be required to comply with the statute.

28. With 6,300 members, the task of segregating funds is nearly impossible and would require retaining new employees to focus entirely on this administrative responsibility.

29. The Chamber currently does not have the capacity and staff to follow up with every one of its 6,300 members regarding their "foreign-influenced" status and to determine whether segregating funds is necessary.

30. Some members themselves cannot decipher whether and to what extent their shareholders are foreign nationals, such as publicly-traded members whose shares regularly trade on stock markets.

31. Even if the Chamber were to successfully segregate membership dues, it would have significantly less funding to contribute towards political activities because of the statute.

**The Effect of the Statute on the Chamber's Present Activities**

32. The Chamber's fiscal year starts October 1 and ends September 30.

33. The Chamber is actively budget-planning for its next fiscal year, which includes preparing for the 2024 election cycle.

34. The Chamber would like to continue to make contributions to Pro Jobs Majority, as it has done in the past to aid in the election of pro-business candidates throughout Minnesota, which is part of the Chamber's mission and purpose.

35. However, the Chamber is stymied in its planning for 2024, and it is fearful of facing the threat of prosecution for engaging in these types of activities on or after January 1, 2024.

36. Due to the impeding effectiveness date of the statute on January 1, 2024, and its inability to be able to comply with the requirements imposed by the statute and the forthcoming

prohibitions imposed by the statute by segregating its membership dues revenue (*see* supra at paragraphs 27-33), the Chamber is forced to accelerate making contributions for independent expenditures to Pro Jobs Majority that it would ordinarily make for fiscal year 2024, by transferring funds before the end of calendar year 2023 (i.e., on or before December 31, 2023). The Chamber is required to do so before the statute formally goes into effect.

37.  Accordingly, the Chamber has made a contribution of $440,000 to Pro Jobs Majority in advance of the 2024 election year to be transferred to Pro Jobs Majority before the statute becomes effective on January 1, 2024.

38.  The Chamber is presently unable to make an advance contribution of more than $440,000, at amounts in line with its contributions in 2020 and 2022.

39.  The need to contribute funds now (i.e., before the statute becomes effective on January 1, 2024) will deprive the Chamber of retaining that money until the second, third, and fourth quarter of its fiscal year in 2024 for alternative interim uses.

40.  As a result, the Chamber will face an increased tax consequence in 2023.

41.  In addition, given the statute's prohibitions, if enforcement of the statute is not enjoined, the Chamber will be unable to contribute additional funds to Pro Jobs Majority in 2024, to bring its 2024 election contributions to amounts in line with its contributions in 2020 and 2022.

42.  In the absence of the statute, the Chamber would make additional contributions to Pro Job Majority in 2024.

43.  Because of the statute, the Chamber will not be able to make any independent expenditures after January 1, 2024, because it is unable to meet the statute's requirements and cannot put itself or its officers and directors or member companies at risk for facing penalties or prosecution.

44. The Chamber's speech is therefore being chilled presently and will continue to be chilled in the absence of relief from the prohibitions and restrictions imposed by the statute.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 19, 2023.

_____
Doug Loon, CEO and President

27257749v5