## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Minnesota Chamber of Commerce, a
Minnesota nonprofit corporation,

          Plaintiff,

vs.

John Choi, in his official capacity as
County Attorney for Ramsey County,
Minnesota, et al.

          Defendants.

CASE 0:23-cv-02015-ECT-JFD

> **MEMORANDUM OF LAW OF AMICI CURIAE MINNESOTA BROADCASTERS ASSOCIATION AND MINNESOTA NEWSPAPER ASSOCIATION**

_____

### INTRODUCTION

The Minnesota Broadcasters Association (MBA) and the Minnesota Newspaper Association (MNA) jointly submit this Memorandum of Law as amici curiae in support of plaintiff Minnesota Chamber of Commerce. Amici agree with plaintiff that the "foreign influenced corporation" provisions of Minnesota's recently enacted "Democracy for the People Act," found in new Minnesota Statute §211B.15, is an unconstitutional infringement on rights protected by the First Amendment. Should the statute take effect, it would eliminate from the field of public discussion the views and perspectives that might otherwise be offered by an important segment of American society, comprising an enormous number of businesses and other entities engaged in a wide range of activities. In addition, the statute

would likely inhibit the ability of news organizations in Minnesota (and even throughout the country) to perform their journalistic functions.  For these reasons, amici join plaintiff in urging the Court to declare the statute presumptively unconstitutional, and to issue a preliminary injunction preventing it from taking effect.

## DISCUSSION

### A.  Identification and Interest of Amici Curiae MBA and MNA

MBA is a voluntary trade association organized as a nonprofit corporation that promotes and protects the interests of Minnesota broadcasting, representing approximately 300 radio and television stations across the state.  MNA is a voluntary trade association also organized as a nonprofit corporation, acting on behalf of all general-interest newspapers and most of the special-interest newspapers in the state; it is the principal representative of the organized press in Minnesota, with approximately 300 newspaper members.  Collectively, MBA and MNA through their members represent a large percentage of Minnesota's professional news organizations and journalists.

As with plaintiff Chamber of Commerce and its members, amici and their members desire to engage in political expression, as they have always done, and they are themselves entities whose speech may be restricted by the new statute.  In addition, they desire to carry the paid political advertising of various business entities and organizations that wish to disseminate such advertising by means of broadcast outlets, newspapers, and the websites they maintain.  However, amici and their members will almost certainly be deterred from doing so by the broad sweep and ambiguous application of Minn. Stat. §211B.15.  Given the severe penalties found in the statute, and the burdensome certification requirements that the statute imposes (as detailed in plaintiff's Memorandum), amici and their members have good

2

cause to be concerned about the consequences of the statute's operation, which it appears could require them to choose between refraining from the dissemination of protected political speech on the one hand, and conveying that speech and risking imposition of the penalties found in the statute on the other.

### B. The Supreme Court has Placed Great Emphasis on the Philosophical Foundation that Supports the Constitutional Commitment to Free Expression.

Amici's objection to Minn. Stat. §211B.15 extends beyond their concern about the direct, adverse impact it will likely have on amici and their members, as discussed below. Amici also share the broader constitutional concern identified by plaintiff Chamber of Commerce— namely, that the statute will severely restrict important categories of expression, and that it therefore offends the First Amendment.

Whether, as a matter of public policy, corporations and other business entities should have the benefit of the protections for expression flowing from the First Amendment can be debated. What is not debatable, however, as plaintiff's Memorandum describes, is that under current, controlling law, these entities do enjoy the full spectrum of rights which the First Amendment guarantees.

Amici will not repeat here the points and authorities cited in plaintiff's Memorandum establishing that proposition. However, they submit that the philosophical foundation on which the constitutional commitment to free expression rests should also be emphasized in the context of a case such as this one, where the free speech rights of a major segment of contemporary American society have been threatened by the Minnesota statute.

The fact that corporations and other business entities seek to participate in the arena of political debate is no surprise, given that political decisions ultimately determine the

character of the government, which is then allowed to exercise a significant degree of influence and control over those entities. When that engagement occurs in the form of advertising messages addressing government and public policy issues generally, or that relate to the particular interests of those entities, it falls squarely into the category of expression that is at the core of the First Amendment's application—public dialogue on matters of public concern.

The "heart of the First Amendment's protection" lies in "the liberty to discuss publicly all matters of public concern." *First National Bank of Boston v. Bellotti* 435 U.S. 765, 776 (1978). "'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.'" *Bellotti, id*., quoting *Thornhill v. Alabama,* 310 U.S. 88 (1940).

The Supreme Court in *Thornhill* noted how the issues that occupy the attention of the political process change over time, often dramatically, that the "exigencies" of the colonial period which produced the First Amendment were focused on freedom from an oppressive government, while a century-and-a half later, in the industrial society that had emerged in America, information about labor disputes was a critical topic of public debate. The Court's recognition that the "exigencies" compelling public discussion are constantly evolving led it to insist that the injection of new and diverse perspectives is constantly required, a process the First Amendment is supposed to promote. See *Thornhill,* 310 U.S. 102.

Freedom of "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *FCC v. League of Women Voters of California* 468 U.S. 364, 381 (1984). "[T]he people of this nation have ordained in the light of history, that,

4

in spite of the probability of excesses and abuses, these liberties [of free expression] are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940).

But speech constraints imposed on particular speakers "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley v. Valeo,* 424 U.S. 1, 19 (1976) *(per curiam)*. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Federal Election Commission,* 558 U.S. 310, 339 (2010).

Thus "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United*, *id.* at 340. And "[i]n a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential" *Buckley,* 424 U.S. at 14-15. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution". *Buckley, id.* "The First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Citizens United,* at 339-340, quoting *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 223 (1989) (citation omitted).

Corporations and other entities, like individuals, contribute to the "'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Citizens United*, at 343, quoting *Bellotti,* 435 U.S. at 783. Political speech is

"indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *Bellotti,* 435 U.S. at 777.

In *New York Times v. Sullivan*, 376 U.S. 254 (1964), one of the central pillars of the Court's First Amendment jurisprudence, the Court discussed at length the philosophy that supports the right to free expression. "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people'" (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). "'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.'" *Id*., quoting *Stromberg v. California*, 283 U.S. 359, 369 (1931). "[T]his opportunity is to be afforded for 'vigorous advocacy' no less than 'abstract discussion.'" *Id*., citing *N.A.A.C.P. v. Button*, 371 U.S. 415, 429 (1963).

In its *Sullivan* opinion, the Court cited with approval the observation of Judge Learned Hand, who said that the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F.Supp. 362, 372 (D.C.S.D.N.Y. 1943). And it quoted at length from the concurring opinion of Justice Brandeis in *Whitney v. California*, 274 U.S. 357, 375—376, one of the most eloquent formulations of the principle described by Judge Hand:

> Those who won our independence believed * * * that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law— the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

*Sullivan*, 376 U.S. at 270.  The Court then concluded:  "Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *Id*.  (Citations omitted.)

A corollary of the Supreme Court's understanding of the First Amendment's free speech guaranty is that the validity of claims made in political contests about issues of public interest and concern must be resolved by public debate involving the widest possible range of views and opinions, and that the communication of those views and opinions therefore benefits the public.  The First Amendment serves an "informational purpose" (*Bellotti*, 435 U.S. at 782), by protecting the public's access to "diverse and antagonistic sources" (*Associated Press v. United States* 326 U.S. 1, 20 (1945), assuring "the public access to discussion, debate, and the dissemination of information and ideas."   (*Bellotti*, 435 U.S. at 783).

This longstanding recognition by the Court that "the First Amendment protects the public's interest in receiving information," *Pacific Gas & Elec. Co. v. Public Util. Comm'n,* 475 U.S. 1, 8 (1986) demonstrates that when in *Citizens United* it held that corporations and other business entities are entitled to claim the rights secured by the free speech guaranty of

the First Amendment, it was not establishing a new principle, but was instead confirming its prior emphasis on the importance assigned by the architects of the First Amendment to the value of encouraging "diverse and antagonistic sources," assuring the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people," and that when it comes to political speech, people have a distinct interest in hearing "what every possible speaker may have to say." *Citizens United*, 558 U.S. at 469. Consequently, when businesses and other entities "choose simply to abstain from protected speech" due to fear that an interdict imposed by the government may possibly apply to them, they are "harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks,* 539 U.S. 113, 119 (2003).

The legislative history of Minn. Stat. §211B.15 depicted in plaintiff's initial Memorandum strongly suggests that one of the motivations for the legislation was a pronounced animus towards the participation of business entities in the electoral process. And while as noted earlier, it may be debated as a matter of policy whether restricting the speech of such entities is a good idea or not, in evaluating that policy choice, its potential impact on the functioning of the democratic process should be considered.

In a society whose economy (and therefore the prosperity and material well-being of its citizens) is grounded mainly on free market principles, the operation and regulation of business entities is an important public concern, especially in an era when exceptionally complex technological developments continually permeate and disrupt the business world.  It may therefore be asked whether it is prudent to place severe limitations on the ability of these business entities to convey their perspectives to the broader society, since there could well me many situations when facts critical to an important policy debate are best known—or

known only to—the business entities and their employees.  Constricting the dissemination of such information arguably imposes greater harm on the citizenry than it does on the business entities, by depriving them of potentially vital insights on political issues and candidates that are being debated in the political forum, thus conflicting with the constitutional principles just discussed.

Corporations and other business entities have in the past by means of paid advertising sought to offer their perspectives on an enormous range of issues that become entangled in the political process, and that are of real public interest and concern.  Therefore, if the philosophy that animates the free expression guarantees of the First Amendment is to be respected, that "right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection," courts should be hesitant to tolerate legislation that effectively threatens to shut off the expression of a large segment of the business community, and by extension, of the entire society.

**C. The Statute's Likely Impact on Political Advertising Revenue Received by News Organizations will Reduce their Ability to Provide News and Information to the Public, Including News and Information Important to the Political Process.**

Advertising revenue accounts for the majority of the income received by most professional news organizations.  That revenue is in turn essential to their ability to perform the primary function of a news organization, which is of course to collect, organize, and disseminate news, a process that requires significant financial expenditures.

However, a difficult reality of the current media landscape is that the advertising revenue available to professional news organizations has diminished significantly since the advent of the internet, which has created myriad additional distribution channels for

advertisers—options such as streaming services, social media platforms, and direct internet solicitation.  These alternatives all compete for advertising dollars with news organizations, and in the last two decades or so, they have diverted substantial amounts of advertising revenue from those organizations, placing a measure of stress on their budgets.  For that reason, every major source of advertising revenue is critical to the ability of professional news organizations to sustain a reasonably vigorous and diverse news operation.

As a result of the economic factors just described, it is now virtually an iron rule in the news business that less revenue means less journalism.  When revenue declines, costs must be reduced somewhere, and because the news operation is a primary contributor to the news organizations' overhead, its funding will inevitably be a target when costs need to be cut.  Those cuts will affect the news operation in a variety of ways, but as has been widely reported, the loss of local news coverage is often one result, with adverse consequences for an informed citizenry.

Especially for broadcasters, revenue from political advertising is one of largest and therefore most important components of their income stream.[1]  A significant percentage of that advertising is attributable to independent expenditures by political action committees

---

[1] See STATISTA at https://www.statista.com/statistics/1324465/us-political-ad-spending-by-media-type/ (Jan. 6, 2023) ("Advertising spend on broadcast TV totaled around 2.1 billion U.S. dollars, the highest value among all media types.").  See also https://www.bia.com/political-advertising-2020-kept-local-tv-revenues-solid-industry-reached-19-7b-despite-pandemic/ (June 10, 2021); https://www.insiderintelligence.com/content/local-ad-spending-will-hit-175-6-billion-2024-thanks-political-boost  (Oct. 24, 2023) ("The strong growth [in local advertising] is largely fueled by political advertising, which will account for $11 billion in spending."

and business entities.[2]  And as plaintiff's Memorandum of Law in support of its motion for a preliminary injunction demonstrates, there is little doubt that this kind of political advertising would be seriously constricted by the operation of Minn. Stat. §211B.15—which appears to have been the intent of the new law's proponents.

A skeptic could argue that the news media's objection to the potential loss of this revenue is self-serving, little more than a reflection of their desire to maximize profits.  But that argument would ignore the integral relationship between the professional news media's function of providing a wide range of news and information for consumption by the general public, and the democratic process, a relationship not invented by the news media for self-promotional purposes, but instead acknowledged from the founding of the country in the free speech and free press clauses of the First Amendment, and cited in a long line of court decisions recognizing the role of the news media in furnishing news and information to the public, offering criticism, and providing a forum for discussion and debate, all of which are critical to the functioning of our democracy.

Those decisions have, for example, referred to "the indispensable service of a free press in a free society," *Time Inc. v. Hill,* 385 U.S. 374, 389 (1967)*,* and they have repeatedly noted that the broad societal interest in a full and free flow of public information is the central rationale that explains the Constitution's protection for free speech on the part of the news media.  "An untrammeled press is a vital source of public information, and an informed

---

[2] See Wesleyan Media Project https://mediaproject.wesleyan.edu/releases-110322/ (Nov. 3, 2022)  [4.3m Tv Ads With Spending Nearing $3b]  ("In ad dollars, outside groups account for 45 percent of the total spending so far in this election cycle," said Erika Franklin Fowler, co-director of the Wesleyan Media Project. "They have sponsored about 30 percent of the ads."  "Outside groups are also far more active than the party committees, even when including candidate/coordinated efforts with party independent spending."

public is the essence of working democracy." *Minneapolis Star & Tribune Co. v. Minn.*

*Comm'r of Revenue,* 460 U.S. 575, 585 (1983).

"Enlightened choice by an informed citizenry is the basic ideal upon which an open

society is premised, and a free press is thus indispensable to a free society.  Not only does

the press enhance personal self-fulfillment by providing the people with the widest possible

range of fact and opinion, but it also is an incontestable precondition of self-government."

*Houchins v. KQED, Inc*., 438 U.S. 1, 17 (1978).  The press "has been a mighty catalyst in

awakening public interest in governmental affairs, exposing corruption among public officers

and employees and generally informing the citizenry of public events and

occurrences." *Estes v. Texas*, 381 U.S. 532, 539 (1965).

"As private and public aggregations of power burgeon in size and the pressures for

conformity necessarily mount, there is obviously a continuing need for an

independent press to disseminate a robust variety of information and opinion through

reportage, investigation, and criticism, if we are to preserve our constitutional tradition of

maximizing freedom of choice by encouraging diversity of expression." *Citizens United,*

*supra*.  "In keeping with this tradition, we have held that the right to publish is central to the

First Amendment and basic to the existence of constitutional democracy," *Id*.,

citing *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936).

While these descriptions of the news media's role are flattering, they also produce

some unease among professional news organizations and journalists, because of the

shrinking revenues that have occurred in recent years, and its effect on the capacity of news

organizations to fully perform the role portrayed in the Court's decisions.  And as described,

the new Minnesota statute threatens to exacerbate the reduction in news media revenues.

Thus the concern of amici about the loss of revenue from political advertising attributable to the new statute is that it will lead to a reduction in news and information conveyed to the general public, which if the above cited authorities are to be believed would not only be harmful to the democratic process itself, but which would also expand the loss of views and opinions from corporations and other business entities about important issues being debated in the political process that will likely result from the implementation of Minn. Stat. §211B.15.

To be clear, amici are not making a plea for special treatment here, asking the Court to help them avoid a proper exercise of legislative authority.  Rather they are requesting protection from a law that is clearly unconstitutional, one that if allowed to take effect, will not only effectively censor the views and opinions of many thousands of business entities, but which will also act to diminish the capacity of the professional news media to provide news and information available to the general public—an outcome inimical to the principal purpose of the First Amendment.

The exceptional breadth and disregard for free expression exhibited by the new statute creates an additional source of concern for amici and their members as well.  Although the statute includes an exemption for the news media,[3] when a law of such broad sweep is motivated by what appears to be a potent measure of political energy, statutory exemptions may be an unreliable shelter, because they can easily be repealed.

---

[3] See Minn. Stat. §211B.15, subd. 5: "This section does not prohibit publication or broadcasting of news items or editorial comments by the news media."

Though often unrecognized, there is no special protection for the news media under the First Amendment, no precedent endorsing distinctions between media corporations and other speakers for purposes of the right to free expression.  "We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers."  *Citizens United*, at 352, quoting *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), (Scalia, J., dissenting, citing *Bellotti,* 435 U.S., at 782 ), and also citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 784 (1985) (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ., dissenting).  Thus if the Minnesota Legislature can restrict the political speech of business corporations and similar entities without offending the Constitution, they could in theory extend those restrictions to media corporations.

This concern is amplified by the burgeoning opportunities for communication afforded by the internet and social media, the way in which the line between the professional news media and others who seek to comment on political and social issues has been blurred, and the extent to which political figures and government officials in the past few years have increasingly called for "content moderation" (i.e., censorship) of internet and social media platforms.  Should these calls continue to expand, they could eventually dilute the long-standing legal antipathy to censoring speech on political and social issues, and therefore invite more aggressive attempts to regulate the expression of the professional news media, imperiling media exemptions such as the one found in Minn. Stat. §211B.15.

In addition, the news media exemption in subdivision 5 of the statute makes no reference of its application to advertising disseminated by the news media.  And according to subdivision 13 of the statute, "An individual who aids, abets, or advises a violation of this

14

section is guilty of a gross misdemeanor."  Consequently, if a news organization disseminates an advertisement from a business entity that violates the statute, it would appear possible that the news organization could be charged with aiding or abetting the violation.  As a result, the protection actually provided by the statutory exemption is subject to legitimate doubt.

### D.  The Fact that a Political Message is Presented as Advertising does not Determine its Degree of Protection Under the First Amendment

The Supreme Court has made clear that simply because particular expression appears in the form of advertising is not dispositive as to whether it should be considered core political speech.  A notable example of this can be found in the Court's *New York Times v. Sullivan* decision, *supra*.  In *Sullivan*, the principal issue before the Court was whether a paid advocacy advertisement harshly criticizing government officials in the context of the civil rights movement should receive a heightened level of First Amendment protection from a defamation claim brought by some of the officials (the advertisement was placed by a number of civil rights leaders and organizations).  The defamation plaintiffs in the case contended that "the constitutional guarantees of freedom of speech and of the press are inapplicable here, at least so far as the *Times* is concerned, because the allegedly libelous statements were published as part of a paid, 'commercial' advertisement."  376 U.S. 265.

But the Court summarily rejected that argument.  "The publication here was not a 'commercial' advertisement in the sense in which the word was used in [an earlier decision of the Court].  It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern. That the *Times* was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers

and books are sold.  Any other conclusion would discourage newspapers from carrying 'editorial advertisements' of this type, and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities—who wish to exercise their freedom of speech even though they are not members of the press. The effect would be to shackle the First Amendment in its attempt to secure 'the widest possible dissemination of information from diverse and antagonistic sources.' To avoid placing such a handicap upon the freedoms of expression, we hold that if the allegedly libelous statements would otherwise be constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement."  *Id*., 376 U.S. at 266.

The analysis found in this passage from the Court's *Sullivan* opinion can be applied directly to many of the political messages that American business entities might desire to disseminate in the context of political debates.  Those messages often communicate information, express opinions, recite grievances, and protest claimed abuses relating to matters of public interest and concern.  Therefore, the fact that they are placed by business entities and take the form of paid advertising should make no difference with respect to the degree of First Amendment protection they receive, and thus "the exacting scrutiny necessitated by a state-imposed restriction of freedom of speech" must be extended to them, as with other core political speech.  *Bellotti*, *supra*, 435 U.S. at 786.  If that scrutiny is applied to Minn. Stat. §211B.15, it plainly fails the constitutional test.[4]

---

[4] An argument often advanced when defending attempts by legislative bodies to restrict the expression of business entities is that the targeted expression is merely "commercial speech,"

### E.  Because the Application of Minn. Stat. §211B.15 is not Limited to Minnesota-based News Organizations, it could Impact any News Organization Doing Business in the State.

While the primary focus of amici's organizational efforts is on advancing the interests and concerns of Minnesota news organizations, they share a common purpose with news organizations throughout the country, and often collaborate with them on matters of national impact.  For this reason, amici's concern about Minn. Stat. §211B.15 is also drawn to the fact that the statute's reach is not confined to Minnesota news organizations alone, but also extends to any entity "that does business in this state."  Minn. Stat. §211B.15, subd. 1(c)).

This dramatically expands the law's potential effect on news organizations, because there are so many based in other states that do business here, and that could therefore be exposed to liability for disseminating an advertisement that relates to candidacies or ballot questions in other states.  To cite only a few examples, CBS Broadcasting, Inc. (based

---

which is entitled to a lower level of First Amendment protection than so-called "core" speech.  See *Florida Bar v. Went for It, Inc.,* 515 U.S. 618, 623 (1995).  In fact, however, the Court has been "careful to distinguish commercial speech from speech at the First Amendment's core," limiting the scope of commercial speech so that it does not invade the realm of core speech. *Board of Trustees v. Fox,* 492 U.S. 469 (1989).  In its *Discovery Network* decision, the Court confirmed that the scope of true commercial speech is quite limited.  "[I]n *Fox,* we described the category [of commercial speech] even more narrowly, by characterizing the proposal of a commercial transaction as "'the test for identifying commercial speech'" (citation omitted).  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993).  Therefore, simply because business entities may through political advertising ultimately be attempting to defend or explain their business behavior is not dispositive in determining whether commercial speech is involved.

When the kinds of *political* advertisements that corporations and other businesses entities have disseminated are examined, few of them exhibit all of the features identified by the Court as signaling commercial speech—in particular, they do not typically focus on pitching particular products or services offered by the advertiser.  In any event, where an advertisement placed by a business entity is primarily addressed to a topic of public interest, it should not diminish the potential significance of the speech to members of the public who may well be concerned with the issues discussed in the advertisement, regardless of the advertiser's identity.

outside of Minnesota) owns WCCO-TV, Tegna, Inc. (based outside of Minnesota) owns KARE-11, the *New York Times* and *Wall Street Journal* deliver many copies of their newspapers to residents of Minnesota, and Forum Communications Company based in Fargo, N.D. own several Minnesota newspapers.  These are simply illustrations, and many other examples could also be listed.  Furthermore, virtually all professional news organizations located outside the state operate websites that are patronized by people in Minnesota.  This could constitute "doing business" in the state as well.

The website example also highlights one of the several troubling ambiguities found in the Minnesota statute.  It is not clear what doing business in the state might actually consist of for purposes of the statute's proscriptions.  And the existence of that ambiguity will increase the concern on the part of out-of-state news entities about the potential application of the statute to them, thus chilling their expression in a manner that offends the First Amendment.

<u>**CONCLUSION**</u>

Because Minn. Stat. §211B.15 is fundamentally incompatible with the protections for free expression derived from the First Amendment, and threatens to inflict immediate harm by infringing on those protections, amici respectfully submit that the motion of the Chamber of Commerce of Minnesota for a preliminary injunction blocking the statute from taking effect should be granted.

DATED:  November 20, 2023

*s/ Mark R. Anfinson*
Mark R. Anfinson
Attorney for Amici Curiae

Uptown Professional Building
3109 Hennepin Avenue South
Minneapolis, Minnesota 55408
(612) 827-5611
*mranfinson@lawyersofminnesota.com*
Atty. Reg. No. 2744

## LOCAL RULE 7.1 CERTIFICATE OF WORD COUNT COMPLIANCE FOR MEMORANDUM OF LAW OF AMICUS CURIAE MINNESOTA BROADCASTERS ASSOCIATION AND MINNESOTA NEWSPAPER ASSOCIATION

Mark R. Anfinson hereby certifies that the Memorandum of Law of Amici Curiae Minnesota Broadcasters Association and Minnesota Newspaper Association complies with Local Rule 7.1(f).

I further certify that, in preparation of the above document, I used the software Microsoft Word 2019, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count, except for the caption, signature-block text, and certifications of compliance.

I further certify that the above document contains 5486 words.

DATED:  November 20, 2023

*s/ Mark R. Anfinson*
Mark R. Anfinson
Attorney for Amici Curiae
Uptown Professional Building
3109 Hennepin Avenue South
Minneapolis, Minnesota 55408
(612) 827-5611
*mranfinson@lawyersofminnesota.com*
Atty. Reg. No. 2744