UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Chamber of Commerce, *a Minnesota nonprofit corporation*,<br><br>*Plaintiff*,<br><br>v.<br><br>John Choi, *in his official capacity as* County Attorney for Ramsey County, Minnesota; George Soule, *in his official capacity as* Chair of the Minnesota Campaign Finance and Public Disclosure Board; David Asp, *in his official capacity as* Vice Chair of the Minnesota Campaign Finance and Public Disclosure Board; Carol Flynn, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Margaret Leppik, *in her official capacity* as Member of the Minnesota Campaign Finance and Public Disclosure Board; Stephen Swanson, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; and Faris Rashid, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board,<br><br>*Defendants*. | No. 23-CV-02015 (ECT/JFD) |

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Interest of *Amicus Curiae* ...................................................................................... 1

Introduction and Summary of Argument ................................................................. 1

Argument .................................................................................................................. 5

    I.     Federal Law Directly And Effectively Addresses Foreign Influence In U.S. Elections .................................................................. 5

    II.    Section 211B.15 Blatantly Defies *Citizens United* ............................. 12

Conclusion ............................................................................................................. 17

## INTEREST OF *AMICUS CURIAE*

The Chamber of Commerce of the United States of America ("Chamber") submits this brief in support of Plaintiff the Minnesota Chamber of Commerce ("Minnesota Chamber").[1] The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. As a preeminent national business association, the Chamber has a strong interest in defending the corporate free speech rights recognized by the U.S. Supreme Court in *Citizens United v. FEC*, 558 U.S. 310 (2010), from assault by political actors.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The United States Supreme Court did not write *Citizens United* to be a "constitutional Maginot Line, easily circumvented by the simplest maneuver." *Bank Markazi v. Peterson*, 578 U.S. 212, 247 (2016) (Roberts, C.J., and Sotomayor, J., dissenting). Yet amended Minnesota Statute § 211B.15 is a transparent attempt to override that case's unequivocal holdings. The *Citizens United* Court held that the Free Speech Clause "has its fullest and most urgent application to speech uttered

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than *amicus curiae*, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

1

during a campaign for political office," that "restrictions distinguishing among different speakers" are "[p]rohibited," and that free-speech protection "extends to corporations." *Citizens United*, 558 U.S. at 339, 340, 342. Of particular importance here, the Court held that prohibitions on protected corporate political speech are unconstitutionally "overbroad" when they are "not limited to corporations or associations that were created in foreign countries or funded predominantly by foreign shareholders." *Id.* at 362.

That resolves this case: Section 211B.15 undeniably prohibits political speech by corporations that are neither created in foreign countries nor funded predominantly by foreign shareholders. So long as a foreign investor owns just *one percent* of a corporation's equity, or the corporation has five percent foreign investment in aggregate, Section 211B.15 bans that corporation from various forms of core political speech. A corporation with 99 percent domestic shareholders is not funded "predominantly" by foreign shareholders. *Citizens United*, 558 U.S. at 362. Section 211B.15 is therefore "overbroad," *id.*, and must be held unconstitutional on its face.

Section 211B.15 prohibits three forms of campaign speech that receive the utmost constitutional protection. First, Section 211B.15 Subd. 4a(a)(1) prohibits "expenditure[s]" in candidate campaigns. But a "ban on corporate independent expenditures to support candidates" is in all but the rarest circumstances

2

"unconstitutional." *Citizens United*, 558 U.S. at 347. Second, Section 211B.15 Subd. 4a(a)(2) prohibits "contributions or expenditures to promote or defeat a ballot question." But "[w]hatever may be the state interest … in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees," "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299 (1981). And third, Section 211B.15 Subd. 4a(a)(3), (4) prohibits contributions to political committees and political funds. But "[i]n light of [*Citizens United*]," "contributions to groups that make only independent expenditures" cannot be prohibited. *SpeechNow.org v. FEC*, 599 F.3d 686, 694 (D.C. Cir. 2010).

Even though these restrictions each prohibit forms of the Constitution's most fundamental speech rights, the purported government interest on the other side is nothing but a fig leaf for *Citizens United* defiance. Minnesota purports to rely on the interest of preventing election corruption by foreign actors, but that justification is pretextual. For one, federal law already effectively prevents election corruption by foreign actors: the Federal Election Campaign Act (FECA) and Federal Election Commission (FEC or Commission) regulations prohibit foreign nationals from directly or indirectly making or influencing contributions or independent expenditures in federal, state, and local elections. *See* 52 U.S.C. § 30121(a)(1); 11 C.F.R. § 110.20(i). Second, Section 211B.15's thresholds for identifying

3

supposedly foreign-influenced corporations are set so low that the provision can only be understood as a broad-based attack on corporate political speech rather than a targeted strike on foreign influence. Indeed, the think tank that first proposed Section 211B.15's thresholds estimates that about *98 percent* of all S&P 500 companies fall under its definition of "foreign influenced." Third, Section 211B.15's enactors candidly observed that the statute's aim is to legislatively annul *Citizens United* and reduce the speech of all corporations. Between Section 211B.15's text and the legislators' own statements, there is no mystery about what Section 211B.15 exists to do.

Moreover, Section 211B.15 will chill the lawful political speech of those corporations falling outside its extreme thresholds because many of those corporations will not be able to verify their precise percentage of foreign ownership every time they wish to speak. Section 211B.15 Subd. 4b requires corporations to certify that they are not foreign influenced within seven business days of any contribution or expenditure. But publicly traded corporations' equity numbers fluctuate constantly and are difficult, if not impossible, to determine. Requiring corporations to inventory their equity breakdown any time they want to engage in political speech impermissibly burdens that speech—to the point that even corporations falling outside Section 211B.15's already extreme thresholds may refrain from speaking at all.

In short, Section 211B.15 will provide little if any additional protection against foreign influence and will instead ban and chill the political speech of American companies. That, in the eyes of its enactors, is a feature and not a bug—the entire purpose of the statute is to circumvent the Supreme Court's *Citizens United* decision and prohibit corporate political speech. The federal courts should not greenlight this blatant defiance of the Constitution and of binding Supreme Court precedent.

## ARGUMENT

I. **FEDERAL LAW DIRECTLY AND EFFECTIVELY ADDRESSES FOREIGN INFLUENCE IN U.S. ELECTIONS**

Lower courts have interpreted the Constitution to permit Congress to "bar[] foreign nationals from contributing to our election processes." *United States v. Singh*, 979 F.3d 697, 710 (9th Cir. 2020).[2] Consistent with this authority, FECA and the FEC's implementing regulations have comprehensively protected federal, state, and local elections from foreign interference for nearly fifty years. *See, e.g.*, *United States v. Kanchanalak*, 192 F.3d 1037, 1049 (D.C. Cir. 1999) (chronicling the legislative history behind FECA's foreign national prohibition, including its antecedent provision in the Foreign Agents Registration Act).

---

[2] But the Supreme Court itself has reserved the question. *See Citizens United*, 558 U.S. at 362 ("We need not reach the question whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process.").

This body of federal law is demonstratively effective. Research commissioned by Congress has consistently found that the current "public record reveals little evidence that foreign money has intruded into U.S. campaigns systematically or decisively," even though the same corporations Minnesota now bans from contributing have been permitted to do so for decades consistent with federal law. R. Sam Garrett, *Foreign Money and U.S. Campaign Finance Policy*, Cong. Rsch. Serv., Mar. 25, 2019, tinyurl.com/yr8brtms.

Congress arrived at the same conclusion after conducting years of extensive factfinding to justify its asserted interest in restricting foreign national participation in electoral campaigns. These efforts began in the 1960s during the so-called Fulbright Hearings that documented efforts by members of the Filipino sugar industry, among others, to funnel campaign contributions to Members of Congress. *See* FEC's Mem. of Points and Authorities in Support of Its Mot. to Dismiss at 3, *Bluman v. FEC,* Civ. No. 10-1776 (D.D.C. filed Dec. 21, 2010) ("*FEC Bluman Mem.*"); *Activities of Nondiplomatic Representatives of Foreign Principals in the United States: Hearings Before the Senate Comm. on Foreign Relations*, 88th Cong. (1963). Congress revisited the issue when it investigated Watergate—a scandal that included a foreign national element—and the Buddhist temple scandals of the mid-1990s, which resulted in 427 subpoenas, 32 days of hearings, and 1,500,000 pages of documents for review. *See FEC Bluman Mem.* at 4–9 & n.4. In other words,

Congress has created and then "repeatedly and carefully refined the foreign national prohibition in response to attempts to circumvent it [with a] historical record and legislative history [that was] real, concrete, and sufficient to show that [the foreign national ban was justified]." *Id.* at 22 (internal quotation marks omitted).

The result is a federal law that prohibits foreign nationals from "directly or indirectly" engaging in a broad array of activities, including the making of:

- contributions or donations in connection with a federal, state, or local election;

- contributions or donations to a political party, including the federal and non-federal accounts of a state, district, or local party committee;

- expenditures or independent expenditures in connection with any federal, state, or local election;[3]

- disbursements for electioneering communications;[4] and

- donations to presidential inaugural committees.

52 U.S.C. § 30121; 11 C.F.R. §110.20.

---

[3] An "independent expenditure" is a communication that expressly advocates for the election or defeat of a candidate but that is not coordinated with a candidate or political party. *See* 52 U.S.C. § 30101(17).

[4] An "electioneering communication" is a broadcast, cable, or satellite communication that refers to a clearly identified candidate for federal office, is distributed within 30 days of a primary or 60 days of a general election, and is targeted to the relevant electorate. 52 U.S.C. § 30121(f).

Furthermore, federal law also prohibits foreign nationals from directing, dictating, controlling, or further participating in the decisionmaking process of a corporation's federal *or* non-federal election activities. *See* 11 C.F.R. § 110.20(i). Decisions off limits to foreign nationals include "the making of contributions, donations, expenditures, or disbursements in connection with elections for any federal, state, or local office or decisions concerning the administration of a political committee." *Id.* Federal law further augments these prohibitions by banning foreign persons from providing "substantial assistance" in connection with any of the above. *Id.* § 110.20(h).

Over the course of many years, hearings, and debates, Congress and the FEC also carefully identified the individuals and entities that should be classified as "foreign nationals" and subject to the ban. Those covered are:

(1) a foreign government;

(2) a foreign political party;

(3) an individual who is neither a U.S. citizen nor a green card holder; and

(4) a "partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country."

*Id.* (citing the definition of "foreign principal" in 22 U.S.C. § 611(b)). This definition notably excludes a business association organized under the laws of, or having its principal place of business in, the United States.

On several occasions, Congress and the FEC debated whether to subject U.S. subsidiaries of foreign corporations to the ban, with particular emphasis on whether the law should include a U.S. entity that was owned or controlled at least fifty percent—notably, not one percent or five percent, as the Legislature has done here—by a foreign entity. *See Contribution Limitations and Prohibitions*, 67 Fed. Reg. 69,928, 69,943 (Nov. 19, 2002) (summarizing the legislative history). But when this question was raised before the FEC, Republicans, Democrats, and even some pro-regulatory campaign finance reform advocates "strongly urged the Commission *not* to extend the prohibition on foreign national involvement to the activities of foreign-owned U.S. subsidiaries." *Id.* (emphasis added). They labelled such an idea "controversial," Letter of The Campaign Legal and Media Center to FEC Acting Asst. Gen. Counsel Mai Dinh, Sept. 13, 2002, tinyurl.com/5dsujtrr,[5] and untethered to "an issue that needed to be addressed," Letter of Senators Harry Reid and John Ensign to FEC Acting Ass't Gen. Counsel Mai Dinh, Sept. 13, 2002,

---

[5] *See also* Letter from Senator John McCain, Senator Russ Feingold, Representative Christopher Shays, and Representative Marty Meehan to FEC Acting Ass't Gen. Counsel Mai Dinh, Sept. 13, 2002, tinyurl.com/mr3drr5u (urging the Commission to not regulate "contributions by foreign-controlled U.S. corporations, including U.S. subsidiaries of foreign corporations").

9

tinyurl.com/428c8a33.  Indeed, as the bipartisan letter of Senators Reid and Ensign underscored, "[e]xisting law and Commission rules are fully adequate to keep foreign corporations from contributing to federal election campaigns through their U.S. subsidiaries, and there was never any suggestion to the contrary during the long efforts to enact campaign finance reform." *Id.*

Rather than adopt a wholesale prohibition on U.S. subsidiaries participating in federal, state, and local elections, the FEC balanced the competing interests and determined that the foreign national prohibition should *not* apply to the U.S. subsidiaries provided the following criteria are met:

- the "domestic corporation is a discrete entity incorporated under the laws of any state within the United States, and its principal place of business is within the United States;"

- the "foreign parent does not finance election-related contributions or expenditures either directly or through the subsidiary, including through subsidizing the subsidiary's business operations, unless the subsidiary can demonstrate by a reasonable accounting method that it has sufficient funds from its own domestic operations to make any contributions or expenditures;" and

- all "decisions … are made by U.S. citizens or permanent residents."

10

FEC, *Foreign Nationals*, tinyurl.com/5n7n8yf6 (summarizing the applicable precedent); *see also* FEC Adv. Op. 2006-15 (TransCanada) at 3 (reviewing the "long line of 'advisory opinions over more than two decades that have affirmed the participation of such subsidiaries in elections in the United States … so long as there is no involvement of foreign nationals in decisions regarding such participation'"). This rule remains in effect nationally.

The balance that Congress and the FEC achieved has adequately addressed potential foreign influence in U.S. elections. There is little evidence that foreign-controlled corporations—much less those that are merely "foreign-influenced" under the Legislature's low thresholds at issue here—are subverting American democracy. To the extent that one-off situations have arisen, the Commission has taken an active role in identifying, policing, and punishing potential violations—even directing the agency's professional staff to prioritize cases that involve allegations of foreign influence. *FEC Report to the Committees on Appropriations on Enforcing the Foreign National Prohibition*, Sept. 18, 2018, tinyurl.com/5b72ut29 ("*FEC Foreign Influence Report*").

Among its more recent enforcement cases, the Commission issued $940,000 in fines—one of the FEC's highest-ever penalties—in a matter involving a Chinese-owned company that made contributions to a federal political committee. *See* Press Release, *BREAKING: Record Fines Imposed Totaling $940,000 for Foreign*

11

*Interference in Presidential Election by Chinese Corporation*, Campaign Legal Ctr., Mar. 11, 2019, tinyurl.com/37r44ube. The Commission has sanctioned others involved in similar (but rare) matters. *See FEC Foreign Influence Report*; Conciliation Agreement in Matter Under Review 2892 (Tetsuo Yasuda and Yasuo Yasuda), tinyurl.com/4k4zfd6w; FEC, *Foreign Nationals*.

In short, federal law—and the FEC's rigorous enforcement of it—is working effectively to keep foreign influence out of Minnesota and national elections. The federal regulatory scheme has effectively protected federal, state, and local elections for over 50 years.

## II.    SECTION 211B.15 BLATANTLY DEFIES *CITIZENS UNITED*

Despite this robust federal protection for elections at all levels of government and a lack of any evidence showing foreign penetration of elections in Minnesota, the Minnesota Legislature enacted amendments to Section 211B.15 purportedly to combat election corruption by foreign actors. But between Section 211B.15's text and the legislative record, there is no mystery that Section 211B.15 is in fact an attempt to flout the First Amendment rights recognized in *Citizens United*.

In *Citizens United*, the Supreme Court held that political-speech bans on corporations that are not "created in foreign countries or funded predominantly by foreign shareholders" are unconstitutional. 558 U.S. at 362. The Court noted that it did not need to reach the question of whether the government has a compelling

interest in limiting foreign influence over the political process. *Id.* Even if it does, the Court observed, that interest cannot be invoked to ban the speech of domestic corporations that are not predominantly foreign-funded. *Id.*; *see also Agency for International Development v. Alliance for Open Society, Inc.*, 140 S. Ct. 2082, 2087 (2020) (explaining that "separately incorporated organizations are separate legal units with distinct legal rights" and therefore foreign affiliates of American companies "remain legally distinct from the American organizations" for First Amendment purposes).

Section 211B.15 runs headlong into this holding. Section 211B.15's speech bans are not limited to corporations created in foreign countries. Nor are they limited to corporations funded predominantly by foreign shareholders. As Yale Law School Dean Heather Gerken—who has elsewhere expressed opposition to *Citizens United*[6]—has observed, the word "predominantly" "indicate[s] that foreign nationals must own at least 50% of [a] company's shares, perhaps substantially more than 50%." Testimony of Heather Gerken 11, U.S. Sen. Committee on Rules and Administration, (Feb. 2, 2010) ("Gerken Testimony"). One percent is not remotely close. While *Citizens United* "indicate[d] that any regulation aimed at foreign

---

[6] Heather K. Gerken, *Boden Lecture: The Real Problem With Citizens United: Campaign Finance, Dark Money, and Shadow Parties*, 97 Marq. L. Rev. 903 (2014).

13

nationals should be appropriately tailored," *id.*, Section 211B.15 is not tailored at all.

But that is unsurprising—Section 211B.15 is intended not as a targeted attack on foreign influence but rather as a broadside against all corporate political speech. Section 211B.15 enacts thresholds proposed by the Center for American Progress, *see* Minnesota Chamber Br. 8, a Washington, D.C. think tank dedicated to "bold" and "progressive" ideas that takes "creative approaches" to policymaking, Center for American Progress, About Us, americanprogress.org/about-us. Center for American Progress has called *Citizens United* a "disastrous decision" that "triggered a flood of political spending," Center for American Progress, *RELEASE*, Jan. 16, 2020, tinyurl.com/asxmjrj9, and advocates for "a constitutional amendment" to "reverse" what it calls "the Supreme Court's misguided decision." *Id.* Section 221B.15 amounts to an effort to reverse the decision by legislation rather than by constitutional amendment.

When adopting the Center for American Progress's proposed legislation, Minnesota legislators themselves left no doubt that Section 211B.15 is aimed at corporate election speech writ large, in open defiance of *Citizens United*. A primary drafter stated that the bill is a response to "practically unlimited [election] spending" that the "*Citizens United* decision" "opened the floodgates on." Minnesota Chamber Br. 8 (quoting Rep. Stephenson). Another legislator explained that "the stated goal

14

of the bill" is to "get political spending out of elections," including "independent expenditures" protected by "*Citizens United*." *Id.* at 9 (quoting Sen. Boldon).

As the Minnesota Legislature intended, Section 211B.15 bans the election speech of enormous swaths of American companies. The Center for American Progress estimates that the statute covers 98 percent of S&P 500 companies. Center For American Progress, Fact Sheet, Nov. 21, 2019, tinyurl.com/4pcxhwdr. (It also estimates that 28 percent of smaller companies reach the five percent aggregate threshold, but does not say how many reach the one percent threshold for individual foreign investors. *Id.*) For perspective, consider the flagrant unconstitutionality of a statute banning the political speech of even ten percent of all American natural persons. The Minnesota Legislature may not think that American corporations deserve the same constitutional protection, but "[t]he [Supreme Court] has … rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Citizens United*, 558 U.S. at 343. The Legislature simply lacks the power to nullify the Supreme Court's holding.

Section 211B.15 bans forms of speech to which the First Amendment "has its fullest and most urgent application." *Id.* at 339. Section 211B.15 Subd. 4a(a) prohibits supposedly "foreign influenced" companies from making (1) independent expenditures, (2) contributions or expenditures related to ballot questions, and

15

(3) contributions to political committees. Each of those forms of speech is at the core of First Amendment protection. *See Citizens United*, 558 U.S. at 347 (expenditures); *Citizens Against Rent Control*, 454 U.S. at 299 (contributions and expenditures related to ballot measures); *SpeechNow*, 599 F.3d at 694 (contributions to political committees). And Section 211B.15 requires companies to certify that they do not fall within the statutory definition of "foreign influenced" *every time they want to speak* about an election through one of those prohibited forms of speech.

Requiring a government certification for each act of political speech places a draconian burden on that speech. And the burden is all the more pronounced because it requires companies to immediately certify information that may be difficult or impossible to obtain. As dissenting legislators observed, most companies cannot know their stock ownership within the period Section 211B.15 requires, which "makes it impossible for any publicly traded company to ever file the certificate of compliance under the statute." Minnesota Chamber Br. 13 (quoting Rep. Niska); *see also* Gerken Testimony at 11 (because "corporations often find it difficult to identify their own shareholders," any restrictions "must take into account what sort of disclosure can be reasonably expected of corporations" and "[it] may be necessary to target certain regulations at foreign shareholders rather than corporations as such"). Even the law's most ardent supporters concede that compliance is "tricky," presents "obstacle[s and] difficulties," Statement of Rep. Zack Stephenson, Minn.

16

House Elections Fin. And Policy Comm., Jan. 18, 2023, and that "it may not be possible for every corporation to verify the U.S. or foreign national status of all of its shareholders with complete confidence," Letter of Ron Fein, Legal Director of Free Speech for People, to the Minn. Senate, Feb. 13, 2023, tinyurl.com/xzfdrdut.

The result is that Section 211B.15 will also chill the speech of companies even if they do not fall within Section 211B.15's extremely aggressive thresholds. Speech prohibitions "have the potential to chill, or deter, speech outside their boundaries." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). That is because a speaker "may be unsure about the side of a line on which his speech falls," or "may worry that the legal system will err, and count speech that is permissible as instead not," or "may simply be concerned about the expense of becoming entangled in the legal system." *Id.* The Constitution forbids such speech restrictions because they result in "self-censorship of speech," a "cautious and restrictive exercise of First Amendment freedoms." *Id.* (cleaned). Section 211B.15's thresholds go far beyond the Constitution's limits on their own, and the chilling effect caused by its extraordinary certification requirement pushes it even further out of bounds.

## CONCLUSION

The Court should grant Plaintiff's motion.

Respectfully submitted,

By: s/ Nur Ibrahim
Nur Ibrahim # 0398397
Caleb P. Burns (DC Bar # 474923)

17

                                      Andrew G. Woodson (DC Bar # 494062)
                                      Jeremy Broggi (DC Bar # 1029427)
                                      Michael Showalter (DC Bar # 1618184)
                                      WILEY REIN LLP
                                      2050 M Street, NW
                                      Washington, DC 20036
                                      (202) 719-7000
                                      nibrahim@wiley.law

                                      Jonathan D. Urick
                                      Kevin R. Palmer
                                      U.S. CHAMBER LITIGATION CENTER
                                      1615 H Street, NW
                                      Washington, DC 20062-2000
                                      (202) 659-6000
                                      kpalmer@uschamber.com

                                      *Counsel for Amicus Curiae*

Dated:  November 21, 2023

18