## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| Minnesota Chamber of Commerce, *a Minnesota nonprofit corporation*, | ) ) ) ) | Case No.: 23-CV-2015 (ECT/JFD) |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| John Choi, *in his official capacity as* County Attorney for Ramsey County, Minnesota; George Soule, *in his official capacity as* Chair of the Minnesota Campaign Finance and Public Disclosure Board; David Asp, *in his official capacity as* Vice Chair of the Minnesota Campaign Finance and Public Disclosure Board; Carol Flynn, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Margaret Leppik, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Stephen Swanson, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; and Faris Rashid, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | ) ) ) | |

## <u>INTRODUCTION</u>

The question before the Court is not a close call. The statute censors American companies who have a recognized First Amendment right to engage in political speech on the baseless pretense that they are "foreign influenced corporations." There is no legitimate

justification for such infringement. Defendants and amici nonetheless advance the pretextual and false claim *Citizens United* created a "loophole" for foreign influence. There is no such "loophole"—and there is no legitimate justification for this statute.

The State has a general interest in "protecting democratic self-governance from foreign influence." But it is the federal government that "has the power to prohibit foreign nationals from donating and contributing to state and local elections"; and "Congress has made a judgment on a matter of foreign affairs and *national security by barring foreign nationals from contributing to our election processes." United States v. Singh*, 979 F.3d 697, 710 (9th Cir. 2020) (emphasis added). There can be no dispute that federal law (FECA and FEC regulations) already fully vindicates this interest—and Defendants and amici themselves identify instances in which the federal government has prosecuted foreign nationals who "directly or indirectly" make contributions or expenditures. *See id*. at 707.

So what is the reason for the Minnesota statute at issue, which according to Defendants permits "lobbying efforts" by "foreign-influenced corporations," but censors their First Amendment rights to make political contributions and expenditures based only on *de minimis* foreign ownership? The statute's sponsors have said it loudly and proudly: to legislatively veto *Citizens United* because they believe there is too much money in politics. This Court must not condone this baseless effort to censor American voices, and must instead protect the First Amendment rights of the Chamber and its members.

**ARGUMENT**

**I.     DEFENDANTS DO NOT DISPUTE THE FIRST AMENDMENT RIGHTS OF THE CHAMBER AND ITS MEMBERS WILL BE INFRINGED, WHICH CONSTITUTES IRREPARABLE HARM.**

Defendants do not dispute:

- the Chamber has standing to challenge the statute;

- the Chamber itself has the First Amendment right to make contributions and expenditures, but that the combination of the statute and other state laws and impossibility of the Chamber knowing which of its 6,300 members are "foreign-influenced corporations," will restrict the Chamber's speech and chill speech beginning January 1, 2024; and

- the Chambers' members who meet the definition of "foreign-influenced corporation" have the First Amendment rights to make contributions and expenditures, but the statute prohibits them from doing so.

These undisputed restrictions on the Chamber's and its members' First Amendment freedoms are certainly impending, and the losses of these freedoms "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011).

Defendants argue Extempore, SPS Commerce, and Lake of the Woods are "only three" companies who will lose their rights. (CFPD Board Mem. 1.) But these three companies are not alone. (Dkt. No. 89, Ex. 1, Ans. Interrog. No. 4.) Their representatives have bravely chosen to speak out in support of the Chamber's motion—and now they are facing onerous subpoenas duces tecum and excessive Rule 30(b)(6) deposition notices.

3

(*See* Declaration of Cianna G. Halloran ("Halloran Decl."), Exs. A-C.) Three restricted citizens is still three too many.

Defendants also improperly critique the Chamber's supporting declarants for not being specific enough about spending. (*See* CFPD Board Mem. 31-33.) These attacks fail for at least three reasons. <u>*First*</u>, irreparable harm is established regardless of the *amount* of speech in which a citizen wishes to engage. <u>*Second*</u>, these declarants are *specific* about their desire to make contributions and expenditures *in 2024*. (*See* Black Decl. ¶¶19-26; Quinteiro Decl. ¶13-14; Nerland Decl. ¶17-18.) <u>*Third*</u>, when the "*potential* for extraordinary harm and a serious chill upon protected speech" is present, "broad preliminary relief" is appropriate. *Rodgers v. Bryant*, 942 F.3d 451, 459 (8th Cir. 2019) (emphasis added).[1]

Defendants further argue the statute does not define "foreign-influenced corporations" to include non-profits (*see* CFPD Board Mem. 31-33), so the Chamber is not restricted. This misses the point. The Chamber's speech will be restricted and chilled because it cannot use dues from "foreign-influenced corporation" members for contributions and expenditures—which Defendants do not dispute.[2] Defendants also do not dispute it is impossible for the Chamber to verify which of its 6,300 members are "foreign-influenced corporations" when dues are paid or contributions or expenditures are made.

---

[1] Defendants also question whether SPS Commerce meets the definition of a "foreign-influenced corporation," but amici show it does. (*See* FSFP/CEM Mem. 16.)

[2] *See, e.g.*, Minutes of the June 7, 2023, CFPD Meeting, CFPD Board (June 7, 2023), *available at* https://cfb.mn.gov/citizenresources/the-board/meetings/agendas/ (discussing that the statute does not prohibit use of funds from "foreign-influenced corporations" that "are *not election related*" (emphasis added)).

Therefore, the Chamber's speech—such as in the form of contributions to Pro Jobs—will be severely curtailed and chilled. (*See* Loon Decl. ¶¶16, 24-31, 41.)

Defendants and amici also erroneously argue that corporations with *any* foreign ownership do not enjoy First Amendment rights because they are not "associations of citizens." (CFPD Board Mem. 25; FSFP/CEM Mem. 8.) But the plaintiff in *Citizens United* was a non-profit; and the Supreme Court's holding specifically applied to "corporations and *other associations*." 558 U.S. at 343 (emphasis added). Defendants' and amici's reckless doctrine is also contrary to the Supreme Court's statement that a company would have to be owned "*predominantly* by foreign shareholders" to be subject to a loss of rights on the basis of mere ownership alone. *Id.* at 362. (emphasis added).

## II.   THE CHAMBER IS LIKELY TO PROVE THE STATUTE IS UNCONSTITUTIONAL IN SEVERAL RESPECTS.

The Chamber is likely to succeed on its claims that the statute is unconstitutional under the First Amendment and Supremacy Clause. Defendants rely merely on hearsay and attorney argument to oppose the actual testimonial and documentary evidence.

### A.   The State Does Not Have a Compelling Government Interest to Support Its Heightened, Unprecedented Restrictions on Corporate Speech.

Turning first to the First Amendment challenge, because the Chamber has established irreparable harm, it is Defendants' burden to prove <u>both</u> (1) a compelling state interest, <u>and</u> (2) that the statute is narrowly tailored to achieve that interest, and there are no less restrictive means. *Gonzales v. O Centro Espiritia Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Defendants have failed to prove either.

Defendants begin by disputing their burden of proof, citing *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008), and claiming the *plaintiff* must demonstrate likelihood of success. However, in a First Amendment case, the Supreme Court has placed the <u>*burden on the government*</u> to prove that it has a compelling interest and that it has applied that interest in the least restrictive means. *Gonzales,* 546 U.S. at 429 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).

Defendants also attempt to distract attention from the Minnesota Legislature's stated "interest" in restricting political spending as the reason for the statute. They argue Senator Boldon, Senate sponsor, made a "misstatement" when she testified "the stated goal of the bill is to get political spending out of elections."[3] (CFPD Board Mem. 16 n.14.) Apart from this being a true statement, it is also a consistent theme throughout the legislative history.[4]

Defendants and amici assert the State's interest is in "protecting democratic self-governance from foreign influence." (CFPD Board Mem. 23; FSFP/CEM Mem. 7-8.) Even if the Court assumes this was the State's interest, this interest is limited to restricting foreign nationals *themselves* from *making*, directly or indirectly, contributions and *participating in* decisions related to spending—something federal law already does. Indeed, Defendants assert *Bluman* "is the persuasive authority on this issue." (CFPD Board

---

[3] Minn. Sen. Floor Debate, 93rd Minn. Leg., Reg. Sess. (April 26, 2023), *available at* https://www.lrl.mn.gov/media/file?mtgid=1048121 (emphasis added).

[4] *E.g.*, Minn. H. Elections, Finance, and Policy Comm., 93rd Minn. Leg., Reg. Sess. (January 18, 2023), *available at* https://www.lrl.mn.gov/media/file?mtgid=104812 ("If I were a king for a day, I would say we should not have nearly as much spending at all" (Rep. Stephenson)).

Mem. 23.) *Bluman* held the federal restrictions are based on the government's "compelling interest…in limiting the participation of foreign citizens in activities of American democratic self-government." *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (Kavanaugh, J.). The statute, however, goes much further than simply placing the same federal restrictions on foreign nationals; it also prohibits *domestic* companies from making any contributions or expenditures based on *de minimis* foreign ownership.

Defendants argue "it makes no sense to ban direct spending by foreign nationals but not indirect spending by the exact same foreign nationals through domestic entities." (CFPD Board Mem. 25.) The Chamber agrees; but this tautological argument gets Defendants nowhere because the federal government has already banned "indirect" spending by "foreign nationals through domestic entities." *See* 52 U.S.C. § 30121; 11 C.F.R. § 110.20; *see also e.g., Singh*, 979 F.3d at 708 (prosecuting foreign nationals for indirect political spending through "straw donors"). Indeed, Congress created a "rewards program" to incentivize reports of "foreign election interference." 22 U.S.C. § 2708(a)(2), (b)(13), (k)(4)(B). Therefore, if "protecting democratic self-governance from foreign influence" were the *actual* interest the statute seeks to achieve, it has already been vindicated by federal law.

At bottom, Defendants and amici have no actual evidence to support the statute's restrictions on domestic entities based on *de minimis* foreign ownership. If the government's interest were intended to be in line with *Bluman*, then it would have merely sought to restrict foreign nationals themselves from participating in decisions regarding,

and in making, contributions and expenditures. The statute, however, restricts far more than that, based on mere assumptions about "foreign influence" by owners, in a transparent attempt to nullify *Citizens United.*

**B.      Even If the Government Had a Compelling Interest, the Statute Is Not Narrowly Tailored to Achieve That Interest.**

Defendants have also failed to prove that restricting domestic companies from engaging in political speech merely because of 1% or 5% aggregate foreign ownership is narrowly tailored to achieving that interest and the least restrictive means of achieving the purported government interest. *See Gonzales*, 546 U.S. at 429.

As a preliminary matter, Defendants and their supporting amici *have proffered no proof and no evidence.* Instead, Defendants and amici cite heavily to hearsay, most notably the "Coates Letter" and website articles. The Coates Letter—which was not submitted by its author for use in this proceeding or in support of Minnesota's proposed legislation, but instead to a single legislator in California about a different law—is inadmissible hearsay, and its weight must be heavily discounted. *See Asseo*, *v. Pan Am. Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986); *J.K. Harris & Co., LLC v. Dye*, No. 01-CV-2041 (RHK/JMM), 2001 WL 1464728, at *4 (D. Minn. Nov. 16, 2001). Moreover, as to articles, in the Eighth Circuit, sources of this sort are "rank hearsay" and not admissible for any purpose. *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014).

But even if considered, this Court will find the hearsay arguments asserted by Mr. Coates and his articles are both ineffective, *see, e.g.*, Coates, Fein, et al., *Quantifying Institutional Block Ownership, Domestic and Foreign, at Publicly Traded U.S.*

8

*Corporations* (draft dated Dec. 19, 2016) at 8 ("[W]e present *no direct evidence* that any foreign company has used such a potential for influence." (emphasis added)) (copy at Halloran Decl., Ex D), and thoroughly rebutted by Jack V. Hoover, in his *published* article, *Foreign-Influence Laws: The Constitutionality of Restrictions on Independent Expenditures by Corporations with Foreign Shareholders*, 107 Va. L. Rev. 1305 (2021).

Any "facts" suggested by Defendants' out-of-court sources are thoroughly rebutted by the Chamber's supporting declarants. Defendants' failure to meet their burden of proof with actual evidence is reason enough to find that the Chamber is likely to succeed.

1.     *The statute's thresholds are overinclusive because they ban speech from domestic entities that are not foreign influenced or controlled.*

Defendants have not met their burden to prove the statute survives strict scrutiny because they concede that the law captures, in its overly-wide net, American companies who are *not* influenced or controlled by foreign nationals, and not at any risk thereof. Strict scrutiny requires that the government use the least restrictive means to achieve its purported interest. *Gonzales,* 546 U.S. at 429. The statute is not and is therefore unconstitutional.

Defendants argue the statute "sweeps precisely as broad as it must." (CFPD Board Mem. 26.) They base this claim on the proposition that because there may be some possible theoretical situation in which a 1% shareholder *could* influence a particular company's leadership to spend a certain way, then *all* companies with a 1% foreign investor *must* be silenced. They make the same (but more dubious) claim with respect to 5% aggregate

ownership.[5] But Defendants provide <u>no factual support for these assertions</u>. Indeed, Defendants merely state "1% level of ownership presents the *opportunity* for corporate influence." (CFPD Board Mem. 31 (emphasis added).) Amici admit, "Not every 1% owner will engage in active ownership, nor need to." (FSFP/CEM Mem. 11.) They state only that the ownership levels "reflect a reasonable understanding" of the potential for foreign influence. (FSFP/CEM Mem. 9.) A "reasonable understanding" is not a "least restrictive means," however, and does not meet strict strutiny.

Put simply, Defendants and amici have no <u>proof</u> that *de minimis* ownership presents an actual or high risk of foreign influence. Instead, Defendants and amici rely solely on theory and conjecture, *see, e.g.*, Coates, et al., *supra,* at 8 ("The presence of large or multiple foreign stockholders <u>*makes plausible*</u> that some degree of foreign influence in U.S. elections…<u>*may occur*</u>…." (emphasis added)), and that there is need for more research! *Id.*[6] Nor can Defendants or amici defend their position based on hypothetical examples of "foreign influence." Tellingly, Defendants and amici have not shown that a foreign investor was the cause for any of the political spending decision in any of their examples.

As a result of the statute's low thresholds, domestic entities organized, headquartered, and operating exclusively under the laws of the United States that are not in any way actually influenced (or at any high risk of influence) by foreign investors are

---

[5] Under Defendants' theory, all of the foreign investors that own in the aggregate 5% would have to coordinate to influence a company to make certain political spending decisions. This is not only unsupported, but also seemingly impossible.

[6] Indeed, amici have even gone so far as to assert they are not even relevant sources for such information. (*See* Halloran Decl., Exs. E-F.)

automatically prohibited from exercising their First Amendment rights. This is necessarily an overinclusive result. Less restrictive means, such as the standards in federal law that criminalize the concerning influence or control at issue, are available. Indeed, as stated above, 23 states have adopted analogous state laws. *See supra* Part II.A. Defendants and amici have failed to support the statute's wider-sweeping standard.

> 2.    *The statute is underinclusive because it excludes labor unions and other business entities, and it also does not prevent foreign-influenced lobbying or other political advocacy efforts.*

The statute is also underinclusive because it excludes labor unions, partnerships, and other business associations—organizations that are, conceptually, just as susceptible to foreign influence. Defendants do not dispute these points. And in arguing against under-inclusivity, they reveal additional gaps in the statute.

Defendants focus on the exclusion of unions, and argue they are inapplicable because they do not have owners. (CFPD Board Mem. 27.) Although a labor union may not have "owners," it is well-documented that labor unions can be influenced by foreign interests.[7] Additionally, Defendants do not address the fact that the statute does not apply to partnerships and other entities, which under Defendants' theory could be "foreign influenced." There is no serious question the statute is underinclusive.

Furthermore, in their briefing, Defendants reveal another way in which the statute is underinclusive: it merely prohibits political *spending*. Yet, if the government interest is in "protecting democratic self-governance from foreign influence" (CFPD Board Mem.

---

[7] *See Infiltrated Labor Unions*, U.S. DOJ, https://www.justice.gov/criminal/criminal-vcrs/infiltrated-labor-unions (last updated November 15, 2023).

23), then the statute would *not* allow allegedly "foreign-influenced corporations" to engage in "lobby efforts." (*Id.* at 32.) This shows the statute was really intended to reduce *spending* (and undermine *Citizens United*), rather than truly protect against "influence."

> 3.    *The certification requirement is further proof that the law is overinclusive, vague, and will chill speech.*

The statute's certification requirements are further evidence of the statute's lack of narrow tailoring because political speech from public companies, whose stock is regularly tracked, will be chilled due to these companies' inability to certify without risk that they are not foreign-influenced corporations. Those who determine with enough degree of certainty that they meet the statutory definition will not be allowed to speak, even when they are not influenced or controlled by any foreign owners. And the Chamber will not be able to use dues from members who choose not to disclose their ownership.

Defendants and amici focus heavily on the burden of the certification requirement, as if to suggest that the ability to determine ownership decides narrow tailoring. It does not. Moreover, Defendants and amici's *arguments* are no substitute for competent witness *testimony*. Archie Black, former long-time CEO and current Chairman of SPS Commerce, Inc., has fully explained why determining ownership on any given day is impracticable for a public company and that risk-averse corporations will be chilled from speaking. (Black Decl. ¶¶ 7-12, 25-26.) The Court should rely on this competent testimony that is based on Mr. Black's personal *direct knowledge and experience*.

The Court should *not* rely on Defendants and amici's mere citation to the Coates Letter and other out-of-court resources. Mr. Coates and these other speakers are not

appearing as witnesses in this matter, so their hearsay statements deserve little to no weight. They have no personal knowledge; and offer nothing more than their speculative assertions. *See, e.g.,* Coates, et al., *supra,* at 8 ("The presence of large or multiple foreign stockholders _makes plausible_ that some degree of foreign influence in U.S. elections…_may occur_ even among U.S. companies with apparently dispersed ownership." (emphasis added)). And Defendants and amici's musings regarding the actual burdens imposed by requiring the confirmation of current owners and their respective nationality on any given day are likewise based on mere *speculation*.

In summary, Defendants have not carried their burden in strict scrutiny to show that the statute is narrowly tailored to the least restrictive means of achieving the alleged goal of "protecting democratic self-governance from foreign influence." The Chamber, on the other hand, has proffered competent evidence showing why the statute is not narrowly tailored. Therefore, the Chamber is likely to succeed on its First Amendment claim.

### C.    The Foreign Influenced Corporation Statute is Preempted.

Apart from the First Amendment violation, the Chamber is likely to prevail on the merits because the statute is preempted by federal law in several respects. Congress has expressly legislated that FECA and FEC regulations preempt any state attempts to regulate federal elections. And Congress's unique expression of its intent to regulate restrictions on foreign nationals' involvement in every "Federal, State, and local election" demonstrates its intent to occupy the field as to this subject through a uniform national standard. Without such a uniform national standard, foreign nationals could influence spending in state and local elections in the 27 states that have not imposed analogous limitations.

13

*1.    The statute's attempt to regulate spending with respect to federal elections is expressly preempted.*

Defendants do not dispute the statute, by its plain terms, attempts to regulate contributions and expenditures with respect to federal elections. (CFPD Board Mem. 19-20.) They argue, however, the Court should (1) apply a presumption against preemption and (2) ignore the text of the statute in lieu of supposed "legislative history." (*Id.*)

First, although there is, in general, a "strong presumption against preemption," *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993), this presumption does *not* apply "when the State regulates in an area where there has been a history of significant federal presence." *Bell v. Blue Cross & Blue Shield of Oklahoma*, 823 F.3d 1198, 1201 (8th Cir. 2016) (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)). Moreover, "the presumption should not apply where 'considerable federal interests' are at stake." *Id.* (quoting *Locke*, 529 U.S. at 108). "That the States may also have legislated alongside Congress…does not alter this conclusion." *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 555 (2009) (Thomas, J., concurring in part).

There is a long history of federal presence on the subject of foreign contributions in connection with elections because of its importance to national security. Congress enacted FECA in 1974, and for the past 50 years, Congress has regulated foreign nationals' ability to contribute to *all* elections. *See* 52 U.S.C. § 30121; 2 U.S.C. § 441e (1974) (predecessor statute). As amicus CLC concedes, *less than half* of the states have attempted to regulate alongside the federal government—and when they have, they have pointed to or reiterated

14

the federal standard.[8] (*See* CLC Mem. 11-12.) These states appreciate the value of a uniform national standard. And in the states that have not so regulated, such direct or indirect involvement by foreign nationals is still barred by virtue of this same uniform national standard. There is no basis to apply any presumption against preemption here.

Second, Defendants exaltation of "legislative history" is misguided. Under Minnesota law, "the letter of the law *shall not be disregarded* under the pretext of pursuing the spirit." Minn. Stat. § 645.16 (emphasis added). Defendants' cases also explain, "if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *United States v. Jungers*, 702 F.3d 1066, 1069 (8th Cir. 2013) (citation omitted).

Defendants cite to *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 545 (8th Cir. 1984), but that case does not support their argument. The Eighth Circuit was addressing a situation in which a Missouri law forbade city police officers from making "any" political contribution. *Id.* at 544. The court held the scope of FECA's preemption clause—which states FECA and FEC rules "supersede and preempt any provision of State law *with respect to election* to Federal office" (emphasis added)—is "not so clear (if any statute ever is) as to preclude us from consulting the legislative history." *Id.* at 545. The legislative history made clear that FECA was not intended to preempt state laws regulating

---

[8]Amicus CLC argues "many states have gone substantially beyond the scope of FECA's foreign money ban." (CLC Mem. 14 & nn.9-10.) However, apart from sporadic extensions of regulation to ballot initiatives, the statutes are *all co-extensive or narrower* than FECA and FEC regulations. Take, for example, Alaska Statute § 15.13.068. This law specifically states that its prohibitions on a "foreign-influenced corporation" are "only to the extent" of that prohibited *or permitted* by federal law. *Id.* § 15.13.068(b)(1)-(2). There is no tradition of state regulation on this particular subject.

15

the political activities of police officers. *Id.* Thus, *Reeder* did not address a situation in which the scope of a *state law* was ambiguous, such that legislative history needed to be consulted; instead, it addressed the ambiguous scope of *FECA's* preemption provision.[9]

Defendants do not argue about the scope of FECA's preemption provision. Nor could they. As *Reeder* itself acknowledges, FECA "supersede[s] state laws on permissible contributions…those, for example, made by unions, *corporations*, or *foreign nationals*." *Id.* (emphasis added). Moreover, even if the statute's legislative history were to be considered, that history would *not* show that the Minnesota Legislature sought only to regulate state and local elections. (*See* Chamber Mem. 8-15.)

Amicus CLC argues the statute does not apply to federal elections, but ignores the definition of "candidate" in Minnesota Statute § 211B.01, subdivision 3, which "means an individual who seeks nomination or election to a *federal*, statewide, legislative, judicial, or local office." Minn. Stat. § 211B.01, subd. 3 (emphasis added). Notwithstanding CLC's incorrect assertion to the contrary (CLC Mem. 7), the "definitions" section of Chapter 211B states that its definitions broadly "apply to this chapter." The statute is codified in Chapter 211B. There is no conflicting definition anywhere else in the Chapter. Therefore, the definition of "candidate" in § 211B.01 applies to the statute and dictates its scope.

---

[9] Defendants' argument that "The Eighth Circuit was explicit that 'some state laws that could be characterized as coming within the preemption provision, if read literally and broadly, remain valid,'" is a misstatement. The court actually observed the appellant "seems to concede" that this was the case. 733 F.2d at 545.

Because the statute attempts to regulate contributions with respect to federal elections, this overreach is expressly preempted by FECA.

>    2.    *The statute is impliedly preempted <u>and</u> conflicts with federal law that permits the speech banned by the statute.*

The statute is also impliedly preempted because Congress has occupied the field of regulation of foreign nationals' contributions and expenditures with respect to all elections, and the statute is in conflict with Congress's intended national uniform scheme of regulation to protect *all* elections. Congress has acted to pervasively occupy the field of regulation on this specific subject, and its federal interest in this topic is dominant.

Defendants again argue that the Court must apply a presumption against field and conflict preemption. (*See* CFPD Board Mem. 20-21.) But, as stated above, the presumption does not apply given 50 years of federal regulation. *See supra* Part II.C.1. Congress's unique, specific regulation of foreign nationals' contributions with respect to "Federal, *State, or local* election" demonstrates its intent to occupy the field and establish a national standard. 52 U.S.C. § 30121 (emphasis added) Indeed, amicus CLC concedes, § 30121 is "unique" in its express extension to state and local elections. This unique expression of congressional intent to legislate not only federal, *but also state and local*, elections on the narrow topic of foreign nationals' spending demonstrates that Congress sought to establish a uniform standard applicable to all elections throughout the country.

As the Ninth Circuit recently observed, it is "necessary and proper" for Congress to regulate election issues like foreign nationals' contributions and involvement in contributions, which bear on national security. *United States v. Singh*, 979 F.3d 697, 710

17

(9th Cir. 2020). The federal government "has the power to prohibit foreign nationals from donating and contributing to state and local elections," and "Congress has made a judgment on a matter of foreign affairs and n*ational security by barring foreign nationals from contributing to the election process." Id.* (emphasis added). "Accordingly, Congress was within its power when it acted to protect the country's political processes after recognizing the susceptibility of the elections process to foreign interference." *Id.*

If Congress could not so-regulate, then states would have the unilateral ability to decide whether foreign nationals can influence state and local elections. The result of amicus CLC's argument, then, would be that foreign nationals would have *carte blanche* ability to influence state and local elections in the 27 states (a majority) that do not independently purport to regulate foreign nationals' participation in political spending.

The uniqueness of Congress's choice to regulate foreign nationals' involvement in political speech in state and local elections supports a strong inference that Congress sought to occupy the field of regulation on this narrow subject. This is buttressed by the fact that Congress has otherwise sparingly sought to regulate state and local elections, and has only done so in banning poll tests in a "Federal, State, or local election," 52 U.S.C. §§ 10303(a)(1), 10501(a); outlawing extortion of contributions to candidates or parties for any "Federal, State, or local election," 18 U.S.C. § 601(a), (b)(1); prohibiting solicitation or receipt of donations in federal buildings in connection with a "Federal, State, or local election," 18 U.S.C. § 607(a)(1); and criminalizing false claims of citizenship to register to vote in any "Federal, State, or local election," 18 U.S.C. § 1015(f). Similarly, the FEC has only issued *one* regulation that applies to any "Federal, State, or local election." *See* 11

18

C.F.R. § 110.20. Congress and the FEC's choices to narrowly regulate state and local elections strongly implies their joint intent to create a uniform national standard, which the statute would undermine if not enjoined. *See* Hoover, *supra,* at 1340 & n.180 ("Federal prohibitions…may represent a comprehensive, nationwide response to foreign political interference to which local laws represent an obstacle.").

To the extent Defendants believe legislative history should control (*e.g.*, CFPD Board Mem. 19-20), the legislative history shows the explicit "Federal, State, or local election" scope in § 30121 was incorporated as part of the Bipartisan Campaign Reform Act of 2002 ("BCRA"). *See* Pub. L. 107-155, Title III, § 303 (Mar. 27, 2002), 116 Stat. 96, 109. Prior to then, FECA barred foreign nationals' involvements in "connection with *an election* to *any* political office…." 2 U.S.C. § 441e(a) (1980) (emphasis added). Thus, the BCRA made even more explicit Congress's intention that the restrictions on contributions and expenditures by foreign nationals apply to every "Federal, State, and local election," thereby resolving any potential "ambiguity" as to the law's scope. *See United States v. Trie*, 21 F. Supp. 2d 7, 13, 25 & n.18 (D.D.C. 1998) (noting potential "ambiguity" regarding § 441e's scope). Following the BCRA, it is now even more clear that the Minnesota statute invades the preempted "zone." *See Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 846 (N.D. Tex. 2011) (explaining a Texas statute fell within the

19

"nonpreempted zone of state laws" because it did *not* impose limits, restrictions, or regulations on "foreign nationals" (citing § 441e)), *aff'd*, 712 F.3d 185 (5th Cir. 2013).[10]

Defendants argue there is no field preemption because there is "*no* federal law that defines the term 'foreign-influenced corporations' or regulates such spending." (CFPD Board Mem. 22.) This argument misses the mark. It is a well-established principle that "*any* policy toward aliens is vitally and intricately interwoven with contemporaneous [federal] policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (emphasis added). The statute attempts to regulate within the same sphere. This undermines the intended purpose and "natural effect" of the uniform national scheme on this inherently federal subject. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

## III.    THE BALANCE OF HARMS WEIGHS IN FAVOR OF PROTECTING THE FREE SPEECH RIGHTS OF THE CHAMBER AND ITS MEMBERS.

Defendants do not seriously dispute the balance of harms weighs in favor of the Chamber and its members; indeed, they admit they have <u>no evidence</u> of *future* attempts by foreign nationals to influence elections in Minnesota through political spending. (*See* Halloran Decl., Exs. G-I.) And federal law addresses the concerns alleged by Defendants. *See supra* Part II.A. At most, Defendants argue the Chamber "delayed" in bringing its

---

[10] Amicus CLC argues, prior to *Citizens United*, Congress did not face a concern about corporate spending in elections, so it could not have intended a uniform standard. (CLC Mem. 14.) However, § 441e pre-dated *Citizens United* by 37 years, and the BCRA by 9 years, and both limit "foreign principal" (foreign corporation) spending in any election.

motion, but Defendants do not dispute that the statute does not go into effect until January 1, 2024. (*See* CFPD Board Mem. 34.) The Chamber has been diligent, rather than dilatory.

## IV. ENJOINING AN UNCONSTITUTIONAL STATUTE FAVORS THE PUBLIC INTEREST IN UPHOLDING THE CONSTITUTION.

Defendants do not dispute that enjoining an unconstitutional statute is in the public interest. They merely argue, "Minnesotans deserve to have their duly enacted laws enforced." (CFPD Board Mem. 37.) There is no basis for Defendants to argue Minnesota has the right to amend the Constitution or abrogate the judgments of Congress and the FEC.

## CONCLUSION

Based on the foregoing, the Chamber respectfully requests the Court enjoin Defendants from enforcing the statute while this matter is finally adjudicated on the merits.

22

Dated: December 11, 2023

**WINTHROP & WEINSTINE, P.A.**


By: *s/Thomas H. Boyd* _
Thomas H. Boyd, #0200517
Tammera R. Diehm, #0327566
Kyle R. Kroll, #0398433
Jordan E. Mogensen, #0400919
Cianna G. Halloran, #0402841

225 South Sixth Street
Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400
tboyd@winthrop.com
tdiehm@winthrop.com
kkroll@winthrop.com
jmogensen@winthrop.com
challoran@winthrop.com

*Attorneys for Plaintiff*

27812001v5

22