UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Minnesota Chamber of Commerce, *a Minnesota nonprofit corporation*,

Plaintiff,

v.

John Choi, *in his official capacity as County Attorney for Ramsey County, Minnesota*; George Soule, *in his official capacity as Chair of the Minnesota Campaign Finance and Public Disclosure Board*; David Asp, *in his official capacity as Vice Chair of the Minnesota Campaign Finance and Public Disclosure Board*; Carol Flynn, *in her official capacity as Member of the Minnesota Campaign Finance and Public Disclosure Board*; Margaret Leppik, *in her official capacity as Member of the Minnesota Campaign Finance and Public Disclosure Board*; Stephen Swanson, *in his official capacity as Member of the Minnesota Campaign Finance and Public Disclosure Board*; and Faris Rashid, *in his official capacity as Member of the Minnesota Campaign Finance and Public Disclosure Board*,

Defendants.

File No. 23-cv-2015 (ECT/JFD)

**OPINION AND ORDER**

---

Thomas H. Boyd, Kyle R. Kroll, Cianna Halloran, Jordan Mogensen, and Tammera R. Diehm, Winthrop & Weinstine, P.A., Minneapolis, MN, for Plaintiff the Minnesota Chamber of Commerce.

Kristine K. Nogosek and Kevin Scott Plaisance, Ramsey County Attorney's Office, St. Paul, MN, for Defendant John Choi.

Janine Wetzel Kimble, Matthew Mason, Nathan J. Hartshorn, Minnesota Office of Attorney General, St. Paul, MN, for Defendants George Soule, David Asp, Carol Flynn, Margaret Leppik, Stephen Swanson, and Faris Rashid, in their official capacities as Members of the Minnesota Campaign Finance and Public Disclosure Board.

_____

In this case, Plaintiff Minnesota Chamber of Commerce, a nonprofit membership organization representing more than 6,000 Minnesota businesses, asserts First Amendment and Supremacy Clause challenges to provisions of the Minnesota Fair Campaign Practices Act. The challenged provisions—which are scheduled take effect January 1, 2024—would forbid some (but not all) business organizations with foreign ownership from exercising their First Amendment free-speech rights in connection with elections for state and local public office and ballot questions in Minnesota. These free-speech prohibitions have teeth in the form of criminal and civil consequences. Important here, the extent of foreign ownership necessary to trigger the statute's prohibitions is not great: a foreign ownership interest of as little as one percent may qualify. Defendants are the Ramsey County Attorney and members of the Minnesota Campaign Finance and Public Disclosure Board. The Ramsey County Attorney (along with all County Attorneys in Minnesota) and the Board are among the state officials empowered to enforce the challenged statute.

The Chamber moved for a preliminary injunction, seeking to enjoin Defendants from enforcing subdivisions 4a and b of the challenged statute, Minn. Stat. § 211B.15. ECF No. 58. The motion will be granted because the Chamber is likely to prevail on the merits of its First Amendment challenge. Preventing foreign influence on Minnesota elections is a compelling state interest in the abstract. The problem is that settled constitutional principles require any state statute that burdens—or, as here, outlaws—

political speech to be narrowly tailored to achieving that compelling interest. The challenged provisions are not narrowly tailored in the sense our Constitution requires.

I

Governor Tim Walz signed H.F. No. 3 into law on May 5, 2023. 2023 Minnesota Laws Chapter 34, art. 3, sec. 3–6. H.F. No. 3 amended Minn. Stat. § 211B.15 to prohibit "foreign-influenced corporations" from making political contributions and independent expenditures in Minnesota's elections. As noted above, the amended statute becomes effective January 1, 2024. 2023 Minnesota Laws Chapter 34, art. 3, sec. 3–6.

For the statute's purposes, a "corporation" is defined as:

> (1) a corporation organized for profit that does business in this state;
>
> (2) a nonprofit corporation that carries out activities in this state; or
>
> (3) a limited liability company formed under chapter 322C, or under similar laws of another state, that does business in this state.

Minn. Stat. § 211B.15 subdiv. 1(c)(1)–(3). Although the "corporation" definition in subdivision 1(c) includes nonprofit corporations, the statute later makes clear that the challenged provisions are not intended to regulate the political activities of nonprofit corporations. Minn. Stat. § 211B.15 subdiv. 1(d).

The statute defines a foreign-influenced corporation as a for-profit corporation or limited liability company for which at least one of the following conditions is met:

> (1) a single foreign investor holds, owns, controls, or otherwise has direct or indirect beneficial ownership of one percent or more of the total equity, outstanding voting shares,

3

>   membership units, or other applicable ownership interests of
>   the corporation;
>
>   (2) two or more foreign investors in aggregate hold, own,
>   control, or otherwise have direct or indirect beneficial
>   ownership of five percent or more of the total equity,
>   outstanding voting shares, membership units, or other
>   applicable ownership interests of the corporation; or
>
>   (3) a foreign investor participates directly or indirectly in the
>   corporation's decision-making process with respect to the
>   corporation's political activities in the United States.

Minn. Stat. § 211B.15 subdiv. 1(d)(1)–(3).  A foreign investor is defined, in turn, as a

person or entity that:

>   (1) holds, owns, controls, or otherwise has direct or indirect
>   beneficial ownership of equity, outstanding voting shares,
>   membership units, or otherwise applicable ownership interests
>   of a corporation; and
>
>   (2) is any of the following:
>
>   (i) a government of a foreign country;
>
>   (ii) a political party organized in a foreign country;
>
>   (iii) a partnership, association, corporation, organization, or
>   other combination of persons organized under the laws of or
>   having its principal place of business in a foreign country;
>
>   (iv) an individual outside of the United States who is not a
>   citizen or national of the United States and who is not lawfully
>   admitted for permanent residence in the United States; or
>
>   (v) a corporation in which a foreign investor as defined in items
>   (i) to (iv) holds, owns, controls, or otherwise has directly or
>   indirectly acquired beneficial ownership of equity or voting
>   shares in an amount that is equal to or greater than 50 percent
>   of the total equity or outstanding voting shares.

4

Minn. Stat. § 211B.15 subdiv. 1(e).

The challenged statute provides that a foreign-influenced corporation must not:

> (1) make an expenditure, or offer or agree to make an expenditure, to promote or defeat the candidacy of an individual for nomination, election, or appointment to a public office;

> (2) make contributions or expenditures to promote or defeat a ballot question, or to qualify a question for placement on the ballot;

> (3) make a contribution to a candidate for nomination, election, or appointment to a public office or to a candidate's principal campaign committee; or

> (4) make a contribution to a political committee, political fund, or political party unit.

Minn. Stat. § 211B.15 subdiv. 4a(a)(1)–(4).   To avoid circumvention, "[a] foreign-influenced corporation must not make a contribution or donation to any other person or entity with the express or implied condition that the contribution or donation or any part of it be used for any of the purposes prohibited by this subdivision."  Minn. Stat. § 211B.15 subdiv. 4a(b).

To enforce these prohibitions, § 211B.15 includes a compliance-certification requirement.  A corporation or limited liability company "that makes a contribution or expenditure authorized by subdivision 3 or 4 must submit a certification to the Campaign Finance and Public Disclosure Board that it was not a foreign-influenced corporation as of the date the contribution or expenditure was made."  Minn. Stat. § 211B.15 subdiv. 4b. "The certification must be submitted within seven business days after the contribution or

5

expenditure is made and must be signed by the corporation's chief executive officer after reasonable inquiry, under penalty of perjury." *Id.*

The challenged provisions are backed by civil and criminal penalties. A representative of a corporation or limited liability company "acting on behalf of the corporation who violates this section is subject to a civil penalty of up to ten times the amount of the violation, but in no case more than $10,000." Minn. Stat. § 211B.15 subdiv. 6(a). A knowing violation of § 211B.15 is a crime. *Id.* subdiv. 6(b). An individual who knowingly violates § 211B.15 on behalf of a corporation may be fined up to $20,000 or imprisoned for up to five years. *Id.* A corporation or limited liability company that violates § 211B.15 is subject to the same civil penalties as an individual. *Id.* subdiv. 7(a). A corporation or limited liability company's knowing violation is also a crime. *Id.* subdiv. 7(b). "A corporation convicted of knowingly violating this section is subject to a fine not greater than $40,000. A convicted domestic corporation may be dissolved as well as fined. If a foreign or nonresident corporation is convicted, in addition to being fined, its right to do business in this state may be declared forfeited." *Id.*

The Chamber filed the operative eight-count Complaint on June 30, 2023. Compl. [ECF No. 1]. On behalf of itself and its members, the Chamber seeks a declaration "Minnesota Statutes sections 211B.15, subds. 1 (a), (b), (c), (d), (e), 4a, and 4b" are unconstitutional because they violate the First Amendment. Compl. ¶¶ 85–96, 142–55. The Chamber also seeks a declaration that those same subdivisions are preempted via the Supremacy Clause by the Federal Election Campaign Act ("FECA"). *Id.* ¶¶ 116–26, 177–87. The Chamber seeks injunctive relief on behalf of itself and its members. *Id.* 97–115,

127–41, 156–76, 188–202.  The Chamber filed a motion seeking a preliminary injunction on October 24, 2023.  ECF No. 58.

II

Before reaching the merits, it is helpful to confirm the Chamber's Article III standing.  The Chamber must allege facts plausibly showing it possesses Article III standing.  *See Jones v. Jegley*, 947 F.3d 1100, 1103–05 (8th Cir. 2020); *see also Rodgers v. Bryant*, 942 F.3d 451, 454–55 (8th Cir. 2019).

The Chamber is an organization that may seek judicial relief from an injury to its members as a representative of those members.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).  To invoke organizational standing, the Chamber must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id.* (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  The Chamber "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing."  *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013) (quoting *Warth v. Seldin,* 422 U.S. 490, 511 (1975)).

Here, the Chamber has done more than plausibly show its standing.  The Chamber submitted declarations from CEOs of member-corporations who testify their corporations will be prohibited from making election expenditures when § 211B.15 subdivision 4a becomes effective.  *See* ECF Nos. 62–64.  This declaration testimony describes an injury,

7

caused by the statute, that will be redressed by enjoining enforcement of the statute.  The First Amendment interests the Chamber seeks to protect are germane to the Chamber's stated mission of "lead[ing] the statewide business community to advance pro-business, responsible public policy."  ECF No. 61 ¶¶ 2–7.  And the Chamber seeks declaratory and injunctive relief that does not require "individualized proof and . . . [is] thus properly resolved in a group context."  *Hunt*, 432 U.S. at 344.[1]

III

A preliminary injunction is an "extraordinary remedy."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  The Eighth Circuit's familiar *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest."  *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112–14 (8th Cir. 1981) (en banc)).  The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase*, 640 F.2d at 113 (footnote omitted).  "The burden of establishing the four factors lies with the party seeking injunctive relief."

---

[1]      At the hearing on the Chamber's motion, the Board did not seriously dispute that the Chamber had adequately demonstrated organizational standing at this stage of the case.

*CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations and internal quotation marks omitted). "[A] party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a 'fair chance' that it will succeed on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008). Instead, the movant must "make[] a threshold showing that it is likely to prevail on the merits." *Id.* at 732. "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). Conversely, when a court determines a plaintiff is "likely to win on the merits of their First Amendment claim, a preliminary injunction is proper." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 877 (8th Cir. 2012).

1

The Chamber's first argument is that the challenged provisions of Minn. Stat. § 211B.15 violate the First Amendment. ECF No. 60 at 21. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "[T]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265,

272 (1971)).  The Supreme Court has "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'"  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 343 (2010) (quoting *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)).  "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *Bellotti*, 435 U.S. at 783).  Although "foreign organizations operating abroad have no First Amendment rights," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. ---, 140 S. Ct. 2082, 2088 (2020), domestic corporations are protected under the First Amendment.  *Citizens United*, 558 U.S. at 342 (collecting cases).  There is no support for the proposition that corporations lose their First Amendment protections merely because a foreign national purchases some share or interest, no matter how small.  *Cf. id.*  After all, "American corporations . . . [are] members of the American political community."  *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 290 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012).  And no case holds that a corporation ceases to be "American" by virtue of any quantum of foreign ownership.

Section 211B.15 subdivision 4a prohibits foreign-influenced corporations from making political contributions and independent expenditures.  Minnesota enforces this ban with civil and criminal penalties.  *See* Minn. Stat. § 211B.15 subdiv. 6–7.  "Independent expenditures are indisputably political speech," *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012), and "[l]aws that burden political speech are

10

'subject to strict scrutiny,'" *Citizens United*, 558 U.S. at 340 (quoting *Fed. Election Comm'n v. Wis. Right To Life, Inc. ("WRTL")*, 551 U.S. 449, 464 (2007)).  Under strict scrutiny, the "*Government* must prove that [§ 211B.15] furthers a compelling interest and is narrowly tailored to achieve that interest." *WRTL*, 551 U.S. at 464.

In general, courts apply a different standard of review when political contributions are regulated.  "[R]estrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003).  "While contributions may result in political expression if spent by a candidate or an association . . ., the transformation of contributions into political debate involves speech by someone other than the contributor." *Buckley v. Valeo*, 424 U.S. 1, 21 (1976).  *Citizens United* "cast[] doubt on *Beaumont*, leaving its precedential value on shaky ground." *Swanson*, 692 F.3d at 879 n.12.  However, the Supreme Court has (so far) declined to reconsider the distinction between contributions and expenditures.  *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 199 (2014) ("[W]e see no need in this case to revisit Buckley's distinction between contributions and expenditures and the corollary distinction in the applicable standards of review."); *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 305 (2022).  Because the Supreme Court has not overruled its earlier precedent, exacting scrutiny remains the standard of review when political contributions are regulated. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).  Under exacting scrutiny, "the challenged law must advance a sufficiently important state interest and employ means closely drawn

to avoid unnecessary abridgment of First Amendment freedoms." *Free & Fair Election Fund v. Mo. Ethics Comm'n*, 903 F.3d 759, 763 (8th Cir. 2018).

Although the Board acknowledges the distinction, it "assumes for purposes of this motion that strict scrutiny applies." ECF No. 88 at 23. The Chamber and amici apply strict scrutiny without acknowledging the distinction. The better answer, for purposes of this order, is to follow the heightened standard of review the Board assumes applies. But it makes no difference in the end. Both tests "assess the fit between the stated governmental objective and the means selected to achieve that objective." *McCutcheon*, 572 U.S. at 199. "Or to put it another way, if a law that restricts political speech does not 'avoid unnecessary abridgment' of First Amendment rights it cannot survive 'rigorous' review." *Id.* (quoting *Buckley*, 424 U.S. at 25). For reasons to be discussed, the political contribution prohibitions in § 211B.15 would fail even under the "closely drawn" test for the same reasons the challenged provisions are not narrowly tailored.

a

The first prong of strict scrutiny is Minnesota's compelling interest. The Board contends "Minnesota has a compelling interest in protecting democratic self-governance in Minnesota from foreign influence." ECF No. 88 at 23. For support, the Board relies on *Bluman v. Federal Election Commission*, 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd,* 565 U.S. 1104 (2012). In *Bluman*, foreign citizens, who resided and worked in the United States on temporary work visas, challenged the constitutionality of 2 U.S.C. § 441e(a), a provision of the Bipartisan Campaign Reform Act. *Id.* at 282–83. Section 441e(a) prohibits foreign citizens from donating money to candidates in federal and state elections.

*Id.*  The court rejected the First Amendment challenge, reasoning "[t]he United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process."  *Id.* at 288.  *Bluman*'s rationale expressly extends to foreign corporations, although the court declined "to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis."  *Id.* at 292 n.4.

The Supreme Court's summary affirmance renders *Bluman* binding precedent, *Hicks v. Miranda*, 422 U.S. 332, 344 (1975), although "the precedential effect of a summary affirmance can extend no farther than the precise issues presented and necessarily decided by those actions," *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182 (1979) (quotations omitted).  From *Bluman*, it follows that Minnesota has a compelling interest to limit the participation of foreign citizens and foreign corporations in activities of American democratic self-government, including spending money to expressly advocate for or against a political candidate.  *Bluman*, 800 F. Supp. 2d at 289–90 ("Spending money to contribute to a candidate or party or to expressly advocate for or against the election of a political candidate is participating in the process of democratic self-government.").

The Chamber seems to challenge the presence of a compelling interest when it argues that the "professed intent to limit 'foreign influence' in domestic elections is a pretext" to limit corporate spending in elections, ECF No. 60 at 26, but this contention is not persuasive.  To support this point, the Chamber relies on statements from the legislative

record.  *See e.g.*, ECF No. 60 at 9 ("[T]he stated goal of this bill is to get political spending out of elections[.]").   As the Board points out, the legislative record includes many references to Minnesota's stated goal of limiting foreign influence.  ECF No. 88 at 14–16. Regardless, the Chamber's subjective-intent analysis would seem to flip the strict-scrutiny test on its head.  As the Supreme Court explained in the equal protection context, "the purpose of strict scrutiny is to 'smoke out' illegitimate [purposes]."  *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).  As in *Citizens United*, the better approach is to rigorously test Minnesota's stated compelling interest.

The scope of the compelling interest also deserves clarification in view of arguments advanced by the Board.  The Board contends "*Bluman* could be read to permit restrictions on election activities of corporations with *any* equity held by foreign investors."  ECF No. 88 at 28.  And it further argues that § 211B.15 "simply makes sure entities contributing to our political process are, indeed, associations of U.S. citizens."  ECF No. 88 at 25.  The Board implies, in other words, that Minnesota has a compelling interest to prohibit all political expenditures by a corporation with even a single foreign shareholder to prevent foreign influence in the process of democratic self-government.

Not so.  For several reasons.  Although *Citizens United* declined to "reach the question whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process," 558 U.S. at 362, Justice Kennedy observed § 441b would be overbroad (even if the interest was compelling) because § 441b was "not limited [to] corporations or associations that were created in foreign countries or funded predominately by foreign shareholders," *id.*  In other

14

words, Justice Kennedy suggested there *could* be a compelling foreign-influence interest to ban the independent expenditures of corporations "funded predominately by foreign shareholders." One percent is a far cry from predominately. *Bluman* serves the Board no better. Because *Bluman* concerned individuals, the court had "no occasion to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis." *Bluman*, 800 F. Supp. 2d at 292 n.4.

The better answer is that preventing the exercise of First Amendment-protected political speech by a corporation with foreign shareholders, without more, does not alone represent a compelling interest. As *Bluman* explained, "American corporations . . . [are] members of the American political community." *Bluman*, 800 F. Supp. 2d at 290. And although *Bluman* found § 441e(a)'s indirect prohibition constitutional, it does not follow that a foreign shareholder indirectly participates in our national political process simply by possessing shares. Instead, Minnesota's compelling interest to prevent foreign nationals from participating in our national political process extends to preventing foreign nationals—including foreign shareholders of domestic corporations—from controlling or exercising influence over a corporation's election-expenditures.

b

The second prong of the strict scrutiny analysis is narrow tailoring. "A narrowly tailored [statute] is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the

least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (collecting cases). "[T]he seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as *precisely* tailored as possible." *Id.* The challenged provisions of § 211B.15 are not narrowly tailored to achieve Minnesota's compelling foreign-influence interest.

(i) The first step is considering how the statute advances Minnesota's stated compelling interest—preventing foreign influence in its elections. *White*, 416 F.3d at 751. To be actually necessary and advance the stated interest, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." *United States v. Alvarez*, 567 U.S. 709, 725 (2012). To this end, courts consider evidence of the harm the Government seeks to prevent. *McCutcheon*, 572 U.S. at 219–21; *Eu*, 489 U.S. at 226; *Cruz*, 596 U.S. at 306–08; *281 Care Comm. v. Arneson*, 766 F.3d 774, 790–91 (8th Cir. 2014).

The Board and amicus Clean Elections identify several potential ways foreign shareholders could exercise control or influence over a corporation's political expenditures. ECF 88 at 29 n.18 ("investors with [1%] ownership can easily get executive-suite management on the phone."), 30 ("The ability to present a shareholder proposal can create substantial leverage."); ECF No. 92 at 10 ("Shareholders can also exert influence through actual or threatened proxy fights to change a company's management."). And the Board contends that a foreign national with one percent ownership could exert such influence over a corporation, pointing to the SEC's longstanding rule that shareholders with a one percent stake in a corporation may present a shareholder proposal. ECF No. 88

at 28.  Fair enough.  But explaining how foreign minority shareholders *could* exercise influence over corporations is not enough to justify § 211B.15's ban on corporations' political speech.  The Board must do more than "simply posit the existence of the disease sought to be cured."  *Col. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 618 (1996) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)).  The Board fails to offer evidence that minority foreign shareholders have even once exercised influence or control over a corporation's election expenditures in Minnesota or elsewhere.

The Board points to Uber and Airbnb spending millions of dollars on municipal ballot initiatives despite the presence of substantial foreign shareholders—Saudi Arabia held a stake in Uber, and Moscow-based DST Global held a stake in Airbnb.  ECF No. 88 at 9; ECF No. 93-1 at 4–5.  But the Board does not identify how, or if, Saudi Arabia or DST Global exercised control or influence over these corporations' election-related expenditures.  Nor is there any reason to infer, for example, that DST Global exercised such influence over Airbnb's response to the "New York Legislature's growing interest in regulating the industry," ECF No. 93-1 at 4–5, election expenditures consistent with Airbnb's core business interests.

Next, the Board cites a handful of news articles involving domestic subsidiaries of foreign companies.  *See* ECF No. 88 at 9.  For example, in 2016, a company "controlled by two Chinese citizens" gave $3 million to support Jeb Bush's run for president.  *Id*. Taking these articles at face value (and assuming, without deciding, that the political expenditures constituted foreign influence in a compelling sense), this only demonstrates

17

how § 211B.15 *slightly* advances Minnesota's foreign-influence interest.  This is because § 211B.15's one-percent and five-percent thresholds are premised on the danger of minority foreign shareholders exercising control or influence.  Evidence that subsidiaries "controlled" by foreign shareholders have (occasionally) attempted to influence the nation's political process does not justify Minnesota's foreign minority shareholder concerns.

The Board's reliance on the City of Seattle's findings of fact is equally unpersuasive.  Seattle found, for example, that foreign nationals were "unlawfully funneling foreign funding into local elections through third parties and shell corporations."  ECF No. 88 at 12.  But Minn. Stat. § 211B.15 does nothing to prevent foreign nationals from "funneling foreign funding into local elections" through straw donors and shell corporations owned by citizens.  And although not a requirement, the absence of any factual findings by the Minnesota Legislature is noteworthy.  Nor has the Board identified any examples of foreign influence in Minnesota elections.  It suffices to say, Minnesota has not demonstrated § 211B.15's one-percent and five-percent thresholds are sufficiently linked to the harm sought to be prevented.  And courts "have never accepted mere conjecture as adequate to carry a First Amendment burden."  *Arneson*, 766 F.3d at 790 (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000)).

(ii) A statute may fail narrow tailoring for being overinclusive.  *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011).  A statute is overinclusive when it "sweep[s] too broadly," infringing further on First Amendment rights than is necessary to advance the

compelling interest. *Wersal v. Sexton*, 674 F.3d 1010, 1026 (8th Cir. 2012); *White*, 416 F.3d at 751.

Section 211B.15 classifies a corporation as "foreign-influenced" when a single shareholder holds a one-percent interest, or multiple shareholders collectively hold a five-percent interest. As discussed previously, corporations with foreign shareholders retain the First Amendment rights identified by *Citizens United*. And § 211B.15's prohibition on corporate independent expenditures, backed by criminal penalties, infringes on those corporations' First Amendment rights. *Citizens United*, 558 U.S. at 339. A domestic corporation with a foreign shareholder holding one percent of its shares is banned from speaking, even if that foreign national is a passive investor who exercises no influence or control over the corporation's election expenditures. Because the Board has failed to identify evidence that minority foreign shareholders regularly (or ever) exercise influence or control over corporations' political expenditures, the challenged provisions of § 211B.15 sweep far too broadly.

*Citizens United* cautions that the loss of corporations' political speech, and consequently their First Amendment rights, must not to be taken lightly. *See Citizens United*, 558 U.S. at 354–56. The Board counters that the statute "affects very few companies overall." ECF No. 88 at 26 (emphasis added). But the Center for American Progress, an advocate for the one-percent and five-percent thresholds, estimates the statute covers 98% of S&P 500 companies and 28% of smaller publicly traded companies. ECF No. 86 at 17 (citing Center for American Progress, Fact Sheet, Nov. 21, 2019, tinyurl.com/4pcxhwdr). Regardless, if § 211B.15 banned the speech of fewer corporations,

that would not solve the over-inclusiveness problem. Minnesota cannot create a "categorical ban[] on speech that [is] asymmetrical to" its stated compelling interest. *Citizens United*, 558 U.S. at 361.

(iii) "[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011)). And "[u]nderinclusiveness can also reveal that a law does not actually advance a compelling interest." *Id.* at 449. A "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (quoting *White,* 536 U.S. at 780). Both concerns are implicated by § 211B.15's underinclusiveness.

The challenged provisions of § 211B.15 are substantially underinclusive. Section 211B.15 subdivision 4a regulates the political contributions and independent expenditures of corporations and limited liability companies. It does not regulate labor unions, partnerships, nonprofits, cooperatives, or other business organizations and associations foreign citizens might just as easily use to participate in Minnesota elections. *See Bellotti*, 435 U.S. at 793 (noting that the exclusion of trusts, "labor unions, and other associations undermines the plausibility of the State's purported concern"). The Board counters that "[t]here is no common governance structure that suggests or implies influence by persons that provide funding to the union or non-profit," ECF No. 88 at 27, and contends "a statute is not invalid under the Constitution because it might have gone farther than it did,"

*Buckley*, 424 U.S. at 105 (quotations omitted).  These points might be persuasive had the Board proffered evidence that minority foreign shareholders controlling or exercising influence over domestic corporations' political expenditures was the most serious risk of foreign influence in Minnesota's elections.  It did not.

There is more.  Section 211B.15 subdivision 1(e)(2)(iv) defines a foreign investor as an "individual outside of the United States."  And a foreign-influenced corporation's status is tested when the corporation makes a political expenditure.  *See* Minn. Stat. § 211B.15 subdiv. 4b.  Under the plain language of the statute, if one foreign citizen owned a fifty percent stake in a domestic corporation, that corporation could make expenditures in Minnesota elections while that foreign citizen vacationed in the United States but not while that foreign citizen resided abroad.  A limited liability company owned by migrant workers could make political expenditures in local elections while those members are in the United States, but not while a member traveled overseas to visit family.  However, if the migrant workers formed a partnership or cooperative, their political contributions would always be allowed by § 211B.15 (regardless of any owner's presence in the United States).  Because the statute tests the status of the corporation at the time expenditures are made, a corporation could make a political expenditure if a foreign national sold her shares the day before a political expenditure regardless of what actual influence that shareholder exerted on the organization's political activities in the days preceding the expenditure. Moreover, although § 211B.15 prohibits foreign investors from "participat[ing] directly or indirectly in the corporation's decision-making process," Minn. Stat. § 211B.15 subdiv. 1(d)(3), the challenged provisions would not forbid non-investor foreign board members

to direct a corporation's election expenditures.   Taken collectively, the challenged provisions thus "leave[] appreciable damage to [Minnesota's] supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172 (quotation omitted).

(iv) Finally, the Board fails to show § 211B.15's ban on political speech is "the least restrictive means" for addressing its compelling interest.  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 827 (2000).  The FEC's regulation prohibits foreign nationals from indirectly influencing federal, state, and local elections as follows:

> A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation, labor organization, political committee, or political organization with regard to such person's Federal or non-Federal election-related activities, such as decisions concerning the making of contributions, donations, expenditures, or disbursements in connection with elections for any Federal, State, or local office or decisions concerning the administration of a political committee.

11 CFR § 110.20(i).  The Board fails to explain why this regulation, focused on the source of the foreign influence rather than banning corporations' political speech, is insufficient to advance Minnesota's compelling interest.  If Minnesota's concern is enforcement of such a regulation, the Board does not explain why disclaimer or disclosure requirements would not be satisfactory. *See Citizens United*, 558 U.S. at 366 ("Disclaimer and disclosure requirements may burden the ability to speak, but . . . do not prevent anyone from speaking.") (quotation omitted).  Or alternatively, a certification requirement.  *See* Wash. Admin. Code § 390-16-335 (requiring certifications that foreign nationals were not involved in making decisions about political contributions).

To summarize, the evidence suggesting that § 211B.15's challenged provisions might advance Minnesota's interest in preventing foreign influence in its elections is highly attenuated, and the challenged provisions are overinclusive, underinclusive, and not the least restrictive means to accomplish Minnesota's stated interest. The challenged provisions are not therefore narrowly tailored. For these same reasons, these provisions fail exacting scrutiny. Section 211B.15 does not "'avoid unnecessary abridgment' of First Amendment rights." *McCutcheon*, 572 U.S. at 199 (quoting *Buckley*, 424 U.S. at 25). For this reason, it cannot survive exacting scrutiny's rigorous review. *Id.* The Chamber will likely prevail on the merits of its First Amendment claim.

2

The Chamber also claims § 211B.15's challenged provisions are preempted by the Federal Election Campaign Act. The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. Congress may preempt state statutes by exercising its power under the Supremacy Clause. It may exercise this power expressly or impliedly. "Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field." *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012). Congress may impliedly preempt state law through conflict or field preemption. Conflict preemption, as its name implies, occurs where a state law "directly conflicts with federal law." *Id.* Direct conflict with federal law occurs "when compliance with both federal and state laws is impossible, and when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress.'" *Keller v. City of Fremont*, 719 F.3d 931, 940 (8th Cir. 2013) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).  "Where Congress occupies an entire field … even complementary state regulation is impermissible.  Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401.  Because the Chamber challenges provisions of § 211B.15 on express, conflict, and field preemption grounds, each will be addressed in turn.

a

"Express preemption exists where Congress uses explicit pre-emptive language to express its purpose." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 792 (8th Cir. 2010) (quotation omitted).  The FECA includes such express language. *See* 52 U.S.C. § 30143.  The FECA states that its provisions and any regulations prescribed under its provisions "supersede and preempt any provision of State law with respect to election to Federal office." *Id.*  And the FEC has clarified through regulation that the FECA supersedes state law with respect to three categories of federal campaign activity. *See* 11 C.F.R. § 108.7(b).  The Board does not dispute that § 211B.15 subdivisions 4a–b would be preempted if its provisions applied to foreign-influenced corporations' federal-election expenditures and contributions.  The parties dispute whether § 211B.15 prohibits political expenditures in federal elections.

Section 211B.15 subdivision 4a prohibits foreign-influenced corporations from, among other things, making "a contribution to a candidate for nomination, election, or appointment to a public office or to a candidate's principal campaign committee." Section

24

211B.15 provides that "[f]or purposes of this section, the terms defined in this subdivision have the meanings given.  Unless otherwise provided, the definitions in section 10A.01 also apply to this section."  Minn. Stat. § 211B.15, subdiv. 1.  Section 211B.15 does not define candidate.  Section 10A.01 does.  It defines candidate as "an individual who seeks nomination or election as a state constitutional officer, legislator, or judge."  Minn. Stat. § 10A.01 subdiv. 10.  In other words, § 10A.01 expressly defines a candidate as an individual running for state office.

The Chamber counters that Minn. Stat.  § 211B.01 defines candidate as "an individual who seeks nomination or election to a federal, statewide, legislative, judicial, or local office . . . except candidates for president and vice-president of the United States."  Minn. Stat. § 211B.01 subdiv. 3.  And "[t]he definitions in chapter 200 and this section apply to this chapter."  Minn. Stat. § 211B.15 is in the same chapter.  Minn. Stat. § 211B.01 subdiv. 1.  If the definition of candidate in § 211B.01 subdivision 3 applies, § 211B.15 prohibits foreign-influenced corporations from making contributions and expenditures to promote or defeat federal candidates.  And because § 211B.15 regulates contributions and expenditures in federal elections, the Chamber reasons, the statute is expressly preempted.

But the Chamber fails to explain why § 211B.01 subdivision 3's definition of candidate controls instead of § 10A.01 subdivision 10's.  In H.F. No. 3, the Minnesota Legislature amended § 215B.15 to expressly incorporate § 10A.01's definitions.  *See* 2023 Minnesota Laws Chapter 34, art. 3, sec. 3–6.  And § 215B.15 subdivision 4a relies on multiple definitions from § 10A.01, including political committee, Minn. Stat. § 10A.01 subdiv. 27, political fund, *id.* subdiv. 28, political party unit, *id.* subdiv. 30, ballot question,

*id.* subdiv. 7, contribution, *id.* subdiv. 11, and expenditure, *id.* subdiv. 9.   None of those terms are defined by § 211B.01 or § 211B.15 subdivision 1.   It is not plausible that the Minnesota Legislature incorporated all of those terms expressly limited to state elections and state-election entities, *see, e.g.*, Minn. Stat. § 10A.01 subdiv. 30 (defining a political party unit as "the state committee, the party organization within a house of the legislature, or any other party organization designated by the chair of the political party in an annual certification of party units provided to the board"), but intended "candidate" to be defined by Minn. Stat. § 211B.01.   Because the FECA only expressly preempts state laws with respect to elections of federal office, and the prohibitions in § 211B.15 subdivisions 4a–b are limited to state offices, the provisions are not expressly preempted by the FECA.[2]

b

State laws "are preempted when they conflict with federal law."   *Keller*, 719 F.3d at 940.   Conflict preemption includes where "compliance with both federal and state regulations is a physical impossibility," *Arizona*, 567 U.S. at 399 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)), and when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* (quoting *Hines*, 312 U.S. at 67).   Because it is not impossible for corporations to comply with § 211B.15 subdivisions 4a–b and the FECA, only the latter type of conflict preemption is at issue here.   "What is a sufficient obstacle is a matter of

---

[2]       If the Chamber were correct, the remedy would be to enjoin the application of § 211B.15's challenged provisions to federal elections, not to state and local elections.   *See, e.g.*, *Republican Party of N.M. v. King*, 850 F. Supp. 2d 1206, 1215–16 (D.N.M. 2012).

judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). When Congress legislates in a field "which the States have traditionally occupied . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).

The parties dispute the application of this presumption. An amicus argues that state elections are a field traditionally occupied by the states. *See* ECF No. 98 at 10. The Chamber replies that the "federal interest in this topic is dominant," ECF No. 100 at 17, because the FECA regulates foreign nationals, and "any policy toward aliens is vitally and intricately interwoven with contemporaneous [federal] policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." ECF No. 100 at 20 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952)). The Chamber further emphasizes that such regulations implicate the federal government's national security interest. ECF No. 100 at 17–18.

But the Chamber discounts *Bluman*'s rationale—the court in *Bluman* did not ground its decision in the federal government's national security or foreign relation interests. Instead, *Bluman* reasoned that "[t]he government may exclude foreign citizens from activities 'intimately related to the process of democratic self-government.'" *Bluman*, 800 F. Supp. 2d at 287 (quoting *Bernal v. Fainter*, 467 U.S. 216 (1984)). And many of the cases *Bluman* cited for this proposition involved states (not the federal government)

excluding foreign nationals.  *Gregory v. Ashcroft*, 501 U.S. 452 (1991) (Missouri); *Bernal*, 467 U.S. 216 (Texas); *Foley v. Connelie*, 435 U.S. 291 (1978) (New York).  *Bluman* explained that "a State's historical power to exclude aliens from participation in its democratic political institutions [is] part of the sovereign's obligation to preserve the basic conception of a political community."  *Bluman*, 800 F. Supp. 2d at 287 (quoting *Foley*, 435 U.S. at 295–96).  Because state elections are a traditional area of state regulation, and states' historical authority to exclude aliens from participating in their democratic political institutions includes prohibiting foreign nationals from spending money in their elections, it seems fair to apply the presumption against preemption here.

Moreover, the FECA includes an express preemption clause.  When Congress includes an express preemption clause in a statute, and a state statute is outside the scope of that express clause, there is a presumption against implied preemption.  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992); *see also WinRed, Inc. v. Ellison*, 59 F.4th 934, 944 (8th Cir. 2023).  Here, Congress expressly preempted state laws only "with respect to election *to Federal office*."  *See* 52 U.S.C. § 30143 (emphasis added).  The FEC's rulemaking confirms this.  *See* 11 C.F.R. § 108.7(b) (describing three areas where federal law supersedes state law concerning federal candidates).  The FEC's regulation states that federal law supersedes state law concerning the "[l]imitation on contributions and expenditures regarding Federal candidates and political committees."  11 C.F.R. § 108.7(b)(3).  If Congress or the FEC wanted to prohibit states from regulating foreign nationals' (or corporations') political contributions and expenditures in state elections, they could have expressly done so.  Neither did.

The Chamber does not overcome these presumptions.  The Chamber broadly argues the statute "conflict[s] with Congress's intended national uniform scheme of regulation to protect *all* elections," ECF No. 100 at 17, and "the FEC's choices to narrowly regulate state and local elections strongly implies their joint intent to create a uniform national standard, which the statute would undermine if not enjoined," ECF No. 100 at 19.  The Chamber seems to be referring to cases such as *Arizona v. United States*, where the Court found that state law would "interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens."  567 U.S. at 406.  But Congress's prohibition on foreign nationals from making contributions and independent expenditures is a single statutory section occupying less than a single page.  *See* 52 U.S.C. § 30121.  The Chamber cites no analogous case where a court has found such a provision to be a "comprehensive federal scheme intentionally leav[ing] a portion of the regulated field without controls." *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988). In *Arizona*, for example, the Supreme Court found the Immigration Reform and Control Act was "a comprehensive framework for 'combating the employment of illegal aliens.'" 567 U.S. at 404 (citing *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)).  52 U.S.C. § 30121 is not comparable.  Looking past volume, Congress has not regulated, for example, foreign contributions or expenditures on local ballot initiatives, and it is not clear Congress intentionally left this door open as part of some comprehensive framework.  *See* Fed. Election Comm'n, *Stmt. of Reasons of Chair Broussard*, at *3 (Nov. 2, 2021), https://www.fec.gov/files/legal/murs/7523/7523_28.pdf.  Congress does not preempt state law every time it considers regulating a topic but ultimately declines to

do so. *See Puerto Rico*, 485 U.S. at 503. And when Congress regulates, it just as often creates a floor rather than a uniform rule preempting stricter state laws. *See Atherton v. F.D.I.C.*, 519 U.S. 213, 216 (1997). Nor is there any indication the FEC has taken such a broad view of the FECA's preemptive reach. *See* ECF No. 98 at 8 n.4 (citing Fed. Election Comm'n, *Suppl. Stmt. of Reasons of Comm'r Goodman*, at *2 (May 1, 2015), https://www.fec.gov/files/legal/murs/6678/15044372967.pdf). Simply put, the Chamber has not met its burden: to demonstrate the FECA's prohibition on foreign contributions and expenditures is the type of comprehensive regulatory scheme that preempts Minnesota's stricter regulations in its own elections.

c

"Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401. It occurs when the Government has regulated a field "so comprehensively that it has left no room for supplementary state legislation." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. ---, 138 S. Ct. 1461, 1480 (2018) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)). But there is little difference between the Court's conflict-preemption jurisprudence, when state laws are obstacles to comprehensive regulatory schemes, and field preemption. *See Arizona*, 567 U.S. at 400–08. The same presumptions against implied preemption apply. And the Chamber fails to clearly distinguish between the arguments in its briefing. *See* ECF No. 100 at 17–20. Therefore, the Chamber's field preemption argument will likely fail on the merits for the same reason its conflict preemption argument will likely fail.

30

B

The second *Dataphase* factor is irreparable harm.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013) (same).  The Chamber contends many of their members "have refrained and will each refrain from making contributions that may be used for independent expenditures or ballot questions, due to the statute's prohibitions."  ECF No. 60 at 22.  The Chamber offers affidavits from CEOs of its member-corporations to support this.  *See* ECF Nos. 62–64.

The Board counters that "Plaintiff's need for immediate relief is undercut by its own delay in bringing a motion for injunctive relief."  ECF No. 88 at 33.  This is a fair concern in the abstract.  "[A] party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).  "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, No. 09-cv-1091 (JNE/JSM), 2010 WL 2131007, at *1 (D. Minn. May 25, 2010) (quoting *Weight Watchers Int'l, Inc. v. Luigino's, Inc.,* 423 F.3d 137, 144 (2d Cir. 2005)); *see also Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999).

But these cases are not comparable to what we have here.  In *Hubbard Feeds*, the plaintiff became "aware of . . . infringing conduct" in 1988, but "delay[ed] nine years in asserting its rights."  *Hubbard Feeds*, 182 F.3d 598 at 602.  In *Aviva Sports*, the plaintiff

knew about the defendant's "allegedly false advertisements for several years before bringing [the] action," and even after bringing the action waited more than nine months to file a motion for a preliminary injunction. *Aviva Sports*, 2010 WL 2131007, at *1. And in *Benisek*, "appellants did not move for a preliminary injunction in the District Court until six years, and three general elections, after the 2011 map was adopted, and over three years after the plaintiffs' first complaint was filed." *Benisek*, 138 S.Ct. at 1944.

The Chamber, by comparison, moved for a preliminary injunction roughly five months after the statute was passed in May 2023.[3] Five months is materially different than several years, six years, and nine years. Moreover, in each of those prior cases the alleged irreparable harm was ongoing for several years when a preliminary injunction was sought. By contrast, the Chamber seeks an injunction before the statute becomes effective on January 1, 2024. Despite claiming that speech is already being chilled, the principal harm at issue is the prohibition of speech, backed by criminal and civil sanctions, that will come into effect on January 1, 2024. In other words, the five-month delay here is not dispositive.

C

The remaining two *Dataphase* factors, the balance of harms and the public interest, don't change anything. "[T]he determination of where the public interest lies also is

---

[3]    Governor Tim Walz signed the bill, H.F. No. 3, into law on May 5, 2023. 2023 Minnesota Laws Chapter 34, art. 3, sec. 3–6. The Chamber filed its motion for a preliminary injunction on October 24, 2023, ECF No. 58, but the Board asserts "[t]he Chamber did not bring its motion for preliminary injunction until September 28, 2023," ECF No. 88 at 33. September 28, 2023, appears to be when the Chamber first met and conferred with Defendants. *See* ECF No. 68 ("Plaintiff then waited another three months, until September 28, 2023, to inform the parties that it planned to file a preliminary injunction motion the following week.").

dependent on the determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007), *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008). "The balance of equities, too, generally favors the constitutionally-protected freedom of expression." *Id.* Where, as here, the Chamber is likely to prevail on its First Amendment claim, the remaining *Dataphase* factors strongly support a preliminary injunction.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Plaintiff Minnesota Chamber of Commerce's Motion for Preliminary Injunction [ECF No. 58] is **GRANTED**;

2.      Defendant Choi, in his official capacity, is enjoined from enforcing the "foreign influenced corporation" provisions in amended Minn. Stat. § 211B.15, those provisions being subdivisions 1(b), 1(d), 1(e), 4a, 4b, the reference to "4a" in subdivision 7b(2), and any related rules and regulations;

3.      The Board, in their official capacities, are enjoined from enforcing the "foreign influenced corporation" provisions in amended Minn. Stat. § 211B.15, those provisions being subdivisions 1(b), 1(d), 1(e), 4a, 4b, the reference to "4a" in subdivision 7b(2), and any related rules and regulations;

4.      Defendants, in their official capacities, are enjoined from pursuing civil or criminal liability for any alleged violations of the "foreign influenced corporation"

provisions in amended Minn. Stat. § 211B.15, those provisions being subdivisions 1(b), 1(d), 1(e), 4a, 4b, the reference to "4a" in subdivision 7b(2), and any related rules and regulations, that allegedly occur during the term of this preliminary injunction; and

5.      Plaintiff Minnesota Chamber of Commerce may seek leave to amend its Complaint if it believes new developments justify amendment, and any such motions shall be filed with the undersigned.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 20, 2023                          s/ Eric C. Tostrud
                                                                    Eric C. Tostrud
                                                                    United States District Court