## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Minnesota Chamber of Commerce, *a Minnesota nonprofit corporation*, <br><br> Plaintiff, <br><br> vs. <br><br> John Choi, *in his official capacity as* County Attorney for Ramsey County, Minnesota; George Soule, *in his official capacity as* Chair of the Minnesota Campaign Finance and Public Disclosure Board; David Asp, *in his official capacity as* Vice Chair of the Minnesota Campaign Finance and Public Disclosure Board; Carol Flynn, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Margaret Leppik, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Stephen Swanson, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; and Faris Rashid, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board, <br><br> Defendants. | Case No.: 23-CV-2015 (ECT/JFD) <br><br><br><br><br><br><br><br><br><br><br><br> **PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS OF PROFESSOR SARAH HAAN** |

## INTRODUCTION

Plaintiff Minnesota Chamber of Commerce ("Chamber") respectfully moves under Federal Rule of Evidence 702 to exclude the opinions offered by Defendants' proffered expert, Professor Sarah Haan. First, Professor Haan admits she is only offering "legal opinions," which are inappropriate and usurp the role of the Court. Second, Professor Haan

is not qualified to offer any non-legal opinions related to the subjects on which she seeks to opine—corporate speech, corporate governance, and campaign finance—because she has no specialized experience in these fields. Third, Professor Haan fails to make up for her lack of experience with any empirical studies or data, nor has she considered or referenced any evidence from this case, to support any of her opinions. Fourth, Professor Haan does not offer more than speculation to support her opinions. Therefore, Professor Haan's opinions must be excluded under Rule 702.

## PROFESSOR HAAN'S BACKGROUND

This involves the First Amendment and issues related to campaign finance and corporate governance. In support of revised Minnesota Statute §211B.16, Defendants have disclosed and intend to offer Professor Sarah C. Haan as a potential expert in this case.

**I.     Professor Haan Is a Lawyer and Law Professor Who Has Admitted Her Opinions in this Case are Entirely Legal Opinions and Conclusions.**

Professor Haan is a lawyer and law professor. (Declaration of Thomas H. Boyd dated July 19, 2024 ("Boyd Decl."), Ex. K ("Haan Dep.") at 66:13-16.) Professor Haan admits her opinions are the product of her legal knowledge and experience, and her expert report reflects nothing more than her legal opinions:

> Q. Are you applying your legal expertise in forming your opinions in this case?
>
> A. Yes.
>
> Q. Is it a fair characterization your report offers your legal opinions on the topics that are important to this case?
>
> My report offers my legal opinions on the subjects addressed in the report.

(*Id.* 66:22-67:4.)

## II. Professor Haan Has No Specialized Experience in the Areas of Corporate Management or Corporate Governance That Are Relevant to This Case.

Professor Haan does not have any actual, let alone *specialized*, experience in the activities of corporate management or corporate governance. (*See* Haan Dep. 11:24-12:6.) For example, she has never worked in a corporate management position, never served on a board of directors, never been involved in making corporate decisions (other than advising clients as a lawyer when in private practice),[1] never provided guidance on shareholder proposals, and never been a member or leader of any professional societies that focus on corporate governance. (*Id.* at 13:14-15:10, 21:20-24, 27:1-4.)

In her report, Professor Haan describes the corporate shareholder proposal process. (Haan Rep. 18-20.) However, she has never submitted a shareholder proposal, cannot recall ever voting on a shareholder proposal, has never provided advice or guidance related to shareholder proposals or proxy fights, and has never served on a corporate board making corporate decisions on shareholder proposals. (*Id.* at 13:19-24, 16:9-22, 21:17-22:8.)

Professor Haan admits she is not aware of any instance in which a foreign shareholder sought to influence corporate political spending decision making. (*Id.* at 153:22-155:17, 156:15-24.) Professor Haan also admits she has no idea whether corporate board members are violating federal regulations prohibiting the participation of foreign nationals in domestic elections or political spending decisions. (*Id.* at 43:9-44:14.)

Professor Haan also has not conducted any empirical research regarding foreign shareholder influence over corporate political spending decisions; and she cannot identify

---

[1] Professor Haan admitted she is not relying on any of this experience. (Haan Dep. 22:3-8.)

any instances in which foreign nationals have influenced corporate political spending oversight committees. (*See id.* at 38:19-40:7, 43:9-44:14.)

III. **Professor Haan Has No Specialized Experience in the Areas of Campaign Finance That Are Relevant to This Case.**

Professor Haan has no actual or specialized experience in the field of campaign finance. She admits she has never worked for any regulating body that is tasked with reviewing corporate decisions regarding political spending or worked for a political action committee, fund, or campaign. (Haan Dep. 14:17-15:10.) She is not a member or leader of any campaign finance professional society. (*Id.* at 23:18-24:8.)

Professor Haan has never completed any empirical research or study into the extent, if any, to which foreign nationals are involved in trying to influence corporate political or election spending. While Professor Haan testified she once *attempted* a research project that focused on the corporate boards of publicly-traded companies that have committees in charge of overseeing campaign finance expenditures to determine the nationalities of the members of those committee, she found it "extremely challenging" to find information and never finished the project. (*Id.* at 38:23-40:7.) Professor Haan testified she "wasn't able to get the information [she] needed to draw any conclusions." (*Id.* at 41:23-43:6.)

Professor Haan did not reprise her prior research project in order to form her opinions in this case, nor did she undertake to complete any independent factual investigation to form her opinions. (*Id.* at 46:6-47:4.)

Professor Haan is aware of no evidence of foreign actors seeking to influence Minnesota elections. (*Id.* 111:2-5.) She only speculates that such alleged influence is occurring:

Q. Do you have any evidence that foreign-influenced corporations are currently interfering in any elections in Minnesota?

A. I don't have any evidence nor would I expect to have any evidence because if this is going on, and it probably is, it would be completely not transparent. *It would be secret. We would not know about it.*

Q. Are you aware of any foreign-influenced corporation interfering in the past in any Minnesota election?

A. No.

(*Id.* at 194:11-22 (emphasis added).) Notwithstanding the lack of any empirical data, evidence, or specialized experience, Professor Haan nonetheless suspects that foreign nationals are actively engaged in attempting to influence corporate spending in domestic elections because of the *absence* of evidence of any such activities. (*See id.* 156:15-24.)

## PROFESSOR HAAN'S OPINIONS

Professor Haan offers legal opinions on five subjects.

*First*, Professor Haan opines:

Minnesota has an urgent (and under applicable legal standards, a 'compelling') interest in excluding foreign-influenced corporations from participation in democratic self-government within the state, in order to preserve the basic conception of the political community, to eliminate foreign corruption from elections, and to eliminate the appearance of foreign corruption in elections. Evidence establishes that, in recent years, foreign actors have often sought to influence American elections, and to use domestic corporations as a means of influence.

(Boyd Decl., Ex. J ("Haan Rep.") at 7.) Professor Haan's assertions are legal conclusions based on her reading of caselaw, historic materials, news articles, and anecdotal information from secondary sources. (*See id.* at 9-15 (content and footnotes).) Professor Haan admits she has no personal experience with any of the purported "foreign actors that have often sought to influence American elections," and she has performed no research to determine the extent to which, if at all, foreign actors have actually sought "to use domestic corporations as a means of influence." (Haan Dep. 108:22-17.)

> *Second*, Professor Haan opines:

> It would be constitutionally permissible for Minnesota to prohibit a corporation with a single foreign shareholder from making independent expenditures in elections in the state, because of the vital importance of campaign finance to the democratic process, and in recognition of the core governance role of shareholders in corporate law. Under Minnesota's Democracy for the People Act, American shareholders retain all of their rights to engage in political expression, individually or in association with each other; they simply must do so outside of organizations that are foreign-influenced.

(Haan Rep. 7) Again, Professor Haan's assertions constitute legal conclusions based on her reading of caselaw, law review articles, and legal treatises. (*See id.* at 15-17.) Professor Haan describes aspects of the duties of corporate managers and the rights of individual shareholders, without identifying any evidence that the dynamics or intersection of these duties and rights have resulted in any actual "influence" by foreign shareholders on corporate political spending decision-making. (*See id.*) Professor Haan has no personal experience, and she has done no research in this area, so she can only guess at whether the potential for any such theorical influence is even close to reality. (Haan Dep. 34:3-15, 43:7-44:18, 46:1-47:4, 137:12-143:19.)

*Third*, Professor Hann opines:

> Any shareholder who is eligible to submit a qualifying shareholder proposal to the corporation is in a position to influence the corporation's decision making. Under SEC Rule 14a-8, a shareholder who has held $2,000 worth of a corporation's stock for at least three years is eligible to make such a proposal. This amount of stock is far less than 1% of stock at most publicly-traded companies.

(Haan Rep. 7) Professor Haan's assertions regarding a shareholder's eligibility to submit a proposal are set forth by the applicable regulations and do not require an expert. (*See id.* at 18-19.) Professor Haan's commentary regarding the motivation of corporate management in responding to shareholder proposals is also unfounded, subjective, and speculative. (*See id.* at 19-20.) While she has written one law review article on the topic (*see id.* 19 n.56), Professor Haan has no personal experience in this area, and she has done no research regarding (and can only guess at whether) shareholder proposals have ever been used for the purpose of exerting foreign influence on corporate political spending decision-making. (Haan Dep. 114:4-16, 189:17-191:5.)

Fourth, Professor Haan opines:

> Today, it is widely accepted in corporate law and practice that a group of shareholders holding, in aggregate, 5% of the corporation's stock can influence the corporation's decision making if those shareholders coordinate or act in concert. A common term for this in corporate law is 'wolf pack.' Because of the difficulty of determining whether shareholders are acting together behind the scenes to influence management—and because coordinated influence-seeking might only become apparent after an election-related expenditure has been made—a prophylactic ban of the type that Minnesota has enacted is the only way to ensure that foreign-influenced corporations will not interfere in elections.

(Haan Rep. 7-8.) Professor Haan generally describes the phenomenon of activist shareholders and the manner in which shareholders acting in concert can *potentially*

influence corporate management decisions. (*See id.* at 20-25.) But Professor Haan cannot identify even one instance in which this "wolf pack" technique has been used to influence corporate political spending decisions—let alone any instances in which any foreign shareholders have formed a "wolf pack" for the purpose of covertly influencing corporate political spending decisions. (Haan Dep. 116:21-117:2.) She admits she has *no evidence* of foreign shareholders acting in concert to influence a corporation. (*Id.*)

> *Fifth*, Professor Haan opines:
>
> The certification requirements in the Democracy for the People Act are not particularly burdensome to corporations. It is relatively easy for both privately-held and publicly-held corporations to obtain information about their own shareholders, at the levels of 1% and 5% aggregate shareholding. Indeed, I would expect most corporations—at least those led by competent managers—to have ready access to this information.

(Haan Rep. 8.) In support of this final opinion, Professor Haan cites to *Citizens United, Blumen*, a federal statute, and two federal regulations. (*See id.* at 26-27 nn.87-91.) This demonstrates her opinions are not only legal conclusions, but also that Professor Haan has no experience to provide expert opinions as to how a private company—or, more importantly, a publicly-held company—would or *could* ascertain the nationalities of its shareholders. (Haan Dep. 39:15-40:7.) Indeed, Professor Haan admitted that she has never personally attempted to identify the nationality of shareholders of a publicly-traded company. (*Id.* at 151:8-11.) Rather, Professor Haan is simply guessing as to how this would be done, suggesting only that "you can just Google them." (*Id.* at 147:7-9.)

## STANDARD OF REVIEW

Federal Rule of Evidence 702 provides:

> A witness who is **qualified** as an expert by **knowledge, skill, experience, training, or education** may testify in the form of an opinion or otherwise **if the proponent demonstrates** to the Court that it is **more likely than not** that:
>
> (a) the expert's **scientific, technical, or other specialized knowledge** will **help the trier of fact** to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is **based on sufficient facts or data**;
>
> (c) the testimony is the **product of reliable principles and methods**; and
>
> (d) the expert's opinion reflects a **reliable application of the principles and methods to the facts** of the case.

Fed. R. Evid. 702 (emphasis added).

This rule was recently amended to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." *Id.* Advisory Committee Notes (2023).

In applying Rule 702, courts consider whether the expert witness is testifying to specialized knowledge that will help the trier of fact understand or decide a fact at issue. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). District courts must ensure expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 579.

Moreover, "a court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.'" *In re Wholesale Grocery Prod. Antitrust Litig.*,

946 F.3d 995, 1000 (8th Cir. 2019) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see, e.g., Smith v. Cangieter*, 462 F.3d 920, 924–25 (8th Cir. 2006) (affirming exclusion of opinion connected to the facts by only the expert's ipse dixit).

The expert must offer more than "vague theorizing based upon general principles," *Pro Service Automotive, L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006), or "patent speculation" and "pure conjecture." *Weisgram v. Marley Co.*, 169 F.3d 514, 518 (8th Cir. 1999); *see also Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293, 297–98 (8th Cir. 1996) (affirming exclusion of "wholly speculative" opinion).

"To the extent [admissibility of an expert's opinions] is a close call," courts may "'relax Daubert's application for bench trials.'" *Keller Industrial, Inc. v. Engineering & Construction Innovations, Inc.,* No. 21-CV-2218 (ECT/JDF), 2024 WL 198999, at *12 (D. Minn. Jan. 18. 2024) (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012)). But that does not mean Rule 702 and *Daubert* cease to apply in a bench trial. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,* 949 F.3d 825, 832-833 (3d Cir. 2020); *accord Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) ("While these concerns are of lesser import in a bench trial, where no screening of the factfinder can take place, the *Daubert* standards of relevance and reliability for scientific evidence <u>must nevertheless be met</u>." (emphasis added)).

"As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is

'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI*, F.3d at 832 (citing *Daubert*, 509 U.S. at 591). "The text of Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the 'trier of fact.'" *Id.* (quoting Fed. R. Evid. 702.) "By using the term 'trier of fact,' rather than specifying judge or jury, Rule 702 does not distinguish between proceedings." *Id.*

> Given that Rule 702 was "amended in response to *Daubert* ... and to the many cases applying *Daubert*, including *Kumho Tire [Co. v Carmichael*, 526 U.S. 137 (1999)]*,*" and its text continues to employ the broad "trier of fact" instead of the more specific "jury," district courts must apply Rule 702 to assess an expert's qualifications, reliability, and fit before weighing the expert's opinions to decide a triable issue. Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."); *see also* Fed. R. Evid. 1101(a) (applying the Federal Rules of Evidence to proceedings before district courts).

*Id.* at 832-33. "Of course, district courts do retain "latitude" to decide "how" to apply those requirements in a bench trial." *Id.* at 833 (quoting *Kumho Tire*, 526 U.S. at 152). "But that "is not discretion to abandon the gatekeeping function" or "perform the function inadequately. Rather, it is discretion to choose among reasonable means of excluding expertise[.]" *Id.* (quoting *Kumho Tire*, 526 U.S. at 158–59 (Scalia, J., concurring)).

Thus, regardless of whether the trial is to a jury or the bench, "[e]xpert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006); *see, e.g., Med. Protective Co. v. Bubenik*, No. 4:06-CV-01639 ERW, 2008 WL 2338069, at *2 (E.D. Mo. May 28, 2008) (applying *Marmo* and, prior to bench trial, excluding expert who

intended to offer inadmissible legal opinions); *see also Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 4:09-CV-01252 ERW, 2018 WL 6110929, at *2-3 (E.D. Mo. Nov. 21, 2018) (applying *Marmo* and, prior to bench trial, excluding expert opinions to the extent they were legal conclusions or opinions, as well as those not based on empirical data).

## ARGUMENT

Professor Haan's opinions should be excluded for at least four reasons: (1) they are mere legal conclusions, (2) she asserts opinions in fields in which she lacks specialized expertise, (3) she does not support her opinions with any—let alone *sufficient*—facts or data, and (4) she provides mere speculation in support of her opinions.

**I.    Professor Haan Admits She Is Only Offering Impermissible "Legal Opinions" and Therefore Defendants Cannot Meet Their Burden to Demonstrate Her Opinions Will "Help the Trier of Fact to Understand the Evidence or to Determine a Fact in Issue."**

The Court should exclude Professor Haan's opinions because she seeks to offer "impermissible legal conclusions." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009). Legal matters are for the Court to decide; accordingly, experts seeking to offer legal opinions must be excluded under Rule 702. *See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995); *Graham v. Connor. Thomas v. Barze*, 57 F. Supp. 3d 1040, 1062 (D. Minn. 2014) (Tunheim, J.).

During her deposition, Professor Haan admitted: "My report offers my *legal opinions* on the subjects addressed in the report." (Haan Dep. 67:3-4 (emphasis added).) In addition, Professor Haan admits that she is only applying her "legal expertise" to form her

opinions. (Haan Dep. 66:22-24.) She testified she is basing her opinions *solely* on her "background in the law and legal scholarship." (Haan Dep. 66:17-21.)

Put simply, Professor Haan's opinions are naked advocacy, rather than reliable expert analysis. To wit, Professor Haan states that there are *no* sources in her expert report that would not be suitable to cite in an *amicus* brief. (Haan Dep. 79:2-6.) And in fact, Professor Haan has submitted such an amicus brief in the related Maine litigation, which is based on "the points that I ma[d]e in my expert opinion." (Haan Dep. 57:3-58:20.) A comparison of Professor Haan's Report with her amicus brief in the Maine litigation reveals many of the same opinions based on dozens of the same sources and using similar statements.[2] In short, Professor Haan is an advocate shrouded as an "expert."

Moreover, the legal opinions set forth in Professor Haan's Report are premised on *incorrect* statements of the law, such as the assertion that the state has a compelling interest to prevent the "appearance of corruption" that she says may arise from alleged foreign influence. For example, Professor Haan opines that Minnesota has a compelling interest to enact the statute so as "to eliminate the appearance of foreign corruption in elections." (Haan Rep. 7 (underlining added).) She asserts "even the *appearance* of foreign influence in our elections poses a threat to self-government." (*Id.* at 9 (underlining added).) According to Professor Haan, "Minnesota could conclude that *any* level of foreign

---

[2] *See* Brief of *Amici Curiae* Corporate and Securities Law Experts in Support of Defendants-Appellants and Vacatur, *Central Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Practices*, No. 24-1265 (1st Cir. June 22, 2024) (Addendum lists Professor Haan as the first professor amicus). A review of that amicus brief reflects the legal analysis in Professor's Haan's Report in this case; and indeed, there are no fewer than 26 of same the sources cited in Professor Haan's Report that are also cited and relied upon for the same propositions in her amicus brief.

ownership was sufficient to render the corporation foreign-influenced for the purposes of preventing corruption or the <u>appearance of corruption</u> in democratic elections." (*Id.* at 16 (underlining added).) Further: "The Constitution permits Minnesota to preserve its political community and eliminate corruption and the <u>appearance of corruption</u> in elections by restricting political expenditures by corporations that are *influenced* by foreign shareholders." (*Id.* at 21 (underlining added).) And: "Under current practices and corporate law norms, a five-percent rule is the least restrictive means by which Minnesota can prevent foreign corruption or the <u>appearance of foreign corruption</u> in elections." (*Id.* at 25 (underlining added).)

Professor Haan's legal opinions conflict with "clear" Supreme Court precedent that holds "the Government <u>may not seek to limit the appearance</u> of *mere influence or access*." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 308 (2022) (emphasis added) (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 208 (2014)). As such, even though the "line between *quid pro quo*[3] corruption and general influence may seem vague at times….[,] the First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it." *Id.* (quoting *McCutcheon*, 572 U.S. at 209); *see also Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, --- F. Supp. 3d ----, No. 1:23-CV-00450-NT, 2024 WL 866367, at *13 (D. Me. Feb. 29, 2024) (rejecting the argument that "the interest in avoiding the appearance of quid pro quo

---

[3] The government only has a recognizable interest in preventing "quid pro quo" corruption or its appearance, and the Supreme Court has "consistently rejected attempts to restrict campaign speech based on other legislative aims." *Cruz*, 596 U.S. 305 (collecting cases). Professor Haan's opinions conflict with this law.

corruption also means there is an interest in avoiding the appearance of foreign government influence," and holding that any such alleged interest is "likely not compelling").

The role of an expert is to assist the trier of fact in understanding the evidence, rather advocating for the ultimate legal conclusions—especially erroneous ones. Professor Haan's opinions cross the line into legal advocacy and should therefore be excluded.

## II. Defendants Cannot Meet Their Burden to Demonstrate Professor Haan Is Qualified "as an Expert By Knowledge, Skill, Experience, Training, or Education" to Offer Opinions on the Areas of Corporate Speech, Corporate Governance, or Campaign Finance That Are Relevant to This Case.

The Court should also exclude Professor Haan's opinions because she lacks "specialized knowledge, skill, experience, training, or education" in corporate speech, corporate governance, and campaign finance to offer opinions on those subjects that would not constitute mere legal opinions. *See* Fed. R. Evid. 702. Professor Haan may have conducted some legal research and scholarship on these topics generally, but she has admits she has no *specialized* knowledge, *specialized* skill, *specialized* experience, *specialized* training, or *specialized* education in these fields. At best, Professor Haan bases her opinions on her work as a law professor researching and teaching classes that touch on these subjects. (*See, e.g.*, Haan Dep. 144:22-145:20, 175:5-22.) But she has no personal or specialized experience that is relevant to and informs her opinions on these topics.

As to *corporate speech and corporate governance*, Professor Haan has never worked in corporate management and has never served on a corporate board of directors or made corporate decisions. (Haan Dep. 13:19-15:1.) Indeed, she has *never worked in business at all*. (*Id.* at 11:24-12:6.) Professor Haan "guess[es]" that "maybe" she could be

considered an "authority" on the rights of shareholders to speak at meetings, communicate with management, and cast votes because she has written about how shareholders' meetings work. (Haan Dep. 172:25-173:4.) However, Professor Haan has never submitted a shareholder proposal, cannot recall ever voting on a shareholder proposal, has never provided advice or guidance related to shareholder proposals or proxy fights, and has never served on a corporate board making corporate decisions on shareholder proposals. (Haan Dep. 13:19-24, 16:9-22, 21:17-22:8.) Outside of some legal scholarship, Professor Haan has no experience on corporate speech or corporate governance topics.

As to *campaign finance*, Professor Haan concedes her opinions related to campaign finance solely on her legal scholarship. (Haan Rep. 6.) She has never worked for a political action committee, political action fund, or political campaign; and she has never conducted surveys, interviews, or gathered data research regarding the intersection of foreign actors and campaign finance. (*See* Haan Dep. 15:1-10, 18:9-19:20, 46:1-47:4.)

Professor Haan also has never worked for a regulating body that reviews corporate decisions, such as the SEC, FEC, or CFPD Board. (Haan Dep. 14:17-15:1.) She also admits: "I'm not a political scientist, so I can't say which specific policies harm American policies to a particular quantum." (Haan Dep. 138:18-139:6.) And, as stated above, she has never been involved in corporate decision-making. (Haan Dep. 14:13-16.) Professor Haan simply has no experience related to campaign finance topics; and, in particular, she has no experience with foreign influence or interference in domestic politics and elections.

Although Professor Haan has conducted some legal scholarship related to the topics of corporate speech, corporate governance, and campaign finance, she has not completed

or published any scholarship on the topic of foreign nationals' participation in or influence over corporate spending. (*See* Haan Dep. 38:19-44:18.) As noted earlier, Professor Haan started a project related to "nationality of board members on [campaign finance board committees]," but she "wasn't able to get the information [she] need to draw any conclusions," and she "was not able to determine if [any FEC regulation] was being violated." (*Id.*) In short, what scholarship she has started (but not completed) is incomplete, inconclusive, and also irrelevant to this case.

The Eighth Circuit has repeatedly required that an expert witness's testimony be limited to topics within her specific areas of expertise. *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (holding that a hydrologist specializing in flood risk management attempting to testify to proper warehouse safety practices was testifying "beyond the scope of his expertise" because the witness had not studied or written articles about warehousing practices and had never been employed by a warehouse); *Olson v. Macalester Coll.*, 681 F. Supp. 3d 949, 983 (D. Minn. 2023) (excluding testimony that an alleged harassment victim "adopted and offered a victim narrative" because although the expert held degrees in psychology, the expert possessed no "education, training, or experience in the area of identifying a 'victim narrative,' assessing the prevalence of that narrative on a college campus, or determining whether an educational institution's policies are premised on accepting that narrative").

Professor Haan's scholarship that tangentially touches on corporate speech, corporate governance, and campaign finance is woefully insufficient to qualify her as an expert and does not bear a close relationship to her opinions about whether foreign

shareholders have influence over corporate political spending. Under Rule 702, Professor Haan must be excluded from testifying on this additional ground.

## III. Defendants Cannot Meet Their Burden To Demonstrate Professor Haan's Conclusions Are "Based on Sufficient Facts or Data."

Professor Haan's opinions should be excluded because they lack a sufficient factual basis. Under Rule 702, an expert's opinion must be "based on sufficient facts or data." In no event will "conclusory statements without sufficient evidentiary support" suffice. *In re Baycol Prod. Litig.*, 596 F.3d 884, 891 (8th Cir. 2010); *accord Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 825 (D. Minn. 2011) (Ericksen, J.).

Typically, an expert relies on the evidence in a case. However, Professor Haan does not rely upon *any* evidence from this case. (*See* Haan Dep. 68:5-24.) As can be seen in the footnotes in her report, she relies instead only on a variety of newspaper articles, secondary sources, and case law (including an opinion from *1809*). (*See* Haan Rep. *passim.*; *see also* Haan Dep. 109:6-12 (explaining that the evidence she refers to regarding foreign actors' influence on elections comes from news reports and "various litigations").) Relying on these kinds of "rank hearsay" is insufficient. *Crews v. Monarch Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014).

Professor Haan also provides no support for many of the claims throughout her report. In such instances, she testified she is relying on her "awareness" of issues "as someone who teaches about the law of money and politics." (Haan Dep. 131:25-132:1-12; *see also id.* at 144:18-25.) For instance, Professor Haan asserts a corporation's management "is likely to care more when someone is a shareholder," but admits to having no "specific

cite" for that proposition. (Haan Dep. 171:12-15.) Professor Haan makes claims about how likely companies are to be attentive to the interests of shareholders, but cannot point to any data quantifying how much more likely a company is to care about the statement of a shareholder over a non-shareholder. (*Id.* at 167:3-10, 175:23-25, 176:1-3.)

Professor Haan asserts that "[t]oday, it is widely accepted in corporate law and practice that a group of shareholders holding, in aggregate, 5% of the corporation's stock can influence the corporation's decision making if those shareholders coordinate or act in concert." (Haan Rep. 7.) However, she is not aware of *any* evidence showing foreign shareholders holding more than 1% or 5% or more in the aggregate have in-fact acted in concert and merely believes it to be possible *because of the __absence__ of such evidence*. (Haan Dep. 116:21-117:11.)

And despite her stated concerns regarding foreign nationals' interference with American elections, Professor Haan admits to having *no evidence* that foreign-influenced corporations now or in the past have *ever* interfered in *any* Minnesota election because she believes such interference is "secret." (Haan Dep. 194:11-18.)

Experts must "explain how [their] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts[.]" *Aviva Sports*, 829 F. Supp. 2d at 825 (quoting Fed. R. Evid. 702, Advisory Committee's note to 2000 Amendment). By relying on rank hearsay and legal commentary (not evidence) in combination with her own subjective beliefs (instead of experience), Professor Haan has failed to "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Aspro,*

*Inc. v. Comm'r of Internal Revenue*, 32 F.4th 673, 676 (8th Cir. 2022). Therefore, Professor

Haan's opinions must be excluded under Rule 702 for this reason as well.

## IV. Professor Haan Relies on Speculation, and Therefore Defendants Cannot Meet Their Burden to Demonstrate Her Opinions Are the "Product of Reliable Principles and Methods."

Finally, Professor Haan's opinions should be excluded because they steeped in

speculation. An expert witness cannot rely on speculation or conjecture. *Weisgram*, 169

F.3d at 518. The Court must exclude "subjective speculation that masquerades as [expert]

knowledge.'" *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009)

(quoting *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001)). And "a

court should not admit opinion evidence that 'is connected to existing data only by the *ipse

dixit* of the expert.'" *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000

(8th Cir. 2019) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Professor Haan seeks to offer opinions based on what she anticipates, presumes, or

suspects—as opposed to pointing to evidence, facts, or data. Although she is unable to find

information regarding the nationality of board members on campaign finance committees

of publicly-traded companies, she "still *suspect[s]* to this day that some of these

committees have non-US citizens on them because it's common for American publicly-

traded companies to have directors who are not American citizens." (Haan Dep. 39:9-14

(emphasis added).) She has no data supporting the supposed common occurrence of foreign

nationals serving as members of these committees of publicly-traded corporations.

When discussing the findings in a third-party report regarding alleged examples of

foreign actors attempting to influence American elections, Professor Haan states there is

"reason to *suspect* there may be much more [examples of foreign influence] because of course if you're a foreign actor trying to interfere in our elections, you have to do it secretly." (Haan Dep. 110:9-12 (emphasis added).) She admits to having no evidence that foreign-influenced corporations are currently interfering in Minnesota elections, yet asserts that the interference is *probably* occurring but that it would be done in *secret*. (*Id.* at 194:14-18.) Professor Haan provides only conjecture to support her assertions that foreign actors are interfering with American elections because the interference is done "secretly."

Professor Haan's prophesizing is perhaps best typified by her testimony that a corporation is influenced by the *mere presence* of a foreign shareholder:

> A....So if one of the candidates has a policy position, for example, that is known for being hardline against -- not to pick on China, but, you know, very aggressive on China or, you know, pick your political issue, then the company will direct their spending to the other candidate. Right. They're not going to spend money -- they're not going to donate to the candidate for the congressional office that might upset their investors. They're going to do the opposite. They're going to direct their funds to the opposing candidate and support that person and they're going to hope for some sort of pat on the back or reward or just approval later from their foreign shareholders as, gosh, you sure supported the right candidate in that race and we're really pleased with how you're running this company because you directed the company's money to the right candidate says the sovereign wealth fund. I mean we don't want to live in an America where that's how money get in to our politics.
>
> Q. Are you aware of any specific instance in which that has occurred?
>
> A. No, I'm not. But it seems logical that this is how things will -- this is how things may work now and will continue to work if this statute gets thrown out.

(*Id.* at 153:22-155:17; *see also id.* 169:6-12.)

In another example, Professor Haan asserts, "[t]he certification requirements in the [Minnesota statute] are not particularly burdensome to corporations," but she admits *she*

*has not done any analysis* as to the costs or difficulties of complying with the certification requirements, and instead she is "just relying on ordinary logic." (Haan Dep. 127:1-9.)

Professor Haan also appeals to "logic" when discussing the possibility of corporations supporting a political candidate who supports polies that may benefit foreign shareholders. Specifically, while she is not aware of any particular instance in which this has occurred, Professor Haan contends that it seems to her to be "logical" that "this is how things may work now and will continue to work if this statute gets thrown out." (Haan Dep. 155:12-17.) These are just some examples of Professor Haan's speculation untethered from facts, data, or recognized principles and methods.

Finally, Professor Haan claims "corporation's political spending decision-makers may be more susceptible to intra-firm pressures than the whole board acting as a body." (Haan Rep. 16.) Professor Haan also claims that directors on the board of a company *may* feel pressure to please foreign shareholders, but admits that she has no evidence of directors' susceptibility to political pressures and does not know how to quantify susceptibility. (Haan Dep. 166:8-167:10.) Indeed, Professor Haan has no empirical research quantifying how much more likely management is to care about a statement of a shareholder, versus a customer, versus any other stakeholder. (*Id.* at 175:23-176:3.) Her opinions are not based on reliable principles and methods or actual data, facts, or evidence.

"An expert generally cannot formulate a theory through supposition based on his or her own expertise." *Presley*, 553 F.3d at 647 (citing *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) (stating, neither "*Daubert* [n]or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse*

*dixit* of the expert" because "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered")). Professor Haan's opinions are solely based on what she speculates to be true, and therefore these opinions are inadmissible and must be excluded for this reason as well.

## CONCLUSION

Because Professor Haan purports to offer legal opinions, lacks qualifications in the fields that are relevant to this case, does not and could not support her opinions with sufficient facts and data, and engages in rank speculation, her opinions must be excluded from evidence in the consideration of the merits of this case.

Respectfully submitted,

Dated: July 19, 2024　　　　　　　　**WINTHROP & WEINSTINE, P.A.**

By: *s/Thomas H. Boyd* _____
Thomas H. Boyd, #0200517
Tammera R. Diehm, #0327566
Kyle R. Kroll, #0398433
Jordan E. Mogensen, #0400919
Cianna G. Halloran, #0402841
225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400
tboyd@winthrop.com
tdiehm@winthrop.com
kkroll@winthrop.com
jmogensen@winthrop.com
challoran@winthrop.com

*Attorneys for Plaintiff Minnesota Chamber of Commerce*

29299580v8