# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Chamber of Commerce, *a Minnesota nonprofit corporation*,<br><br>Plaintiff,<br><br>vs.<br><br>John Choi, *in his official capacity as* County Attorney for Ramsey County, Minnesota; George Soule, *in his official capacity as* Chair of the Minnesota Campaign Finance and Public Disclosure Board; David Asp, *in his official capacity as* Vice Chair of the Minnesota Campaign Finance and Public Disclosure Board; Carol Flynn, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Margaret Leppik, *in her official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; Stephen Swanson, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board; and Faris Rashid, *in his official capacity as* Member of the Minnesota Campaign Finance and Public Disclosure Board,<br><br>Defendants | Case No.: 0:23-cv-02015<br><br><br><br><br><br>**DECLARATION OF DOUG LOON IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

I, Doug Loon, hereby declare:

1.    I am President and CEO of Plaintiff Minnesota Chamber of Commerce ("Chamber"), a nonprofit membership organization organized under the laws of the State of Minnesota. I have held this position since 2015. Prior to assuming leadership of the

1

Chamber, I spent 20 years at the U.S. Chamber of Commerce, as Director of Congressional and Public Affairs and then as Vice President of Regional Affairs and Advocacy.

**The Chamber's Mission and Purposes**

2.      The Chamber is the largest organization representing businesses in Minnesota. The Chamber is currently comprised of approximately 6,300 members, which include both privately-held and publicly-traded companies in every industry and located throughout all of Minnesota.

3.      The Chamber leads the statewide business community to advance pro-business, responsible public policy aimed at creating jobs and growing the economy and provides services to its members to address their evolving business needs. As part of this mission, the Chamber pursues these policies and represents its members' interests through lobbying efforts, supporting pro-business candidates, and advocating issues that impact its members. The Chamber carries out these efforts through various means, including financial contributions to political action committees.

4.      The Chamber has commenced this lawsuit in accordance with and furtherance of the above-described mission and purposes, to defend the First Amendment rights of the Chamber and its members to engage in constitutionally protected free speech and free association activities by challenging the Minnesota law recently enacted in 2023 that, if permitted to become effective, prohibits free speech and imposes civil and criminal penalties for political speech by domestic corporations and limited liability companies.

5.      The Chamber's actions to protect its own free speech rights and the free speech rights of its members are germane to the mission and purpose of the Chamber's

organization, which seeks to advocate and promote business issues that impact its members.

6.     Here, the Chamber is seeking to protect its own rights to engage in free speech through the use of its membership dues to fund independent expenditures and debate over ballot initiatives which will be prohibited by the recently enacted Minnesota legislation amending Minnesota Statute § 211B.15 (the "statute"). The Chamber is also seeking to protect and represent the interests of its members who are corporations and limited liability companies that seek to make independent expenditures and contribute to ballot question debates directly or through political committees for various business reasons but would be deterred from doing so by the prohibitions and penalties imposed by the statute.

7.     The statute's prohibition on protected First Amendment free speech rights adversely affects a core business function of the Chamber—to participate as an organization in society as well as to serve as an entity collectively engaged with an association of individual members to effect positive and constructive change in society. Businesses, as contributors and developers of society, appropriately seek to use their influence and resources to improve the communities in which they operate and to which they contribute substantially as taxpayers, employers, and responsible corporate citizens.

**The Chamber's Members' Chilled Speech**

8.     The Chamber's members include privately-held and publicly-traded corporations and limited liability companies that are subject to the statute.

3

9.     For example, the Chamber's members include corporations and limited liability companies that currently have or may have in the future foreign investors that own non-controlling, de minimis interests of 1% or more in stock or foreign investors who collectively own non-controlling, de minimis interests of 5% or more in stock. While these members are not in fact actually influenced by these foreign, non-controlling investors, these members are nonetheless prohibited from engaging in political speech by the statute because of these de minimis, noncontrolling interests owned by foreign investors.

10.     The Chamber's members also include corporations and limited liability companies that are publicly traded on an ongoing basis, and therefore these entities do not have precise visibility into the extent to which its shares or membership units are owed by "foreign investors" as defined by the statute. Consequently, these entities and officers are unable to certify as required by the statute that they are not "foreign influenced" at any given point in time due to these regular fluctuations in ownership and the lack of visibility as to the nationality of each individual owner. Thus, these companies and their officers cannot certify they are not "foreign influenced" even where there is no evidence that there was any involvement or influence whatsoever by any foreign investor over any decisions regarding the entity's independent expenditures.

11.     The Chamber estimates that at least 100 of the Chamber's members are corporations and LLCs that the Minnesota Legislature has now inappropriately defined as "foreign influenced corporations." This estimate is the base minimum number of such corporations and LLC members; the Chamber's membership likely includes many more members who are or will be adversely impacted and restricted by the statute, but the

4

Chamber cannot specifically identify all such numbers because of the Chamber's limited access to each member's current ownership. All such members may be prohibited by the statute from making independent expenditures if the statute becomes effective.

12.     If the statute were upheld, those members of the Chamber who would like to make independent expenditures to support candidacies or ballot question initiatives in future election cycles must now be concerned about whether they are prohibited from doing so because they may be deemed "foreign influenced" under the new statute.

13.     The statute interferes with the efforts and ability of these Chamber members to plan and budget for political speech activities now and in the future, and they would be understandably fearful of facing the threat of criminal prosecution, civil penalties, and potential dissolution for violations of the statute for engaging in these types of activities.

14.     The speech these Chamber members seek to engage in during the upcoming election cycles will be censored if Defendants are not permanently enjoined from enforcing the statute.

**The Chamber's Membership Dues**

15.     The Chamber's members each pay annual membership dues, which accrue annually in the month when that particular company first became a member of the Chamber. Therefore, the Chamber receives membership dues on a rolling basis every month of the year.

16.     The Chamber uses its membership dues partially for the purpose of making independent expenditures to its political action committee called Pro Jobs Majority which

is an Independent Expenditure Political Committee, as permitted by Minnesota Statutes section 10A.12.

17.    The Chamber typically budgets a total in the range of $500,000-700,000 to be made per election cycle to Pro Jobs Majority.

18.    In 2020, another general election year, the Chamber made contributions to Pro Jobs Majority that totaled $765,000, spread across the Chamber's fiscal year.

19.    These funds were used for political spending including independent expenditures to promote or defeat candidates.

20.    In 2022, in which the most recent general election occurred, the Chamber made independent expenditures to Pro Jobs Majority that totaled $1,347,118.00, spread across the Chamber's fiscal year.

21.    These funds were used for political spending including independent expenditures to promote or defeat candidates.

22.    The Chamber's members understand and generally support the use of their membership dues for pro-business initiatives, including the use of those dues for political expenditures through Pro Jobs Majority.

23.    The Chamber understands that if the statute is not permanently enjoined the Chamber will have to segregate the funds it uses for these purposes so as to exclude any revenue from membership dues paid by members who either are statutorily defined to be "foreign influenced corporations" or are members who the Chamber is unable to determine are not "foreign influenced corporations." This will be the only way in which the Chamber would be able to make independent expenditures in compliance with the statute.

24.     While the Chamber itself cannot be defined as a "foreign influenced corporation" because it is an association with no owners, the Chamber is still nonetheless prohibited from making independent expenditures using membership dues from corporations and LLCs who either are statutorily defined to be "foreign influenced corporations" or are members who the Chamber is unable to determine are not "foreign influenced corporations."

25.     The Chamber's concerns are verified by the Campaign Finance and Public Disclosure Board ("Board") itself which published its "review of changes to campaign finance and public disclosure laws" on June 7, 2023, stating that the statute "does not prohibit donations by a foreign-influenced corporation to an association's general treasury money for its general purposes that *are not election related*." (Emphasis added.)  I also understand that Jeff Sigurdson, Executive Director of the Campaign Finance and Public Disclosure Board testified at his deposition in this case that this interpretation is accurate.

26.     As a result, the statute would burden the Chamber with the unduly difficult task of verifying which of its members are "foreign influenced corporations" in order to be able to segregate the membership dues received from those members in a separate account so as to certify that the Chamber is not using any funds collected from a "foreign influenced corporation" every time that it spends funds in connection with an election. Even if this were otherwise feasible, the Chamber does not have the staffing, resources, or capacity to accomplish such an ongoing segregation of funds that would be required to comply with the statute.

27.     With 6,300 members, the task of segregating funds is nearly impossible and would require retaining new employees to focus entirely on this administrative responsibility.

28.     The Chamber currently does not have the capacity and staff to follow up with every one of its 6,300 members regarding their "foreign-influenced" status and to determine whether segregating funds is necessary.

29.     Some of the Chamber's members themselves cannot determine whether and to what extent their shareholders are foreign nationals, such as publicly-traded members whose shares regularly trade on stock markets and who do not have detailed information regarding the nationality of each of their actual shareholders.

30.     Even if the Chamber had the resources to enable it to be able to segregate membership dues, the Chamber would have significantly less funding to support its mission and contribute towards political activities because of the statute.

**The Effect of the Statute on the Chamber's Present Activities**

31.     The Chamber's fiscal year starts October 1 and ends September 30.

32.     At the time the Chamber filed its Motion for Preliminary Injunction it was actively budget-planning for its next fiscal year, which included preparing for the 2024 election cycle.

33.     At that time and due to the impeding effectiveness date of the statute on January 1, 2024, and its inability to be able to comply with the requirements imposed by the statute and the forthcoming prohibitions imposed by the statute by segregating its membership dues revenue (*see* supra at paragraphs 24-30), the Chamber was forced to

accelerate making contributions for independent expenditures to Pro Jobs Majority that it would ordinarily make for fiscal year 2024, by transferring funds before the end of calendar year 2023 (i.e., on or before December 31, 2023). The Chamber was required to do so before the statute formally was set to go into effect.

34.    Accordingly, the Chamber made a contribution of $440,000 to Pro Jobs Majority in advance of the 2024 election year before the statute were to become effective on January 1, 2024.

35.    Due to the timeline moving up, the Chamber was unable to make an advance contribution of more than $440,000, at amounts in line with its contributions in 2020 and 2022.

36.    The need to contribute funds then (i.e., before the statute were to become effective on January 1, 2024) deprived the Chamber of retaining that money until the second, third, and fourth quarter of its fiscal year in 2024 for alternative interim uses.

37.    As a result, the Chamber faced increased tax consequences in 2023.

38.    The Court granted the Chamber's preliminary injunction on December 20, 2023, enjoining the enforcement of the statute pending the outcome of this litigation.

39.    As a result of the injunction, the Chamber was able to make a contribution to Pro Jobs on June 25, 2024 in the amount of $500,000.

**The Effect of the Statute on the Chamber's Activities Going Forward**

40.    The Chamber seeks to continue to make contributions to Pro Jobs Majority, as it has done in the past, to aid in the election of pro-business candidates throughout Minnesota, which is part of the Chamber's mission and purpose.

9

41.     In the absence of the statute, the Chamber would continue to make additional contributions to Pro Job Majority in future election cycles.

42.     However, the Chamber would be stymied in planning for future election cycles if the statute is not permanently enjoined.

43.     In addition, given the statute's prohibitions, if enforcement of the statute is not permanently enjoined, the Chamber will be unable to contribute additional funds to Pro Jobs Majority in future election cycles.

44.     If the statute is not permanently enjoined, the Chamber will not be able to make any independent expenditures, because it is unable to meet the statute's requirements and cannot put itself or its officers and directors or member companies at risk for facing penalties or prosecution.

45.     The Chamber's speech would therefore be chilled in the absence of relief from the prohibitions and restrictions imposed by the statute.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July __18__, 2024.

_____
Doug Loon, CEO and President

29219089v1