UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Minnesota Chamber of Commerce, *a Minnesota nonprofit corporation*,

        Plaintiff,

v.

John Choi, *in his official capacity as County Attorney for Ramsey County, Minnesota*; George Soule, *in his official capacity as Chair of the Minnesota Campaign Finance and Public Disclosure Board*; David Asp, *in his official capacity as Vice Chair of the Minnesota Campaign Finance and Public Disclosure Board*; Carol Flynn, *in her official capacity as Member of the Minnesota Campaign Finance and Public Disclosure Board*; Dave Kleis,[1] *in his official capacity as Member of the Minnesota Campaign Finance and Public Disclosure Board*; Stephen Swanson, *in his official capacity as Member of the Minnesota Campaign Finance and Public Disclosure Board*; and Faris Rashid*, in his official capacity as Member of the Minnesota Campaign Finance and Public Disclosure Board*,

        Defendants.

File No. 23-cv-2015 (ECT/JFD)

**OPINION AND ORDER**

---

Thomas H. Boyd, Kyle R. Kroll, Cianna Halloran, Jordan Mogensen, and Tammera R. Diehm, Winthrop & Weinstine, P.A., Minneapolis, MN, for Plaintiff Minnesota Chamber of Commerce.

---

[1]    Margaret Leppik previously held this position. *See* ECF No. 154. She has been replaced by Dave Kleis. *Id.* Mr. Kleis is automatically substituted under Federal Rule of Civil Procedure 25(d).

Kristine K. Nogosek and Kevin Scott Plaisance, Ramsey County Attorney's Office, St. Paul, MN, for Defendant John Choi.

Janine Wetzel Kimble, Matthew Mason, and Nathan J. Hartshorn, Minnesota Attorney General's Office, St. Paul, MN, for Defendants George Soule, David Asp, Carol Flynn, Dave Kleis, Stephen Swanson, and Faris Rashid.

---

In this case, Plaintiff Minnesota Chamber of Commerce, a nonprofit membership organization representing more than 6,000 Minnesota businesses, asserts First Amendment and Supremacy Clause challenges to provisions of the Minnesota Fair Campaign Practices Act. The challenged provisions would forbid some (but not all) businesses with foreign ownership from exercising First Amendment free-speech rights in connection with elections for state and local public office and ballot questions in Minnesota. These free-speech prohibitions have teeth in the form of criminal and civil consequences. Important here, the extent of foreign ownership necessary to trigger the statute's prohibitions is not great: a foreign ownership interest of as little as one percent may qualify. Defendants are the Ramsey County Attorney and members of the Minnesota Campaign Finance and Public Disclosure Board. The Ramsey County Attorney (along with all County Attorneys in Minnesota) and the Board are among the state officials empowered to enforce the challenged statute.

This is the case's second round of motions. In the first, the Chamber moved for a preliminary injunction, seeking to enjoin Defendants from enforcing subdivisions 4a and 4b of Minnesota Statutes section 211B.15. I granted the motion, finding it likely the Chamber would prevail on the merits of its First Amendment challenge. "The problem," as I saw the case then, was "that settled constitutional principles require any state statute

that burdens—or, as here, outlaws—political speech to be narrowly tailored to achieving that compelling interest. The challenged provisions are not narrowly tailored in the sense our Constitution requires." *Minn. Chamber of Com. v. Choi*, 707 F. Supp. 3d 846, 854 (D. Minn. 2023). At the same time, I found it likely that the Chamber would not prevail on the merits of its Supremacy Clause claims. The preliminary injunction was not appealed, meaning the challenged provisions were on hold through the 2024 election cycle and to date.

There are several issues to decide in this second round. The Chamber and Defendants filed competing summary-judgment motions addressing the merits of the Chamber's claims. Prefatory to the merits, Defendants argue the Chamber lacks Article III standing to bring the case. To help show its Article III standing, the Chamber moved to supplement the record with evidence that came into existence after discovery closed. And the Chamber moved to exclude the opinions of Defendants' expert witness from consideration in connection with the summary-judgment motions.

The upshot is this: (1) The Chamber has associational standing to bring the case, meaning subject-matter jurisdiction is present. (2) Though I don't think the post-discovery evidence is necessary to establish the Chamber's associational standing, the better answer is to grant the Chamber's motion to supplement the record with this evidence. (3) The Chamber's motion to exclude Defendants' expert yields a mixed result. It will be granted in part to exclude the expert's purely legal opinions. The factual opinions that make up the bulk of the expert's proffered testimony are fair game in adjudicating the parties' competing summary-judgment motions. (4) With respect to the Chamber's First

Amendment claims, the Chamber's summary-judgment motion will be granted, and Defendants' motion will be denied. The fuller, post-discovery record shows the challenged foreign-influence provisions fail First Amendment scrutiny as a matter of law. There are, in other words, no First Amendment–related fact questions that require a trial to resolve. (5) With respect to the Chamber's Supremacy Clause claims, the Chamber's motion will be denied, and Defendants' motion will be granted. The preemption questions at the core of these claims are purely legal, meaning there is no good reason to second-guess the decision at the preliminary-injunction stage to reject these claims.

I

Governor Tim Walz signed H.F. No. 3 into law on May 5, 2023. 2023 Minn. Laws ch. 34, art. 3, secs. 3–6. H.F. No. 3 amended Minnesota Statutes section 211B.15 to prohibit "foreign-influenced corporations" from making political contributions and independent expenditures in Minnesota's elections.[2] The amended statute was scheduled to become effective January 1, 2024. 2023 Minn. Laws ch. 34, art. 3, secs. 3–6.

For the statute's purposes, a "corporation" is defined as:

> (1) a corporation organized for profit that does business in this state;
>
> (2) a nonprofit corporation that carries out activities in this state; or
>
> (3) a limited liability company formed under chapter 322C, or under similar laws of another state, that does business in this state.

---

[2]    Section 211B.15 is a part of the "Minnesota Election Law." Minn. Stat. § 200.01. "The Minnesota Election Law applies to all elections held in this state unless otherwise specifically provided by law." Minn. Stat. § 200.015.

Minn. Stat. § 211B.15, subdiv. 1(c)(1)–(3). Although the "corporation" definition in subdivision 1(c) includes nonprofit corporations, the statute later makes clear that the challenged provisions are not intended to regulate the political activities of nonprofit corporations. Minn. Stat. § 211B.15, subdiv. 1(d).

The statute defines a "foreign-influenced corporation" as a corporation—*i.e.*, a for-profit corporation or limited-liability company—for which at least one of the following conditions is met:

> (1) a single foreign investor holds, owns, controls, or otherwise has direct or indirect beneficial ownership of one percent or more of the total equity, outstanding voting shares, membership units, or other applicable ownership interests of the corporation;

> (2) two or more foreign investors in aggregate hold, own, control, or otherwise have direct or indirect beneficial ownership of five percent or more of the total equity, outstanding voting shares, membership units, or other applicable ownership interests of the corporation; or

> (3) a foreign investor participates directly or indirectly in the corporation's decision-making process with respect to the corporation's political activities in the United States.

Minn. Stat. § 211B.15, subdiv. 1(d)(1)–(3). A "foreign investor" is defined, in turn, as a person or entity that:

> (1) holds, owns, controls, or otherwise has direct or indirect beneficial ownership of equity, outstanding voting shares, membership units, or otherwise applicable ownership interests of a corporation; and

> (2) is any of the following:

5

(i) a government of a foreign country;

(ii) a political party organized in a foreign country;

(iii) a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country;

(iv) an individual outside of the United States who is not a citizen or national of the United States and who is not lawfully admitted for permanent residence in the United States; or

(v) a corporation in which a foreign investor as defined in items (i) to (iv) holds, owns, controls, or otherwise has directly or indirectly acquired beneficial ownership of equity or voting shares in an amount that is equal to or greater than 50 percent of the total equity or outstanding voting shares.

Minn. Stat. § 211B.15, subdiv. 1(e).

The challenged statute provides that a foreign-influenced corporation must not:

(1) make an expenditure, or offer or agree to make an expenditure, to promote or defeat the candidacy of an individual for nomination, election, or appointment to a public office;

(2) make contributions or expenditures to promote or defeat a ballot question, or to qualify a question for placement on the ballot;

(3) make a contribution to a candidate for nomination, election, or appointment to a public office or to a candidate's principal campaign committee; or

(4) make a contribution to a political committee, political fund, or political party unit.

Minn. Stat. § 211B.15, subdiv. 4a(a)(1)–(4). To avoid circumvention, "[a] foreign-influenced corporation must not make a contribution or donation to any other person or

6

entity with the express or implied condition that the contribution or donation or any part of it be used for any of the purposes prohibited by this subdivision."  Minn. Stat. § 211B.15, subdiv. 4a(b).

To enforce these prohibitions, section 211B.15 includes a compliance-certification requirement.  A corporation "that makes a contribution or expenditure authorized by subdivision 3 or 4 must submit a certification to the Campaign Finance and Public Disclosure Board that it was not a foreign-influenced corporation as of the date the contribution or expenditure was made."  Minn. Stat. § 211B.15, subdiv. 4b.  "The certification must be submitted within seven business days after the contribution or expenditure is made and must be signed by the corporation's chief executive officer after reasonable inquiry, under penalty of perjury."  *Id.*

The challenged provisions are backed by civil and criminal penalties.  A representative of a corporation "acting on behalf of the corporation who violates this section is subject to a civil penalty of up to ten times the amount of the violation, but in no case more than $10,000."  Minn. Stat. § 211B.15, subdiv. 6(a).  A knowing violation of section 211B.15 is a crime.  *Id.* subdiv. 6(b).  An individual who knowingly violates section 211B.15 on behalf of a corporation may be fined up to $20,000 or imprisoned for up to five years.  *Id.*  A corporation or limited liability company that violates section 211B.15 is subject to the same civil penalties as an individual.  *Id.* subdiv. 7(a).  A corporation's knowing violation is also a crime.  *Id.* subdiv. 7(b).  "A corporation convicted of knowingly violating this section is subject to a fine not greater than $40,000.  A convicted domestic corporation may be dissolved as well as fined.  If a foreign or nonresident corporation is

convicted, in addition to being fined, its right to do business in this state may be declared forfeited." *Id.*

The Chamber filed the operative eight-count Complaint on June 30, 2023.  Compl. [ECF No. 1].  On behalf of itself and its members, the Chamber seeks a declaration "Minnesota Statutes sections 211B.15, subds. 1 (a), (b), (c), (d), (e), 4a, and 4b" are unconstitutional because they violate the First Amendment.  Compl. ¶¶ 85–96, 142–55.  The Chamber also seeks a declaration that those same subdivisions are preempted via the Supremacy Clause by the Federal Election Campaign Act.  *Id.* ¶¶ 116–26, 177–87.  The Chamber seeks injunctive relief on behalf of itself and its members.  *Id.* ¶¶ 97–115, 127–41, 156–76, 188–202.  As explained in the introduction, above, the challenged provisions have been on hold since December 2023, when the Chamber's motion for a preliminary injunction was granted.  *Minn. Chamber of Com.*, 707 F. Supp. 3d at 854.

II

A

Defendants say the Chamber has not shown an Article III–worthy injury, meaning it lacks standing to sue, and this jurisdictional issue must be the starting point.  *See United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 828 (8th Cir. 2013).  The United States Constitution limits the subject-matter jurisdiction of federal courts to ongoing cases and controversies.  *See* U.S. Const. art. III, § 2, cl. 1.  "Therefore, the plaintiff's standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'"  *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "To show Article III standing, a plaintiff has

8

the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury will likely be redressed by a favorable decision." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 561). Therefore, in this summary-judgment context, the familiar summary-judgment standards apply, just as they would if the issue concerned the case's merits. As the Second Circuit explained:

> At the summary-judgment stage, the plaintiff "can no longer rest on [the complaint's] allegations" of standing. *Lujan*, 504 U.S. at 561, 112 S. Ct. 2130 (cleaned up). Instead, to demonstrate his entitlement to summary judgment on this issue, the plaintiff must "set forth by affidavit or other evidence specific facts" showing that there is no genuine dispute as to facts that attest to his standing. *Id.* (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c). Conversely, to defeat a defendant's motion for summary judgment on the same issue, the plaintiff must produce evidence showing the *presence* of a genuine issue regarding standing that would warrant resolution by trial. *See* Fed. R. Civ. P. 56(c).

*Lugo v. City of Troy*, 114 F.4th 80, 87–88 (2d Cir. 2024). These same principles apply in the other direction to Defendants' motions. Here, the Chamber's motion will be resolved by viewing the Article III–relevant record in the light most favorable to Defendants, and Defendants' motion will be resolved by viewing this same record in the light most

favorable to the Chamber.  *See Progressive Preferred Ins. Co. v. Est. of Stover*, 485 F. Supp. 3d 1043, 1046 (D. Minn. 2020).

Several rules apply to answer whether the Chamber suffered an Article III-worthy injury.  An injury-in-fact is the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted).  Regarding First Amendment claims specifically, the Eighth Circuit explained:

> There are two types of injuries conferring standing for prospective First Amendment relief.  *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016).  The first occurs when a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)).  The second occurs when a plaintiff self-censors.  *Id.* (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011)).  Self-censoring occurs when a plaintiff alleges it "would like to engage in arguably protected speech, but that [it] is chilled from doing so by the existence of the statute." *Arneson*, 638 F.3d at 627.

*Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022).[3]  To show a credible threat of prosecution for Article III purposes, a plaintiff need not "actually violate[]" the challenged statute or "risk prosecution." *Jones v. Jegley*, 947 F.3d 1100, 1104 (8th Cir. 2020).  "[W]hen a course of action is within the plain text of a statute, a 'credible threat of

---

[3]    It seems academic, but I do not understand these categories to be separate in all cases.  It is not difficult to hypothesize a would-be speaker who fits in both.  What if, for example, a plaintiff "alleges an intention to engage in" prohibited speech but self-censors out of fear of prosecution?  To be clear, I do not understand membership in the first category to require a plaintiff to actually engage in prohibited speech.

prosecution' exists." *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019). "Total lack of enforcement of a statute" may defeat a plaintiff's attempt to show a credible threat of prosecution, "but only in extreme cases approaching desuetude." *Arneson*, 638 F.3d at 628 (citing *St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006)); *see also Jones*, 947 F.3d at 1104 (recognizing that a plaintiff's fear of consequences and self-censorship is reasonable "as long as there is no 'evidence— via official policy or a long history of disuse—that authorities' have 'actually' refused to enforce [the] statute") (quoting *Arneson*, 638 F.3d at 628). Self-censorship based on the chilling effect of a statute is a sufficient injury in fact so long as the plaintiff's fear of consequences is "objectively reasonable." *Arneson*, 638 F.3d at 627 (quoting *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009)).

The Chamber may seek judicial relief from its own injuries or from an injury to its members as a representative of those members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To invoke standing as a representative of its members, or "associational standing," the Chamber must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The Chamber "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (quoting *Warth,* 422 U.S. at

511).   In other words, when it comes to showing associational standing, one injured member is enough.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

These rules are applied bearing in mind the Eighth Circuit's guidance that "[t]he First Amendment standing inquiry is 'lenient' and 'forgiving.'"  *Dakotans for Health*, 52 F.4th at 386 (quoting *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699–700 (8th Cir. 2021)).  "[W]hen . . . 'threatened enforcement effort implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing.'"  *Id.* (quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)).

B

The Chamber seeks to establish associational standing by showing that three of its members would have standing to sue on their own, and one of these is Lake of the Woods Cannabis Company.[4]   In a declaration filed in support of the Chamber's summary-judgment motion, Lake of the Woods's co-founder and Chief Executive Officer, Eric Nerland, testified regarding several standing-relevant facts.   He testified the organization is a "privately-held C-corporation incorporated in Minnesota with its principal place of business in Warroad, Minnesota."  ECF No. 135 ¶ 2.  The company "currently manufactures and sells CBD beverages and products as allowed by Minnesota law . . . [and] intends to open dispensaries in Minnesota and sell adult use cannabis once legal to do so."  *Id.* ¶ 3.  Lake of the Woods is a Chamber member "and pays membership dues to advance the Chamber's pro-business initiatives."  *Id.* ¶ 21.  Lake of the Woods "believes it

---

[4]     The Chamber also seeks to show its own standing.  Here, the associational-standing question is more straightforward, so it makes better sense to start there.

has in the past met, and currently and will in the future meet, the statute's definition of 'foreign influenced corporation.'" *Id.* ¶ 6. This is because a Canadian citizen who is not a United States citizen or a permanent resident of the United States owns 19.5 percent of the company's stock. *Id.* ¶¶ 7–8. Mr. Nerland testified that, absent the challenged statute, Lake of the Woods would make independent expenditures and campaign contributions to support pro-cannabis civic and political initiatives and candidates. *See id.* ¶¶ 12–20. "To that end, [Lake of the Woods] has been actively researching candidates and campaigns that are pro-cannabis and support future dispensary businesses in" five Minnesota counties. *Id.* ¶ 16. However, were the statute to remain in effect, Lake of the Woods would not "make any independent expenditures or contributions because it does not meet the statute's requirements and cannot put itself or its officers and directors at risk for facing civil penalties or criminal prosecution." *Id.* ¶ 20. Consistent with this testimony, after the Chamber filed Mr. Nerland's initial declaration—and while Defendants were preliminarily enjoined from enforcing the statute—Lake of the Woods "made an independent expenditure by purchasing advertisement space in the Roseau Times-Region and advertising that [Lake of the Woods] supports the re-election of Representative John Burkel in District 01A." ECF No. 160 ¶ 8; *see also id.* ¶ 9 Ex. A. But for the preliminary injunction, Lake of the Woods would not have made this expenditure. *Id.* ¶ 11.

As a matter of law, the Chamber possesses associational standing by virtue of the standing Lake of the Woods would otherwise have to sue on its own behalf. The upshot of Mr. Nerland's declaration testimony is that Lake of the Woods intended to engage in First Amendment–protected conduct—that is, the making of independent expenditures and

13

campaign contributions supportive of its cannabis-related and other business activities. *See* ECF No. 135 ¶¶ 17–20. However, owing to Lake of the Woods's status as a foreign-influenced corporation, *see id.* ¶¶ 7–8, Minn. Stat. § 211B.15, subdiv. 1(d)(1), these activities would be proscribed by the challenged statute, Minn. Stat. § 211B.15, subdiv. 4a(1), (3). Mr. Nerland's testimony shows, in other words, that Lake of the Woods intended to engage in First Amendment-protected conduct proscribed by a statute.[5] That Lake of the Woods's course of action falls clearly within the challenged statute's plain text establishes a credible prosecution threat. *Alexis Bailly Vineyard*, 931 F.3d at 778. These facts, in turn, establish the "first" type of injury the Eighth Circuit has identified that confers standing for prospective First Amendment relief. *See Dakotans for Health*, 52 F.4th at 386. These facts establish a causal relationship between Lake of the Woods's injury and the challenged statute, and there is no reasonable question a favorable decision would redress the injury. The interests the Chamber here seeks to protect are germane to the Chamber's stated mission of "lead[ing] the statewide business community to advance pro-business, responsible public policy." ECF No. 61 ¶¶ 2–7. And the Chamber seeks declaratory and injunctive relief that does not require "individualized proof and . . . [is] thus properly resolved in a group context." *Hunt*, 432 U.S. at 344.

If it mattered (I don't think it does), Lake of the Woods's independent expenditure to purchase advertisement space in the *Roseau Times-Region*, made after the preliminary

---

[5]    Defendants do not dispute that these parts of Mr. Nerland's declaration testimony describe Lake of the Woods's intentions and the state of things at the time this case was commenced. *See L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 892 (8th Cir. 2024) ("[S]tanding is assessed at the time the action commences.") (quotation omitted).

injunction's entry, proves the genuineness of Lake of the Woods's announced intentions. ECF No. 160 ¶¶ 8–9, Ex. A. Defendants argue that evidence of this expenditure cannot be considered, but for reasons that will be discussed in a bit, I do not agree. Also, if it mattered, Mr. Nerland's testimony establishes that without the preliminary injunction's entry Lake of the Woods would have self-censored—that is, it would have avoided making independent expenditures and contributions because it could not certify that it is not a foreign-influenced corporation. ECF No. 135 ¶ 11. This would have established the "second" type of First Amendment standing-conferring injury the Eighth Circuit has recognized. *Dakotans for Health*, 52 F.4th at 386.

Defendants advance several contentions to show the Chamber does not possess associational standing via Lake of the Woods's injuries, but Defendants' arguments on this point are not persuasive. Defendants say the Court erred in answering the standing question—and determining the Chamber possessed associational standing—before issuing the preliminary injunction. *See Minn. Chamber of Com.*, 707 F. Supp. 3d at 856–57 (finding the Chamber possessed associational standing); ECF No. 146 at 18 (arguing that the Court evaluated Article III standing at the preliminary-injunction stage "[d]espite State Defendants' request" not to do so and "[w]ithout the benefit of a full record"). Ordinarily, refusing to address a colorable subject-matter-jurisdiction question before deciding the merits of a preliminary-injunction motion isn't an option. This is so for a straightforward reason: The absence of subject-matter jurisdiction means the absence of judicial power to issue this extraordinary remedy. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (characterizing "injunctive relief as an extraordinary remedy"); *Nat'l Football*

*League Players Ass'n v. Nat'l Football League*, 874 F.3d 222, 225–29 (5th Cir. 2017) (vacating preliminary injunction because district court lacked subject-matter jurisdiction); *Shred-it Am., Inc. v. MacNaughton*, CV NO 10-00547 DAE-KSC, 2010 WL 11565359, at *4 (D. Haw. Dec. 27, 2010) (recognizing that, "prior to issuing a preliminary injunction, the district court must satisfy itself that it has . . . subject matter jurisdiction over the claims asserted"). Regardless, it is difficult to understand what present concern this argument might reflect. At this stage, the more Chamber-friendly standard that was applied to evaluate the preliminary-injunction motion gives way to the more demanding summary-judgment standard, and this more demanding standard must be applied to a more developed record.[6] There isn't a law-of-the-case problem here. *See Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 905 (8th Cir. 2010) ("The law-of-the-case doctrine only applies to final orders, not interlocutory orders.").

Defendants identify what they believe are standing-defeating gaps in the Chamber's standing-supporting evidence, but these gaps are either immaterial under First Amendment standing rules or filled by record evidence. Defendants' primary contention is that "Lake of the Woods has not engaged in any activities prohibited by the Act at any point in its existence or changed its operations in any way because of the Act." ECF No. 146 at 27. I do not read the cases to require Lake of the Woods to have engaged in prohibited activities

---

[6]    "When assessing standing at the preliminary injunction stage, [the Eighth] [C]ircuit has assumed the complaint's allegations are true and viewed them in the light most favorable to the plaintiff." *Dakotans for Health*, 52 F.4th at 386; *but see Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ("At the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." (quoting *Winter*, 555 U.S. at 22)).

to establish its standing (and, in turn, the Chamber's). The law seems clear on this point: to establish its Article III standing, Lake of the Woods need not "actually violate[]" the challenged statute or "risk prosecution." *Jones*, 947 F.3d at 1104. What matters is whether Lake of the Woods possesses "an *intention* to engage in a course of conduct" protected by the Second Amendment but forbidden by the statute. *Dakotans for Health*, 52 F.4th at 386 (emphasis added). According to Defendants, the record lacks evidence showing Lake of the Woods's intention in this regard. *See* ECF No. 146 at 24 ("[T]here is no evidence in the record that any of Plaintiff's members presently proposing to prepare budgets and allocate assets that will be used to make prohibited contributions, independent expenditures, or ballot question expenditures, now or in the future."). This is not correct. Mr. Nerland's declaration testimony placed Lake of the Woods's intention to engage in just such a course of conduct but for the statute beyond dispute. ECF No. 135 ¶¶ 16–20. He testified that Lake of the Woods had "begun the process of creating advertisements in support of certain pro-cannabis political candidates that would be considered an independent expenditure under Minnesota law," *id.* ¶ 17, and that Lake of the Woods "intend[ed] to make these expenditures in advance of the 2024 election," *id.* ¶ 18. Again, if evidence of an expenditure were required, the record has it in the form of Lake of the Woods's purchase of advertising space in the *Roseau Times-Region* to back a Minnesota House candidate. ECF No. 160 ¶ 8; *see also id.* ¶ 9 Ex. A.

Defendants' response to Lake of the Woods's expenditure evidence is to argue it cannot be considered, but it can, and the better answer is that it should. It is true the

Chamber first produced evidence of the expenditure well after discovery closed.[7]    Rule 26(e), however, requires a party who has made a disclosure under Rule 26(a) or responded to written discovery requests to timely "supplement or correct its disclosure or response" if it obtains additional responsive information that "has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1).  The Chamber's disclosure falls within Rule 26(e)'s supplementation requirement.  The expenditure was responsive to a discovery request Defendants propounded.  *Compare* ECF No. 167 at 5 (asserting that Lake of the Woods's "independent expenditures and contributions . . . have been specifically requested by Defendants in discovery"), *with* ECF No. 172 (declining to deny this assertion).  Rule 37 does not, as Defendants contend, justify excluding this evidence.  Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The Chamber did not "fail[] to provide" this information; it timely supplemented in compliance with Rule 26(e)(1)(A).  If prejudice mattered, Defendants have not shown it.  The Chamber offered Defendants the opportunity for further discovery including cross-examination and written requests regarding the expenditure, but Defendants declined.  ECF No. 168 ¶ 6.  For these

---

[7]    Fact discovery closed January 17, 2024.  ECF No. 51 at 1 ¶ 2.  Lake of the Woods made the expenditure in August 2024.  ECF No. 160 ¶ 8.  The advertisement ran August 26, 2024.  *Id.*  The Chamber's counsel received the invoice for the advertisement on September 13, 2024, and promptly produced it to Defendants.  *See* ECF No. 168 ¶¶ 4, 6.  The parties met and conferred regarding the supplementation six days later, on September 19.  *Id.* ¶ 6.

reasons, the Chamber's Motion for Leave to Supplement the Summary Judgment Record will be granted.

Defendants broadly challenge the quantity and quality of the Chamber's evidence. They argue that "[t]he only purported alleged harm suffered by any of the [Chamber's] over 6,300 members are the self-serving declarations from three entities; none of which produced any supporting evidence in discovery." ECF No. 146 at 19. And, Defendants argue, the Chamber "has failed to name any members that are fearful of prosecution outside of the three entities that submitted declarations." *Id*. at 27. It is true that the Chamber has identified a very small number of its thousands of members to establish associational standing. But it doesn't matter. As explained, the Chamber "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities*, 711 F.3d at 869 (quoting *Warth*, 422 U.S. at 511). One is enough. *Summers*, 555 U.S. at 498. Regarding Defendants' criticism of the declarations submitted by the Chamber's members, particularly Lake of the Woods, declarations are evidence, and they usually are self-serving. That's not the issue. The issue is whether the declaration testimony, considered against the entire record, establishes Lake of the Woods's Article III injury beyond dispute. On this question, Defendants do not identify evidence that contradicts or undermines the declaration testimony.[8]

---

[8]    Because the Chamber has standing through Lake of the Woods, it is not necessary to determine whether the Chamber has associational standing through any of its members other than Lake of the Woods or whether the Chamber independently has standing.

III

The Chamber moves to exclude the testimony of Defendants' expert, Sarah C. Haan, the Class of 1958 Uncas and Anne McThenia Professor of Law at the Washington and Lee University School of Law. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

The Eighth Circuit has said the *Daubert* inquiry involves a three-part test:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Academy Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 790 (8th Cir. 2024) (quoting

*Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 561 (8th Cir. 2014) (quoting *Polski v.*

*Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008))).  Several other general rules guide the Rule 702/*Daubert* analysis.  "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quotation omitted).  But an expert's opinion must be excluded if it "is so fundamentally unsupported that it can offer no assistance to the [factfinder]."  *Id.* at 929–30 (quotation omitted); *see Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006) ("Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."); *see also S&H Farm Supply, Inc. v. Bad Boy, Inc.*, 25 F.4th 541, 551 (8th Cir. 2022) ("[A] district court may exclude expert testimony if it finds that there is simply too great an analytical gap between the data and the opinion proffered." (quotation omitted)).

"The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011).  For this reason, courts "relax Daubert's application for bench trials." *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012); *see Grant ex rel. United States v. Zorn*, 107 F.4th 782, 794 (8th Cir. 2024) ("The concerns underlying *Daubert* exclusion of dubious [expert] testimony are less stringent in a case

such as this one, which involved a bench trial where the judge served as both factfinder and gatekeeper of evidence."), *reh'g and reh'g en banc denied*, 2024 WL 4456550 (8th Cir. Oct. 9, 2024), *pet. for cert. docketed* (U.S. Nov. 15, 2024).

Begin with Professor Haan's qualifications. She earned a Bachelor of Arts degree in History from Yale College. ECF No. 130-10 at 29. She earned her law degree from Columbia Law School, where she served as Articles Editor of the *Columbia Law Review*. *Id.* After serving as a litigation associate with two New York law firms from 2000 to 2008 (Davis Polk & Wardwell and Richards Kibbe & Orbe LLP), Professor Haan began her law-school teaching career as a teaching fellow at Columbia Law School. *Id.* at 36–37. After serving in that position for what looks to be one academic year, Professor Haan became an instructor of legal research and writing at Pace University Law School. *Id.* From there, she moved to the University of Idaho College of Law, where she served as Associate Professor from Fall 2012 to Spring 2017. *Id.* at 29. Professor Haan has been at Washington and Lee since then, except for a semester as a visiting professor at the University of Virginia School of Law in 2024. *Id.* Professor Haan teaches (and has taught) numerous courses at Washington and Lee, including Business Associations, Mergers & Acquisitions, Law of Money in Politics, Close Business Arrangements, Publicly Held Businesses, Advanced Topics in Corporate Law (Corporate Finance), Professional Responsibility, and Business Immersion. *Id.* Professor Haan has published numerous articles and given many presentations regarding corporate law. *See id.* at 30–36. She also has published articles and presented, though less often, regarding the First Amendment. *See id.* at 30, 32–33, 36.

Professor Haan has received fellowships and a prize for excellence in legal scholarship from Washington and Lee. *Id.* at 29.

Professor Haan offers five opinions in her report:

1. Minnesota has an urgent (and under applicable legal standards, a "compelling") interest in excluding foreign-influenced corporations from participation in democratic self-government within the state, in order to preserve the basic conception of the political community, to eliminate foreign corruption from elections, and to eliminate the appearance of foreign corruption in elections. Evidence establishes that, in recent years, foreign actors have often sought to influence American elections, and to use domestic corporations as a means of influence.

2. It would be constitutionally permissible for Minnesota to prohibit a corporation with a single foreign shareholder from making independent expenditures in elections in the state, because of the vital importance of campaign finance to the democratic process, and in recognition of the core governance role of shareholders in corporate law. Under Minnesota's Democracy for the People Act, American shareholders retain all of their rights to engage in political expression, individually or in association with each other; they simply must do so outside of organizations that are foreign-influenced.

3. Any shareholder who is eligible to submit a qualifying shareholder proposal to the corporation is in a position to influence the corporation's decision making. Under SEC Rule 14a-8, a shareholder who has held $2,000 worth of a corporation's stock for at least three years is eligible to make such a proposal. This amount of stock is far less than 1% of stock at most publicly-traded companies.

4. Today, it is widely accepted in corporate law and practice that a group of shareholders holding, in aggregate, 5% of the corporation's stock can influence the corporation's decision making if those shareholders coordinate or act in concert. A common term for this in corporate law is "wolf pack." Because of the difficulty of determining whether shareholders are acting together behind the scenes to influence management—and because coordinated influence-seeking might only become

apparent after an election-related expenditure has been made—
a prophylactic ban of the type that Minnesota has enacted is the
only way to ensure that foreign-influenced corporations will
not interfere in elections.

5.  The certification requirements in the Democracy for the People
Act are not particularly burdensome to corporations.  It is
relatively easy for both privately-held and publicly-held
corporations to obtain information about their own
shareholders, at the levels of 1% and 5% aggregate
shareholding.  Indeed, I would expect most corporations—at
least those led by competent managers—to have ready access
to this information.

*Id.* at 8–9.

Professor Haan's opinions will be excluded to the extent she offers legal argument

labeled as expert opinions, but that's it.  Expert testimony regarding legal matters is

inadmissible.  *See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d

838, 841 (8th Cir. 2003); *Williams v. Wal-Mart Stores, Inc.*, 922 F.2d 1357, 1360 (8th Cir.

1990).  This principle follows necessarily from Rule 702.  The Rule permits expert

testimony if, among other things, "the expert's scientific, technical, or other specialized

knowledge will help the trier of fact *to understand the evidence or to determine a fact in

issue*."  Fed. R. Evid. 702(a) (emphasis added).  In other words, experts testify to aid the

factfinder in understanding or determining the facts; they do not testify to aid the factfinder

in understanding or determining the law.  Professor Haan offers opinions regarding purely

legal matters.  Her opinion that Minnesota has a "compelling . . . interest in excluding

foreign-influenced corporations from participation in" Minnesota's political process

answers the first prong of the strict-scrutiny inquiry.  *See Fed. Election Comm'n v. Wis.

Right to Life, Inc.* (*WRTL*), 551 U.S. 449, 464 (2007).  Her opinion that Minnesota could

24

"constitutionally . . . prohibit a corporation with a single foreign shareholder from making independent expenditures in elections in the state" is the same thing as saying the challenged Act is constitutional (because the Act doesn't go that far).

Defendants identify no reason to second-guess these conclusions. Defendants do not address these two opinions specifically. Defendants argue that Professor Haan's status as a lawyer and law professor does not render *all* her opinions legal conclusions. ECF No. 153 at 18. Fair enough. But Professor Haan's legal expertise isn't the issue, and we're not talking about excluding all her opinions on this basis. The issue is that the two excluded opinions are purely legal in character. It wouldn't make a difference, in other words, if Professor Hahn were a non-lawyer historian or political scientist. It is true that Professor Haan tethered the excluded legal opinions to opinions regarding facts, but the admissibility of those factual opinions is a different issue. Defendants also cite cases for the proposition that an expert's opinion should not be excluded because it touches on legal issues or, in the words of Federal Rule of Evidence 704, "embraces an ultimate issue." *Id.* at 18–19. The two excluded opinions do more than that; they are pure legal conclusions.

The Chamber advances three primary arguments seeking wholesale exclusion of Professor Haan's proffered testimony, but apart from the two excluded legal conclusions, the Chamber's arguments are not convincing. First, in the Chamber's view, Professor Haan admitted during her deposition that "her expert report reflects nothing more than her legal opinions." ECF No. 123 at 2, 12–15. It is true that Professor Haan testified: "My report offers my legal opinions on the subjects addressed in the report." ECF No. 130-11 at 67:3–4. It is just as true, however, that her report includes factual opinions and descriptions of

facts regarding the presence of foreign influence on American elections, the extent to which corporate shareholders may possess influence over a corporation's political (and other) activities, and a corporation's access to information necessary to comply with the Act's certification requirements. ECF No. 130-10 at 8–9, 11–28. Because the report includes these opinions and information, it would not be reasonable to construe the one sentence cited from Professor Haan's deposition testimony as an admission that she provides only exclusion-worthy legal opinions.

Second, the Chamber argues that Professor Haan is not qualified to give her opinions. ECF No. 123 at 3, 15–18. To support this contention, the Chamber identifies a host of positions Professor Haan has not occupied and experiences she has not had. *See id.* at 15–17. The Chamber points out, for example, that Professor Haan has not held a corporate management position or submitted a shareholder proposal. ECF No. 123 at 3, 16. This approach does not persuade. Rule 702 does not require a witness to possess all (or even most) conceivably relevant "knowledge, skill, experience, training, or education" to qualify as an expert. Fed. R. Evid. 702. The question is whether the witness possesses a sufficient quantity and quality of these attributes to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The better answer is that Professor Haan clears that bar. In the abstract, experience as a law professor counts. *See ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 314–15 (D. Minn. 2011); *Midwestern Machinery v. Nw. Airlines, Inc.*, 211 F.R.D. 562, 568 (D. Minn. 2001). And Professor Haan's opinions regarding corporate speech, corporate governance, and campaign finance align comfortably with her specialized knowledge. *See* ECF No. 130 at

6 (listing areas of study as "corporate law, securities law, corporate governance, corporate history, corporate political speech, [and] corporate campaign finance"); ECF No. 130-11 at 31:17–25 (describing empirical research on shareholder proposals). The Chamber cites no authority for the proposition it seems to advocate—*i.e.*, that a law professor is not qualified to opine regarding her research topics without personal experience working in those areas. The Chamber instead cites two cases in which courts excluded expert testimony proffered by professors, *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001), and *Olson v. Macalester Coll.*, 681 F. Supp. 3d 949, 983 (D. Minn. 2023)), but in these cases the professors opined on matters outside their study areas. We don't have that here.

Finally, the Chamber argues that Professor Haan's conclusions are not based on sufficient facts or data and are speculative. ECF No. 123 at 18–23. If this case involved a potential jury trial, the Chamber's arguments would deserve closer and more specific consideration. The case does not appear to involve a jury trial. Though the Chamber demanded "a jury trial as to all such issues, claims, and matters that are so triable," Compl. ¶ 203, the Chamber seeks only equitable relief, and "section 1983 injunctive and declaratory relief is not triable by a jury," *Wilson v. Bailey*, 934 F.2d 301, 305 n.4 (11th Cir. 1991). *See Potts v. City of Lafayette*, 121 F.3d 1106, 1110–11 (7th Cir. 1997) ("[T]he application of the First Amendment to the facts of a particular case is not an issue for a jury to resolve, but is a legal question for the court to decide."). In this situation, the better approach is to consider the expert's factual opinions and, if the need be, account for the Chamber's arguments as part of the summary-judgment analysis.

IV

The parties' summary-judgment motions will be evaluated with the familiar standards in mind. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. As noted earlier as part of the Article III standing analysis, courts take a slightly modified approach where, as here, there are cross-motions for summary judgment. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). When considering the Chamber's motion, the record must be viewed in the light most favorable to Defendants, and when considering Defendants' motion, the record must be viewed in the light most favorable to the Chamber. *See id.*

V

A

To properly analyze the merits of the Chamber's First Amendment challenge, it is necessary first to determine whether the challenge is "facial" or "as applied." In most constitutional contexts, "'[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in *all* its applications,' regardless of the individual circumstances." *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024) (quoting *Bucklew v. Precythe*,

587 U.S. 119, 138 (2019)). In the First Amendment context, the law demands less. As the Supreme Court recently explained, "[t]o 'provide[] breathing room for free expression,' we have substituted a less demanding though still rigorous standard." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *United States v. Hansen*, 599 U.S. 762, 769 (2023)). "The question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Ams. for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021)).[9] An as-applied challenge, by contrast, requires a court to examine a statute based on the challenger's individual circumstances. *Veasley*, 98 F.4th at 909.

The Chamber pleaded both facial and as-applied First Amendment challenges in its Complaint. *See* Compl. ¶¶ 48, 89–91, 105–107, 148–150, 166–168 (alleging facial challenges); *id.* ¶¶ 92, 108, 151, 169 (alleging as-applied challenges). The question is which of these is in play on the parties' summary-judgment motions. The Chamber did not answer this question explicitly in its opening brief. *See generally* ECF No. 129. In its opening brief, the Board didn't either; it noted only that the Chamber brought challenges of both types. ECF No. 146 at 33. In its reply brief, the Chamber argued that it is entitled to summary judgment on its as-applied challenges, asserting "the statute is unconstitutional

---

[9]    In its opening brief, the Board argued: "A plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the Act is unconstitutional in all of its applications." ECF No. 146 at 34 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). The Board continued, arguing "the Government need only demonstrate that [the Act] is constitutional in some of its applications." *Id.* (quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024)). As explained above, this is not correct. *See Moody*, 603 U.S. at 723.

as-applied to the Chamber and its members," though it also suggested the facial-versus-as-applied distinction doesn't really matter. ECF No. 158 at 7. As with its opening brief, the Board did not address this question in its reply brief. *See generally* ECF No. 161.

I understand the motions to concern the Chamber's facial challenges. The Chamber brought this case for itself and in a representative capacity for its members. Compl. ¶ 4. There are "approximately 6,300 members." *Id.* ¶ 18. And there is every reason to think the challenged provisions might apply in different ways, or perhaps not at all, depending on which of these thousands of members we're talking about. An as-applied challenge would require information regarding the Chamber and its members' individual circumstances. *Veasley*, 98 F.4th at 909. We have that for the Chamber and for three of its members. *See* ECF No. 129 at 16–25. But the record contains no information regarding any other members' individual circumstances or the circumstances of members who might logically be grouped together. The record, in other words, tells us nothing about almost all the members the Chamber here represents. A representative suit brought on behalf of thousands of organizations in this way necessarily claims that "a substantial number of [the law's] applications are unconstitutional," *Moody*, 603 U.S. at 723 (quotation omitted), and that is the hallmark of a facial First Amendment challenge. In addition to these considerations, it seems worth pointing out that I understood the Chamber's motion for a preliminary injunction to implicate a facial challenge. In that context, the Chamber argued the challenged provisions are "facially unconstitutional." ECF No. 60 at 25. The Board acknowledged that the Chamber advanced a "facial challenge." ECF No. 88 at 2, n.3. And the motion was adjudicated as a facial challenge. *See Minn. Chamber of Com.*, 707 F.

Supp. 3d at 857 (recognizing that the relief sought by the Chamber did not require individualized proof and could be resolved in a group context). No party has suggested it was incorrect to construe the Chamber's preliminary-injunction motion that way, and the summary-judgment motions have been presented in substantially the same way. It would be odd to treat the summary-judgment motions differently.[10]

B

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "[T]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). The Supreme Court has "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 343 (2010) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination

---

[10]    In a case involving a First Amendment facial challenge, the Supreme Court explained in *Moody*, "the question . . . is whether a law's unconstitutional applications are substantial compared to its constitutional ones." 603 U.S. at 718. "To make that judgment," the Court continued, "a court must determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." *Id.* The parties' arguments fit this framework, though in an all-and-nothing way. The Chamber claims the challenged provisions are *unconstitutional* in *all* their applications; it therefore identifies no constitutional applications. Defendants take just the opposite position, arguing the statute is *constitutional* in *every* application. Like the Chamber, Defendants concede nothing, meaning they identify no unconstitutional applications.

of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *Bellotti*, 435 U.S. at 783). Although "foreign organizations operating abroad have no First Amendment rights," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020), domestic corporations are protected under the First Amendment, *Citizens United*, 558 U.S. at 342 (collecting cases). There is no support for the proposition that corporations lose their First Amendment protections merely because a foreign citizen or instrumentality purchases some share or interest, no matter how small. *Cf. id.* "American corporations . . . [are] members of the American political community." *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 290 (D.D.C. 2011), *aff'd,* 565 U.S. 1104 (2012). And no case holds that a corporation ceases to be "American" by virtue of any quantum of foreign ownership.

Section 211B.15 subdivision 4a prohibits foreign-influenced corporations from making independent expenditures and political contributions. Minnesota enforces this ban with civil and criminal penalties. *See* Minn. Stat. § 211B.15 subdivs. 6–7. "Independent expenditures are indisputably political speech," *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012), and "[l]aws that burden political speech are 'subject to strict scrutiny,'" *Citizens United*, 558 U.S. at 340 (quoting *WRTL*, 551 U.S. at 464). "Under strict scrutiny, the *Government* must prove that [section 211B.15] furthers a compelling interest and is narrowly tailored to achieve that interest." *WRTL*, 551 U.S. at 464.

In general, courts apply a different standard of review when political contributions are regulated. "[R]estrictions on political contributions have been treated as merely

'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003).  "While contributions may result in political expression if spent by a candidate or an association . . . , the transformation of contributions into political debate involves speech by someone other than the contributor." *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (per curiam).  Though *Citizens United* "cast[] doubt on *Beaumont*, leaving its precedential value on shaky ground," *Swanson*, 692 F.3d at 879 n.12, the Supreme Court has (so far) declined to reconsider the distinction between contributions and expenditures, *see McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 199 (2014) ("[W]e see no need in this case to revisit *Buckley*'s distinction between contributions and expenditures and the corollary distinction in the applicable standards of review."); *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 305 (2022).  Because the Supreme Court has not overruled its earlier precedent, exacting scrutiny remains the standard of review when political contributions are regulated.  *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).  Under exacting scrutiny, "the challenged law must advance a sufficiently important state interest and employ means closely drawn to avoid unnecessary abridgment of First Amendment freedoms." *Free & Fair Election Fund v. Mo. Ethics Comm'n*, 903 F.3d 759, 763 (8th Cir. 2018).  As with strict scrutiny, the State must make this showing.  *Buckley*, 424 U.S. at 25; *see Students for Life Action v. Jackley*, --- F. Supp. 3d ---, No. 3:23-CV-03010-RAL, 2024 WL 3950706, at *12 (D.S.D. Aug. 27, 2024) (quoting *Jones*, 947 F.3d at 1105).  Exacting scrutiny "is a tough standard to meet." *Miller v. Ziegler*, 109 F.4th 1045, 1049 (8th Cir. 2024).

The parties push back against this dual framework to make matters easier for themselves. The Chamber argues strict scrutiny applies, not just to the statute's independent-expenditure prohibitions, but also to the statute's prohibitions on political contributions. ECF No. 158 at 3–4. In the Chamber's understanding, the line between strict and exacting scrutiny is not determined by the character of the spend—*i.e.*, independent expenditures versus contributions. Instead, the Chamber says, it is determined by the limitation imposed by the challenged statute: *bans* trigger strict scrutiny; *limits or restrictions* trigger exacting scrutiny. *See id.* As support, the Chamber cites *Federal Election Commission v. Beaumont*, 539 U.S. 146, 161 (2003). *Beaumont* does not support this argument; it rejects it. *In Beaumont*, the aggrieved party, NCRL, mounted a First Amendment challenge to a federal statute that barred non-profit corporations from contributing directly to candidates for federal office. *Id.* at 149–50. NCRL "argue[d] that application of the ban on its contributions should be subject to a strict level of scrutiny, on the ground that [the challenged statute] does not merely limit contributions, but bans them on the basis of their source." *Id.* at 161. This is the same argument the Chamber advances. The Supreme Court rejected the contention, explaining that the level of scrutiny "turns on the nature of the activity regulated." *Id.* at 162. The court explained: "It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself." *Id.* Fidelity to binding Supreme Court precedent requires that this same approach be applied here.

On the flip side, Defendants argue that exacting scrutiny should apply to everything, including the statute's regulation of independent expenditures. As support for this contention, Defendants cite *Foley v. Connelie*, 435 U.S. 291, 295–96 (1978). ECF No. 146 at 33. In Defendants' understanding, *Foley* stands for the proposition that, when challenged, statutes regulating non-citizens' participation in a state's democratic political institutions or in activities that affect a political community's members are subject to exacting scrutiny. *Id.* The case does not support that rule or the application of exacting scrutiny to the challenged provisions' regulation of independent expenditures. *Foley* was not a First Amendment case. It did not concern independent-expenditure regulations. The case addressed a Fourteenth Amendment Equal Protection Clause challenge to a New York statute that limited state police appointments to citizens. *Foley*, 435 U.S. at 292. Nor did *Foley* apply exacting scrutiny. The Supreme Court applied rational-basis review. *Id.* at 296 ("The State need only justify its classification by a showing of some rational relationship between the interest sought to be protected and the limiting classification."). And the Court held that the statute survived this lenient standard, explaining that, because "the police function is one where citizenship bears a rational relationship to the special demands of the position . . . [a] State may, . . . consonant with the Constitution, confine the importance of this important public responsibility to citizens of the United States." *Id.* at 300. It is difficult to understand how *Foley*'s application of rational-basis review to an equal-protection challenge might justify determining that exacting review applies to the Chamber's free-speech challenges.

C

1

Begin with the application of strict scrutiny to the challenged prohibitions on independent expenditures.  Defendants argue "Minnesota has a compelling interest in protecting its democratic self-governance [from] foreign influence."  ECF No. 146 at 34. For support, Defendants rely on *Bluman*.  In *Bluman*, foreign citizens who resided and worked in the United States on temporary work visas challenged the constitutionality of 2 U.S.C. § 441e(a), a provision of the Bipartisan Campaign Reform Act.  800 F. Supp. 2d at 282–83.  Section 441e(a) prohibits foreign citizens from donating money to candidates in federal and state elections.  *Id.*  The court rejected the First Amendment challenge, reasoning "[t]he United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process."  *Id.* at 288.  *Bluman*'s rationale expressly extends to foreign corporations, although the court declined "to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis."  *Id.* at 292 n.4.  The Supreme Court's summary affirmance renders *Bluman* binding precedent, *Hicks v. Miranda*, 422 U.S. 332, 344 (1975), although "the precedential effect of a summary affirmance can extend no farther than the precise issues presented and necessarily decided by those actions," *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182 (1979) (quotation omitted).

36

*Bluman* teaches that Minnesota has a compelling interest to limit the participation of foreign citizens and foreign corporations in activities of democratic self-government, including spending money to expressly advocate for or against a political candidate.  *See Bluman*, 800 F. Supp. 2d at 289–90 ("Spending money to contribute to a candidate or party or to expressly advocate for or against the election of a political candidate is participating in the process of democratic self-government.").  It follows logically that this compelling interest extends to preventing foreign nationals—including foreign shareholders of domestic corporations—from controlling or influencing a corporation's election expenditures.

Defendants argue that "*Bluman* calls for a broader interest."  ECF No. 146 at 37. Defendants say Minnesota's "right extends to preventing foreign money in elections (directly or indirectly through corporations) to protect democratic self-governance from foreign influence." *Id.* at 38.  I do not understand this argument.  Perhaps the argument is an opaque way of suggesting that Minnesota has a compelling interest in preventing *all* corporations—with or without foreign shareholders—from participating in the activities of Minnesota's democratic self-government to guard against the possibility of foreign influence.  If this understanding is correct, accepting the contention would contravene *Citizens United*.  Perhaps the argument is better understood as saying that Minnesota has a compelling interest in preventing corporations with any foreign ownership from participating in the activities of Minnesota's democratic self-government.  If this understanding is correct, the argument must still be rejected.  Although *Citizens United* declined to "reach the question whether the Government has a compelling interest in

preventing foreign individuals or associations from influencing our Nation's political process," 558 U.S. at 362, Justice Kennedy observed § 441b would be overbroad (even if the interest were compelling) because § 441b was "not limited to corporations or associations that were created in foreign countries or funded predominately by foreign shareholders," *id.*  In other words, Justice Kennedy suggested there *could* be a compelling foreign-influence interest to ban the independent expenditures of corporations "funded predominately by foreign shareholders."  Any amount of foreign ownership is a long way from "predominately."  And because *Bluman* concerned individuals, the court had "no occasion to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis."  *Bluman*, 800 F. Supp. 2d at 292 n.4.  As *Bluman* explained, "American corporations . . . [are] members of the American political community."  *Id.* at 290.  And although *Bluman* found § 441e(a)'s indirect prohibition constitutional, it does not follow that a foreign shareholder indirectly participates in our national political process simply by possessing shares.

Defendants argue separately that Minnesota possesses "a compelling interest in protecting democratic self-government from the *appearance* of foreign influence," ECF No. 146 at 38 (emphasis added), but this contention is not convincing.  Defendants cite no case reaching this conclusion.  The one court to have considered the argument rejected it.  *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 721 F. Supp. 3d 31, 51–52 (D. Me. 2024).  In Defendants' view, the same considerations that led the Supreme Court to decide that preventing the appearance of *quid pro quo* corruption is a compelling government interest, *see McCutcheon*, 572 U.S. at 207, support the

conclusion that preventing the appearance of foreign influence is too, ECF No. 146 at 38–40. This comparison is inapt. The Supreme Court has confined its recognition of this appearance interest to laws limiting "'individual financial contributions' to particular candidates." *McCutcheon*, 572 U.S. at 207. We're not talking about that kind of limitation here. The challenged statute establishes no limits on contributions to candidates. It does not establish expenditure or contribution limits at all. It prohibits a corporation from expending or contributing any amount if the corporation meets the statute's foreign-influenced definition. This type of restriction does not trigger *quid pro quo* corruption concerns. As the Supreme Court explained: "Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption." *Id.* at 208. It is difficult to understand how foreign influence is inherently pernicious in a way that resembles "'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions' to particular candidates." *Id.* at 207 (quoting *Buckley*, 424 U.S. at 27). And it is difficult to identify the boundaries associated with a government interest in preventing the mere appearance of foreign influence in the democratic process. For example, could the state ban the publication of pro- or anti-candidate editorials authored by noncitizens? Could the state ban or restrict political rallies sponsored or attended by noncitizens? Recognizing an "appearance" interest makes these questions (and many others like them) reasonable to ask. *See Citizens United*, 558 U.S. at 359 ("Reliance on a generic favoritism or influence theory . . . is at odds with standard First Amendment analyses because it is unbounded and

susceptible to no limiting principle." (quotation omitted)).  Minnesota does not possess a compelling interest in protecting democratic self-government from the appearance of foreign influence.

2

"A narrowly tailored [statute] is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (collecting cases).  "[T]he seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as *precisely* tailored as possible." *Id.*  The challenged provisions of section 211B.15 are not narrowly tailored to achieve Minnesota's compelling foreign-influence interest.

(i) The first step is considering how the statute advances Minnesota's stated compelling interest—preventing foreign influence in its elections. *See id.*  To be necessary and advance the stated interest, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." *United States v. Alvarez*, 567 U.S. 709, 725 (2012).  To this end, courts consider evidence of the harm the Government seeks to prevent.  *McCutcheon*, 572 U.S. at 219–21; *Eu*, 489 U.S. at 226–29; *Cruz*, 596 U.S. at 306–08; *281 Care Comm. v. Arneson*, 766 F.3d 774, 790–91 (8th Cir. 2014).  Defendants "must do more than simply 'posit the existence of the disease sought to be cured.'"  *Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 618

(1996) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)). Courts "have never accepted mere conjecture as adequate to carry a First Amendment burden." *Arneson*, 766 F.3d at 790 (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000)). It is not enough, in other words, to explain how foreign minority shareholders *could* exercise influence over corporations.

Defendants have not identified trial-worthy evidence showing that the challenged provisions advance Minnesota's compelling interest in the relevant sense. Defendants admit they have no evidence of a corporation that has been influenced by a minority foreign investor to make an expenditure or contribution in Minnesota. In her deposition, Professor Haan was asked if she had "any evidence that foreign-influenced corporations are currently interfering in any elections in Minnesota." Professor Haan testified: "I don't have any evidence nor would I expect to have any evidence because if this is going on, and it probably is, it would be completely not transparent. It would be secret. We would not know about it." ECF No. 130-11 at 194:11–18. The evidence Defendants rely on shows only that shareholders *may* or *could* exert formal and informal influence over a corporation's affairs. *See* ECF No. 146 at 4–9. For example, Defendants point out that "[a]ny shareholder owning at least $2,000 of stock for three years can present a shareholder proposal," and that shareholders who submit shareholder proposals "can exert influence." *Id.* at 7. Defendants do not identify a single instance, however, of a foreign shareholder using this process to influence a corporation to make a political expenditure or contribution. *See id.* at 6–9. Defendants provide no evidence that would permit quantifying the risk they identify in any reasonable, non-speculative way.

41

Defendants identify several instances in which they claim foreign actors sought to influence American political matters, but these do not show a causal link between the challenged provisions and the injury to be prevented. For example, Defendants assert: "Foreign-influenced companies contributed over $163 million to committees in Colorado, Michigan, Minnesota, Montana, New York, and Washington between the start of the two-year 2018 election cycle and the end of 2022." ECF No. 146 at 9 (quoting ECF No. 130-10 at 15). This assertion adopts the challenged statute's definition of foreign-influenced corporations. *See* ECF No. 130–10 at 15. Showing the statute was violated on its terms says nothing about whether the statute's prohibitions advance Minnesota's compelling interest in preventing foreign shareholders of domestic corporations from controlling or influencing a corporation's election expenditures. The argument puts the cart before the horse. Defendants identify examples of corporations Defendants say were "controlled" or connected to foreign citizens or businesses when the corporations made political expenditures. *See* ECF No. 146 at 9–10. These include Airbnb, American Pacific International Capital (or "APIC"), and American-based subsidiaries of foreign companies. *Id.* For most of these, Defendants do not provide information essential to determining whether the foreign actors themselves exercised control over the corporations' election-related expenditures. *See id.* For APIC, Defendants note that a federal investigation determined the contribution "had been made at the behest of . . . two Chinese citizens who owned a majority interest in APIC's parent company." ECF No. 130-10 at 16. There is no realistic connection between these events and the challenged provisions; it seems akin to identifying a motorist who drove 100 miles per hour in a 55-mile-per-hour zone in

California to justify imposing a 25-mile-per-hour speed limit statewide in Minnesota. Finally, Defendants describe several examples of money laundering and bribes that have no evident connection to the challenged provisions. It is difficult to understand, for example, how any part of section 211B.15 might have applied to the conviction-prompting activities of U.S. Senator Robert Menendez or his wife, Nadine Menendez, had those activities (or activities like them) occurred in Minnesota. *See* ECF No. 146 at 10–11. As another example, Defendants do not explain how the challenged provisions relate to Russia, China, or Iran's reported ongoing campaigns to undermine America's democratic institutions. *Id.* at 10. Defendants do not suggest these countries are engaging in their campaigns by gaining influence through ownership in American corporations. There is no evidence of that.

(ii) A statute may fail narrow tailoring for being overinclusive. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011). A statute is overinclusive when it "sweep[s] too broadly," infringing further on First Amendment rights than is necessary to advance the compelling interest. *Wersal v. Sexton*, 674 F.3d 1010, 1026 (8th Cir. 2012); *White*, 416 F.3d at 751.

The challenged provisions are overinclusive as a matter of law. Section 211B.15 classifies a corporation as "foreign-influenced" when a single shareholder holds a one-percent interest, when multiple shareholders collectively hold a five-percent interest, or when "a foreign investor participates directly or indirectly in the corporation's decision-making process with respect to the corporation's political activities in the United States." Minn. Stat. § 211B.15, subdiv. (d)(1)–(3). Again, corporations with foreign

shareholders retain the First Amendment rights identified by *Citizens United*. Section 211B.15's prohibition on corporate independent expenditures, backed by criminal penalties, infringes on those corporations' First Amendment rights. *Citizens United*, 558 U.S. at 339. As the Chamber pointed out, a domestic corporation with a foreign shareholder holding one percent of its shares is banned from speaking, even if that foreign national is a passive investor who exercises no influence or control over the corporation's election expenditures, has no voting rights, or recuses from corporate decisions. ECF No. 129 at 35. Defendants do not dispute these points. And *Citizens United*, albeit in dicta, suggested that an expenditure and contribution ban "not limited to corporations or associations that were created in foreign countries or funded *predominately* by foreign shareholders" would be overbroad. *Citizens United*, 558 U.S. at 362 (emphasis added). The challenged statute's foreign-ownership thresholds are a long way from "predominate." The prohibition on foreign investors "participat[ing] directly or indirectly" in the corporation's political activities seems virtually boundless. Minn. Stat. § 211B.15, subdiv. 1(d)(3). The statute does not define "directly" or "indirectly." Given its common understanding, the more expansive term, "indirectly," would apply to activities that are only "obliquely or circuitously" connected to a corporation's decisions regarding political engagement. *Indirect*, *Merriam-Webster's Unabridged Dictionary*, https://unabridged .merriam-webster.com/unabridged/indirect (last visited Feb. 6, 2025) (defining "indirect" as "not direct: such as . . . deviating from a direct line or course **:** not proceeding straight from one point to another **:** proceeding obliquely or circuitously . . . not directly aimed at or achieved"); *see also Indirectly*, *Cambridge Dictionary*, https://dictionary.cambridge

44

.org/us/dictionary/english/indirectly (last visited Feb. 6, 2025) (defining "indirectly" as "in a way that is not direct or not connected in a simple way"). The provision's national coverage—whether that coverage is construed to reach the location of the corporation's political activities or the location of the investor's direct or indirect participation—adds significantly to the statute's overinclusiveness.[11]

Defendants argue that "the Democracy for the People Act affects few companies," ECF No. 146 at 43, but the record indisputably belies this assertion. The number of corporations that would be affected by the statute is significant. The Center for American Progress, an advocate for the one- and five-percent thresholds, explained: "Of 111 corporations studied among the S&P 500 stock index, 74 percent exceeded the 1 percent threshold for a single foreign owner and 98 percent exceeded the 5 percent aggregate foreign ownership threshold. Among smaller publicly traded corporations, only 28 percent exceeded the 5 percent aggregate foreign ownership threshold." Michael Sozan, *Fact Sheet: Ending Foreign-Influenced Corporate Spending in U.S. Elections*, Ctr. for Am. Progress (Nov. 21, 2019), tinyurl.com/4pcxhwdr (cited in ECF No. 86 at 17). Professor Haan cited comparable data in her report, including an Opensecrets.org investigative report. ECF No. 130-10 at 15 (citing Jimmy Cloutier et al., *Foreign-Influenced Corporate Money in State Elections*, OpenSecrets, https://www.opensecrets.org/news/reports/foreign-influenced-corporate-money [https://perma.cc/DZJ6-5FYT] ("Opensecrets.org Report")). The report examined corporate contributions in six states, including Minnesota,

---

[11]    For these reasons, section 211B.15, subdivision 1(d)(3) cannot be severed, as Defendants request.

"where the contributors are companies that have met the criteria for being foreign-influenced corporations under" section 211B.15. Opensecrets.org Report. The report found: "At least 800 companies with over 5% aggregate foreign ownership or an individual foreign owner over 1% at any point during the 2022 election cycle collectively gave those committees tens of millions of dollars across the six states." *Id.* The report's authors described their analysis as "a conservative estimate of corporate political contributions by foreign-influenced corporations" and explained that "these numbers should be understood as a floor and not a ceiling on the amount of corporate political spending by foreign-influenced companies in these states." *Id.*

*Citizens United* cautions that the loss of corporations' political speech, and consequently their First Amendment rights, must not to be taken lightly. *See* 558 U.S. at 354–56. Minnesota cannot create a "categorical ban[] on speech that [is] asymmetrical to" its stated compelling interest. *Id.* at 361. Because Defendants have not identified evidence that minority foreign shareholders exercise influence or control over corporations' political expenditures, the challenged provisions of section 211B.15 sweep too broadly as a matter of law.

(iii) "[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (quoting *Brown*, 564 U.S. at 802). "Underinclusiveness can also reveal that a law does not actually advance a compelling interest." *Id.* at 449. A "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable

damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)).

The challenged provisions are underinclusive. Section 211B.15 subdivision 4a regulates the political contributions and independent expenditures of corporations and limited liability companies. It does not regulate labor unions, partnerships, nonprofits, cooperatives, or other business organizations and associations foreign citizens might just as easily use to participate in Minnesota elections. *See Bellotti*, 435 U.S. at 793 (noting that the exclusion of "trusts, labor unions, and other associations undermines the plausibility of the State's purported concern").

Defendants do not address the statute's omission of partnerships, cooperatives, or other business organizations. *See* ECF No. 146 at 45–46. Defendants argue only that labor unions and nonprofit organizations are not susceptible to member or participant influence, and they cite *Buckley* for the proposition that "a statute is not invalid under the Constitution because it might have gone farther than it did." *Id.* at 45 (citing *Buckley*, 424 U.S. at 105 (quotation omitted)). Defendants cite no evidence, however, showing that labor unions and nonprofits are not susceptible to influence or perhaps are less susceptible to influence than corporations. *See id.* Nor do they cite evidence showing that minority foreign shareholders controlling or exercising influence over domestic corporations' political expenditures poses a more serious risk of foreign influence in Minnesota's elections than foreign influence over other organizations.

Section 211B.15's definition of "foreign investor" also shows the statute is underinclusive. Section 211B.15 subdivision 1(e)(2)(iv) defines a foreign investor as an

47

"individual outside of the United States."  A foreign-influenced corporation's status is tested when the corporation makes a political expenditure.  *See* Minn. Stat. § 211B.15 subdiv. 4b.  Under the plain language of the statute, then, if one foreign citizen owned a fifty percent stake in a domestic corporation, that corporation could make expenditures in Minnesota elections while that foreign citizen vacationed in the United States but not while that foreign citizen resided abroad.  A limited-liability company owned by migrant workers could make political expenditures in local elections while those members are in the United States, but not while a member traveled overseas to visit family.  (If the migrant workers formed a partnership or cooperative, their political contributions would always be allowed by section 211B.15, regardless of any owner's presence in the United States.)  Because the statute tests the status of the corporation at the time expenditures are made, a corporation could make a political expenditure if a foreign national sold her shares the day before a political expenditure regardless of what actual influence that shareholder exerted on the organization's political activities in the days preceding the expenditure.  Moreover, although section 211B.15 prohibits foreign investors from "participat[ing] directly or indirectly in the corporation's decision-making process," Minn. Stat. § 211B.15 subdiv. 1(d)(3), the challenged provisions would not forbid non-investor foreign board members to direct a corporation's election expenditures.  Taken collectively, the

48

challenged provisions thus "leave[] appreciable damage to [Minnesota's] supposedly vital

interest unprohibited." *Reed*, 576 U.S. at 172 (quotation omitted).[12]

(iv) Defendants do not show that section 211B.15's ban on political speech is "the

least restrictive means" for addressing its compelling interest. *United States v. Playboy

Ent. Grp., Inc.*, 529 U.S. 803, 827 (2000). A Federal Election Commission regulation

prohibits foreign nationals from indirectly influencing federal, state, and local elections as

follows:

> A foreign national shall not direct, dictate, control, or directly
> or indirectly participate in the decision-making process of any
> person, such as a corporation, labor organization, political
> committee, or political organization with regard to such
> person's Federal or non-Federal election-related activities,
> such as decisions concerning the making of contributions,
> donations, expenditures, or disbursements in connection with
> elections for any Federal, State, or local office or decisions
> concerning the administration of a political committee.

11 C.F.R. § 110.20(i) (2025).

Defendants argue the federal regulation is ineffective, ECF No. 146 at 46–47, but it

is hard to see how based on the evidence Defendants cite. Investigations generally begin

when a member of the public files a complaint with the Commission. ECF No. 149-1 at

16:12–17. The Commission also conducts audits and uses "information gained from its

own files and observations," both of which sometimes lead to investigations. *Id.* at 16:18–

---

[12] Defendants' response to this series of physical-presence-related concerns is to suggest "the statute appears to be geared towards where a person lives." ECF No. 146 at 46. This is reasonable, Defendants say, "because that is information that the company can generally access." *Id.* Nowhere, however, does section 211B.15 specify that "outside of the United States" means a non-citizen who does not reside or "live" in the United States. If the legislature intended that meaning, it would have been easy to say.

17:2.  The Chamber's rebuttal expert, former commissioner Bradley Smith, *see* ECF No. 130-12 at 4, testified that about eighty percent of investigations begin with a complaint, and most of the rest begin with audits.  ECF No. 149-1 at 17:12–15.  Defendants assert "there is a startling lack of knowledge of campaign finance law among members of the public."  ECF No. 146 at 46.  But its record citations do not support this statement.  *See* ECF No. 149-1 at 41:1–6 (stating that most campaign-finance violations are inadvertent but not discussing the relationship between public knowledge of campaign finance and the FEC's complaint process).  Defendants also cite evidence that foreign shareholders who are also board members would be involved in corporate political spending.  ECF No. 146 at 46–47.  This evidence does not show, however, that foreign minority shareholders possess influence because they are shareholders.  And the law already prohibits foreign board members from participating in decisions over corporate political expenditures or contributions.  *See* 11 C.F.R. § 110.20(i) (2025); Fed. Election Comm'n, Advisory Opinion 2006-15 (May 19, 2006) [ECF No. 130-13] at 3 (allowing American corporations with a foreign board member to make political contributions "provided that . . . all decisions concerning donations and disbursements will be made by individuals who are U.S. citizens or permanent residents").  The Board fails to show that this regulation, focused on the source of the foreign influence rather than on corporations' political speech, is insufficient to advance Minnesota's compelling interest.[13]

---

[13]    Defendants do not explain why disclaimer or disclosure requirements would not be satisfactory.  *See Citizens United*, 558 U.S. at 366 ("Disclaimer and disclosure requirements may burden the ability to speak, but . . . do not prevent anyone from

D

Exacting scrutiny, as discussed earlier, remains the standard of review when political contributions are regulated. As a reminder, under exacting scrutiny, "the challenged law must advance a sufficiently important state interest and employ means closely drawn to avoid unnecessary abridgment of First Amendment freedoms." *Free & Fair Election Fund*, 903 F.3d at 763. The State must make this showing, *Buckley*, 424 U.S. at 25, and "[i]t is a tough standard to meet," *Miller*, 109 F.4th at 1049.

The parties give no reason to think the challenged provisions, to the extent they address political contributions, survive exacting scrutiny. In its opening brief, the Board argued only that the challenged provisions survive exacting scrutiny because: "Here, there remain several different ways for citizens to participate in elections. And the vast majority of companies are not affected by the Act." ECF No. 146 at 47. These points did not save the statute under strict scrutiny, and the Board does not explain why the outcome should be different under exacting scrutiny. The Chamber did not apply exacting scrutiny in its opening brief, leading the Board to argue in its reply brief that the Chamber had "waived" any argument under this standard. I do not agree. It is true that a litigant's complete failure to respond to an opposing party's argument is often construed as a waiver. *See Doll v. Trellis Walnut Towers LLC*, No. 24-cv-136 (ECT/TNL), 2024 WL 4355084, at *3 (D. Minn. Sept. 30, 2024) (collecting cases). Here, however, the Board's argument just

---

speaking." (quotation omitted)). Nor do they explain why a certification requirement would not be satisfactory. *See* Wash. Admin. Code § 390-16-335 (2025) (requiring certifications that foreign nationals were not involved in making decisions about political contributions).

repeated points it made in connection with strict scrutiny to which the Chamber had already responded. Given the closeness between strict and exacting scrutiny, *Dakotans for Health*, 52 F.4th at 391 (describing exacting scrutiny as "just short of strict scrutiny"), the parties can't be faulted for not providing extensive analysis of this question.

Regardless, I conclude the outcome does not change under exacting scrutiny. A specific explanation of the closely-drawn standard appears in *Bonta*. There, the Court explained: "Where exacting scrutiny applies, the challenged requirement must be narrowly tailored to the interest in promotes, even if it is not the least restrictive means of achieving that end." 594 U.S. at 609–10. Similarly, the Court noted in *McCutcheon* that exacting scrutiny "require[s] a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *McCutcheon*, 572 U.S. at 218 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)) (cleaned up). I understand these statements to mean that the "closely drawn" analysis is essentially narrow tailoring without the "least restrictive" prong. That would leave the three other prongs: the statute must actually advance the government's interest, it must not be overinclusive, and it must not be underinclusive. Cases support this understanding. In *McCutcheon*, for example, the Supreme Court looked for evidence that a contribution cap actually advanced the stated interest. *Id.* at 210. The Eighth Circuit applied the same reasoning in *Jones*, 947 F.3d at 1105–06. And a statute is not closely drawn if it "disproportionately burdens numerous First Amendment interests." *Randall v. Sorrell*, 548 U.S. 230, 262 (2006); *see Dakotans*

*for Health*, 52 F.4th at 391 (finding a "dramatic mismatch" between governmental interest and regulation); *Wagner v. Fed. Election Comm'n*, 793 F.3d 1, 21–24 (D.C. Cir. 2015) (analyzing a contribution ban for overinclusiveness); *Schickel v. Dilger*, 925 F.3d 858, 875 (6th Cir. 2019) (analyzing statute for underinclusiveness); *Mariani v. United States*, 212 F.3d 761, 765 (3d Cir. 2000) (same).  If this understanding is correct, the challenged statute's contribution regulations fall under exacting scrutiny for the same reasons they fell under strict scrutiny.

VI

The Chamber's Supremacy Clause claims were addressed and rejected in the order entering the preliminary injunction.  *Minn. Chamber of Com.*, 707 F. Supp. 3d at 864–68. The preemption issues were—and are—purely legal.  *See id.*  Here, the parties identify no evidence that might justify revisiting those claims.  *See* ECF No. 129 at 39–45; ECF No. 146 at 29–32.  Summary judgment will therefore be entered in Defendants' favor on these claims.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Plaintiff's Motion for Leave to Supplement the Summary Judgment Record [ECF No. 166] is **GRANTED**.

2.    Plaintiff's Motion to Exclude the Opinions of Professor Sarah Haan [ECF No. 122] is **GRANTED IN PART** and **DENIED IN PART** as explained in Part III, above.

3.    Defendants' Motion for Summary Judgment [ECF No. 144] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** with respect to Plaintiff's Supremacy Clause claims in Counts III, IV, VII, and VIII.  The motion is **DENIED** in all other respects.

4.    Plaintiff's Motion for Summary Judgment [ECF No. 128] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** with respect to Plaintiff's First Amendment claims in Counts I, II, V, and VI.  The motion is **DENIED** in all other respects.

5.    Defendant Choi, in his official capacity, is permanently enjoined from enforcing the "foreign-influenced corporation" provisions in amended Minnesota Statutes section 211B.15, those provisions being subdivisions 1(b), 1(d), 1(e), 4a, 4b, the reference to "4a" in subdivision 7b(2), and any related rules and regulations.

6.    Defendant Board members, in their official capacities, are permanently enjoined from enforcing the "foreign-influenced corporation" provisions in amended

Minnesota Statutes section 211B.15, those provisions being subdivisions 1(b), 1(d), 1(e), 4a, 4b, the reference to "4a" in subdivision 7b(2), and any related rules and regulations.

7.    Defendant Board members, in their official capacities, are permanently enjoined from pursuing civil or criminal liability for any alleged violations of the "foreign-influenced corporation" provisions in amended Minnesota Statutes section 211B.15, those provisions being subdivisions 1(b), 1(d), 1(e), 4a, 4b, the reference to "4a" in subdivision 7b(2), and any related rules and regulations.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 7, 2025                          s/ Eric C. Tostrud
                                                 Eric C. Tostrud
                                                 United States District Court